**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| BEN F. BEARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 2:06-653-WHA |
| | ) |
| LEHMAN BROTHERS HOLDINGS, INC., | ) |
| d/b/a LEHMAN CAPITAL, PETER R. | ) |
| KERN, OAK ASSET MANAGEMENT, LLC, | ) |
| MIDLAND LOAN SERVICES, INC., | ) |
| JOLLY ROGER, LLC; JOLLY ROGER I, INC., | ) |
| CAPITAL SEVEN RECOVERY, LLC, | ) |
| PETER FAHEY, LARRY W. CARLSON, | ) |
| | ) |
| Defendants. | ) |

**<u>MOTION TO TRANSFER OR REASSIGN CASE</u>**

COMES NOW the Plaintiff, Ben F. Beard, and respectfully requests the Court to transfer

or reassign this case to Judge Myron H. Thompson.  In support thereof, the Plaintiff would show

the Court the following:

1.       On June 14, 2006, the Plaintiff filed its Complaint against Lehman Brothers

Holdings, Inc., d/b/a Lehman Capital, Peter R. Kern, Oak Asset Management, LLC, Midland

Loan Services, Inc., Jolly Roger, LLC, Jolly Roger I, Inc., Capital Seven Recovery, LLC, Peter

Fahey, and Larry W. Carlson in the Circuit Court of Pike County, Alabama, alleging counts for

fraudulent misrepresentation, suppression, deceit, fraudulent deceit, fraudulent misrepresentation,

and conspiracy.  The case was removed from the Circuit Court of Pike County to the United

States District Court for the Middle District of Alabama on July 21, 2006.  For the Court's

convenience, a copy of the Complaint is attached hereto as Exhibit "A," and is briefly

summarized below.

2.     As stated in the Complaint, the history of this case revolves around the conduct of the Defendants with regard to certain loans made to ProMarketing, LLC ("ProMarketing"), a limited liability company formed under the laws of Alabama for the purpose of, among other things, acquiring, owning and managing convenience stores.  As also stated in the Complaint, in or about early 2000, representatives for ProMarketing including Beard and Sam J. Carroll, III, negotiated with Lehman Brothers Holdings, Inc., d/b/a Lehman Capital ("Lehman Brothers") with regard to the financing of certain convenience stores located in Alabama, Florida and Georgia.  On March 24, 2000, Lehman Brothers agreed to loan to ProMarketing the sum of Twenty-five Million Dollars ($25,000,000.00) for the financing of the above-referenced convenience stores, with the debt guaranteed by Sam J. Carroll, III, Ben F. Beard, James W. Jackson, Jr., and Robert Warren Jackson ("the Carroll and Beard Guaranties"), and via a separate guaranty executed by BFB, LLC ("the BFB Guaranties"), all of which were conditional recourse guaranties.  After the financial impact of September 11, 2001 and other economic shifts significantly decimated much of the convenience store industry, Beard contacted representatives of Lehman Brothers to discuss the financial difficulties facing ProMarketing and the possibility of some forebearance or refinance agreement.  Beard continued these negotiations with Lehman Brothers to maintain the viability of the loans and to service the Lehman Brothers debt, along with maintaining the viability of the collateralized convenience stores based upon the various representations made by Peter Kern ("Kern") and others acting as employees, agents or representatives of Lehman Brothers, as better described in the Complaint.  Primarily, however, these discussions were based upon a separate and different opportunity wherein Beard would, via

a new entity, be able to participate in the refinance or purchase of the collateralized stores as the result of a demand by Lehman upon AIG to pay off or assume the debt pursuant to an environmental insurance policy.  In or about June of 2004, Beard received correspondence indicating that an unknown entity known as Jolly Roger, LLC ("Jolly Roger") or Jolly Roger I, Inc. ("Jolly Roger I"), claimed to have obtained ownership of the loans via an assignment from Lehman Brothers.  Beard later learned that Capital Seven Recovery, LLC ("Capital Seven") claimed some interest in the ProMarketing loans, as well.  Upon information and belief, Jolly Roger, Jolly Roger I and Capital Seven are owned and/or controlled by Defendants Peter Fahey and Larry W. Carlson.

      3.     Judge Thompson previously presided over the case of *Sam J. Carroll, III, and GOCO Acquisition Corporation v. German American Capital Corporation, et al.* ("the *Carroll* case"), bearing a case number of 01-T-981-S, which was filed in the Circuit Court of Dale County, Alabama, and then removed to the United States District Court for the Middle District of Alabama, Southern Division, on August 9, 2001.  A copy of the Complaint, as amended, is attached hereto as Exhibit "B," for the Court's convenience.  The Complaint, as amended, included counts for fraud, misrepresentation, deceit, fraudulent decent, and suppression, breach of contract, unconscienability, declaratory judgment, breach of duty of good faith and fair dealings, breach of fiduciary duty and good faith, intentional interference with business relations, waiver of contract provisions, conspiracy and conversion.  The basic subject matter of that case also included certain tortious conduct alleged against the defendants with regard to the financing of convenience stores in Alabama and Florida that contain issues of law and fact that are common to the present case.  Notably, the allegations in that litigation revolved completely

around the conduct of two employees of the defendants, Peter Fahey and Larry W. Carlson, the exact same individuals who are defendants in the present case. Even a cursory review of the present case and the *Carroll* case clearly show that the issues, conduct, and actors in the two cases are alarmingly similar and closely intertwined. As reflected in the Memorandum Decision entered in *Carroll* (Exhibit "C"), the conduct of these individuals is glaringly consistent even though their corporate name has changed.

4.      In fact, by their own conduct, the Defendants have implicitly admitted that the present case and the *Carroll* case are inherently tied together. On Monday, July 24, 2006, representatives of Jolly Roger arrived unannounced at the corporate headquarters of ProMarketing in Troy, Alabama, allegedly under the guise of performing an audit of the ProMarketing financial and corporate records. This intrusion occurred while counsel for both Beard and ProMarketing were attempting to communicate with counsel for Jolly Roger, to no avail, and was undeniably intended to be a guerilla attack to catch Beard off guard and unprepared. Importantly, for the purpose of this Motion, the Jolly Rogers representatives were demanding, among other things, copies of all documents related to GOCO Acquisition Company and other items related to the *Carroll* case. Without question, the Jolly Roger Defendants believe the issues in the present case and the *Carroll* case are interrelated.

5.      The Plaintiff contends that because Judge Thompson is intimately familiar with the issues of fact and law in the *Carroll* case, judicial efficiency and economy would best be served if the present case were transferred or assigned to him. Further, the Plaintiff would show the Court that the transfer of this case to Judge Thompson would ensure the practical administration of the case based upon his knowledge of the common questions of law, facts, and

other virtually identical issues as a result of his presiding over the *Carroll* case.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff requests the Court to transfer or assign this case to Judge Myron H. Thompson, and further requests Judge Thompson accept the case based upon the reasons set forth hereinabove.  The Plaintiff requests such other and more equitable relief as the Court deems proper.

/s/Lee R. Benton
Lee R. Benton
ASB: 8421-E63L


/s/C. Steven Ball
C. Steven Ball
ASB: 5126-A64C

**OF COUNSEL**:
BENTON & CENTENO, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
Phone: (205) 278-8000
Facsimile: (205) 278-8008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing pleading by electronic transmission or by first class mail to the following on this the 28th day of July, 2006:

David B. Anderson
Waller Lansden Dortch & Davis, L.L.P.
1901 6th Ave N. Ste. 1400
Birmingham, AL 35203

Terry L. Butts
P.O. Box 272
Luverne, AL 36049

Michael E. Jones
Jones & Coots, LLC
P.O. Box 367
Luverne, Alabama 36049

Steven G. Brody
King & Spalding, LLP
1185 Avenue of the Americas
New York, NY 10036

/s/C. Steven Ball
Of Counsel

## IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

| | |
|---|---|
| BEN F. BEARD, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>LEHMAN BROTHERS HOLDINGS, INC., )<br>d/b/a LEHMAN CAPITAL, PETER R. )<br>KERN, OAK ASSET MANAGEMENT, LLC, )<br>MIDLAND LOAN SERVICES, INC., )<br>JOLLY ROGER, LLC; JOLLY ROGER I, INC.,)<br>CAPITAL SEVEN RECOVERY, LLC, )<br>PETER FAHEY, LARRY W. CARLSON, )<br>)<br>    Defendants. ) | Civil Action No. _CV06-135_ |

## COMPLAINT

COMES NOW Ben F. Beard, an individual, and files his Complaint against Defendants,

Lehman Brothers Holdings, Inc., d/b/a Lehman Capital, Peter R. Kern, Oak Asset Management,

LLC, Midland Loan Services, Inc., Jolly Roger, LLC, Jolly Roger I, Inc., Capital Seven

Recovery, LLC, Peter Fahey, and Larry W. Carlson, and in support thereof would show the Court

the following:

1.    The Plaintiff, Ben F. Beard ("Beard"), is an individual, who is the managing

member of ProMarketing, LLC ("ProMarketing"), a limited liability company formed under the

laws of Alabama on March 9, 2000, for the purpose of, among other things, acquiring, owning

and managing convenience stores.  ProMarketing is headquartered in Troy, Alabama.

2.    The Defendant, Lehman Brothers Holdings, Inc., d/b/a Lehman Capital ("Lehman

Brothers"), is, upon information and belief, a Delaware corporation which does business in the

state of Alabama.



3.      The Defendant, Peter R. Kern ("Kern"), is, upon information and belief, an adult individual residing in the state of New York.

4.      The Defendant, Oak Asset Management, LLC ("Oak Asset"), is, upon information and belief, a California limited liability company which does business in the state of Alabama.

5.      The Defendant, Midland Loan Services, Inc., ("Midland"), is, upon information and belief, a Missouri corporation which does business in the state of Alabama.

6.      The Defendant, Jolly Roger, LLC, ("Jolly Roger"), is, upon information and belief, a Delaware limited liability company which does business in the state of Alabama.

7.      The Defendant, Jolly Roger I, Inc., ("Jolly Roger I"), is, upon information and belief, a Delaware corporation which does business in the state of Alabama.

8.      The Defendant, Capital Seven Recovery, LLC, ("Capital Seven"), is, upon information and belief, a Delaware limited liability company which does business in the state of Alabama.

9.      The Defendant, Peter Fahey ("Fahey"), is, upon information and belief, an adult individual residing in the state of New York.

10.     The Defendant, Larry W. Carlson ("Carlson"), is, upon information and belief, an adult individual residing in the state of Connecticut.

11.     At all times relevant hereto, each of the respective individual Defendants were acting as agents of Lehman Brothers, Oak Asset, Midland, Jolly Roger, Jolly Roger I, and/or Capital Seven, and were acting as agents within the line and scope of their legal authority. The tortious conduct of the Defendants described hereinbelow took place in Pike County, Alabama.

## FACTS

12.    In or about early 2000, representatives for ProMarketing, including Beard and

Sam J. Carroll, III, began searching for financing for twenty-eight (28) convenience stores

located in the states of Alabama, Florida, and Georgia. Ultimately, it was determined that

Lehman Brothers, would be the lender for the transaction.

13.    On March 24, 2000, Lehman Brothers agreed to loan to ProMarketing the sum of

Twenty-five Million Dollars ($25,000,000.00) for the financing of the above-referenced

convenience stores. The transaction included five separate loans for the total sum of

$25,000,000.00, as follows: (1) loan number 217000029 in the amount of $4,519,000.00; (2)

loan number 217000030 in the amount of $5,389,000.00; (3) loan number 217000031 in the

amount of $5,313,000.00; (4) loan number 217000032 in the amount of $5,303,000.00; and (5)

loan number 217000033 in the amount of $4,276,000.00. Each separate loan required the

execution of a separate Promissory Note; Mortgage, Security Agreement, Financing Statement &

Fixture Filing; Loan and Security Agreement (collectively, the "Loan Agreement"); and various

other financing documents presumably for the purpose of securing the debt and the real and

personal property collateralizing the debt (primarily the convenience stores themselves), the real

property upon which the convenience stores were located, and certain other vendor agreements

that were related to the convenience stores. Importantly, Lehman Brothers also required two

separate guaranties of the debt, the first being a guaranty executed by James W. Jackson, Jr.,

Robert Warren Jackson, Sam J. Carroll, III, and Ben F. Beard ("the Carroll & Beard Guaranties")

and the second being a guaranty executed by BFB, LLC ("the BFB Guaranties"), both conditional

recourse guaranties.[1]  There were a total of five separate Carroll & Beard Guaranties and five

separate BFB guaranties executed for the total debt, one for each loan.

14.    From the distribution of the loan proceeds on March 24, 2000 forward,

ProMarketing made each of its monthly payments pursuant to the Notes to Lehman Brothers.

However, after the national tragedy of September 11, 2001 ("9/11"), the economic impact upon

the convenience store industry, and specifically the gasoline industry, was significant.  Also,

there were numerous other entrants into the market, including the emergence of the "big box"

retailers led by Wal-Mart.  Shortly after 9/11, ProMarketing began to struggle with the servicing

of its debt to Lehman Brothers, among others.  However, ProMarketing continued to make its

monthly payments of approximately $240,000.00 to Lehman Brothers.

15.    On or about February 1, 2002, Beard contacted representatives of Lehman

Brothers to discuss the financial difficulties of ProMarketing and the possibility of some

forebearance agreement.  On or about February 6, 2002, Beard began communicating with Kern,

a vice-president at Lehman Brothers.  The purpose of the contact was to establish an open line of

communication between the representatives of ProMarketing and Lehman Brothers to discuss the

financial difficulties facing ProMarketing, and to also make Lehman Brothers aware that

ProMarketing intended to do all in its power to honor its obligations pursuant to the Loan

Agreements.  For several months thereafter, ProMarketing continued to make payments to

Lehman Brothers, though the payments made caused ProMarketing to operate at a deficit.

16.    However, the state of the depressed industry environment and the general national

---

[1]At the inception of the loan transactions, ProMarketing had several members who later
transferred their respective interests to Beard.  Beard is now the sole member of ProMarketing.

economy continued to decline, and ultimately ProMarketing was unable to pay the October 1, 2002 payment to Lehman Brothers. On October 1st, Beard contacted Kern at Lehman Brothers to discuss ProMarketing's status. Additionally, on that date, Beard wrote to Kern telling him of ProMarketing's plan to attempt to restructure by liquidating certain assets of ProMarketing that did not serve as collateral to the Lehman Brother's debt and to further restructure ProMarketing with the guidance and acceptance of Lehman Brothers. Beard also informed Kern of ProMarketing's intention to obtain other potential investors and to obtain certain financial professionals' assistance in the restructuring of the business to maximize the value of the assets and goodwill. Kern, in his individual capacity and as a representative of Lehman Brothers, agreed to forebear any immediate attempt to collect the debt. In fact, Kern admitted to Beard that the economic issues facing ProMarketing were common throughout the industry and that Lehman Brothers had numerous non-performing loans that required ongoing cooperation between the lender and borrower. Kern also told Beard that because of the problems with this and other similarly situated Lehman Brothers loans, it was important to attempt to maintain the ProMarketing loan as a performing, non-default loan on the Lehman Brothers' books. As such, in or about early October 2002, Lehman Brothers, by and through Kern, began and maintained an ongoing discussion with Beard to fashion a plan to keep the ProMarketing convenience stores operating and to protect the collateral.

17.     In the months of October and November 2002, Beard, as a representative of ProMarketing, continued to communicate with Lehman Brothers, by and through Kern, via several telephone conferences and meetings, both in Alabama and Atlanta, Georgia. During this period, Kern, along with Paul Sven ("Sven"), another vice-president at Lehman Brothers in

charge of workouts and financial restructuring, a representative of Midland and others, traveled to Troy, Alabama to meet with Beard to attempt to work out a plan for payment and to inspect some of the collateral properties. Among other things, Lehman Brothers demanded that ProMarketing hire a consulting firm to monitor its operations, analyze cash flow, assets and liabilities, and to assist with possible future restructuring. Upon information and belief, Oak Asset was retained by Lehman Brothers for essentially the same purpose and to further assist Lehman Brothers in overseeing the restructuring of ProMarketing and was acting as the agent for Lehman Brothers. At the direction of Lehman Brothers, ProMarketing sought a consultant and ultimately hired Navigant Consulting, Inc. ("Navigant"), for that purpose.

18.     During one of those meetings, upon information and belief the November 7, 2002, meeting in Atlanta, attended by Beard, Kern, representatives of Navigant, and Gerard J. Maughan ("Maughan") of Oak Asset, Lehman Brothers began making additional demands upon ProMarketing to further reduce its expenses. Among other things, Lehman Brothers demanded that Beard reduce his salary as manager of ProMarketing and that ProMarketing cease making any further rental payments on its office headquarters pursuant to its lease with Beard, pursuant to his ownership of the building housing the office headquarters.

19.     Moreover, Kern represented to Beard that Lehman Brothers believed a vast majority of the collateralized convenience stores were contaminated by environmental issues from gas storage tanks and other industry related issues. Kern also represented to Beard that Lehman Brothers had purchased an environmental protection insurance policy from, upon information and belief, American International Group, Inc. ("AIG") to cover such contamination. Kern represented to Beard that environmental assessments performed by Lehman Brothers led

them to believe that approximately 70% of the stores were contaminated and that Lehman was

working on settlement with AIG wherein AIG would take over the contaminated stores, pursuant

to the obligations in the insurance policy, and that ProMarketing would be able to get a "good

deal" on the contaminated properties and to also retain the remaining 30% of the non-

contaminated stores via some restructuring or refinance. Kern further represented to Beard that

ProMarketing would be involved with the negotiations with AIG to protect its interests and to

negotiate the transaction wherein ProMarketing would have up to one (1) year to refinance the

remaining 30% of the stores for the approximate fair market value of the non-contaminated

stores (presumably no more than 30% of the $25 million debt) and would be able to negotiate a

below market value price with AIG for the contaminated stores. Kern further represented to

Beard that any attempt to refinance the ProMarketing loans would be delayed until after the

resolution of the claim with AIG and agreed that ProMarketing could make nominal or interest

only payments until the AIG claim settled, as long as the collateralized stores remained

operational. These various representations were later confirmed and restated by Kern to Beard in

telephone conferences.

20.    In an attempt to induce Beard to continue to maintain the operations of

ProMarketing and keep the collateralized stores operating, including those with allegedly

substantial environmental damage, Kern represented to Beard that ProMarketing would be "at the

table" when all negotiations were ongoing with AIG. Further, upon information and belief, Kern

made that representation to induce Beard to continue to inject his personal capital into

ProMarketing's operations and Beard further agreed to reduce his salary and caused

ProMarketing to cease making lease payments to Beard for the ProMarketing office headquarters.

As a result of Kern's representation, Beard did not entertain any possible liquidation of ProMarketing. Further, because of Lehman Brothers's requirement that a consultant be hired, ProMarketing began payments to Navigant, which cost ProMarketing fees and other expenditures in excess of $400,000.00 over the next two years.

21.    From approximately October of 2002 through June of 2004, Beard had only sporadic communication with Kern or anyone from Lehman Brothers. Throughout this period, Beard continued to try to obtain information regarding the claim with AIG and to determine if any settlement had been reached with regard to the environmental insurance policy. Upon information and belief, throughout this period, representatives of Lehman Brothers, Oak Asset and, perhaps, Navigant, had numerous meetings with AIG regarding the contaminated properties and the subject insurance policy. Despite the representations of Kern, and Beard's request to be included in any such discussions, neither Beard nor any representative of ProMarketing was ever a part of such discussions nor were they consistently advised of the status of the negotiations. Infrequently, Kern and other representatives of Lehman, often by and through Oak Asset, would discuss generally the AIG negotiations and would send word through Navigant that settlement was soon coming. Upon information and belief, the purpose of forwarding such communication was merely to make sure that Beard maintained ProMarketing's operation of the collateral stores.

22.    Throughout 2003, Beard continued to attempt to keep ProMarketing afloat and make payments to service the Lehman Brothers' debt. Essentially, communications with Lehman Brothers were virtually nonexistent, other than the occasional flow of information from Oak Asset to Navigant, and ProMarketing continued to struggle in a rapidly declining market. Expecting that ProMarketing would at some point hear from Lehman Brothers regarding the AIG

settlement, Beard continued to cause ProMarketing to operate, though at a substantial loss, in

anticipating that Kern's representations that ProMarketing would be allowed to refinance and

restructure via the non-contaminated stores. Upon information and belief, Lehman Brothers and

Oak Asset, and perhaps agents of Jolly Roger, continued to negotiate with AIG for their own

respective benefit and purposely excluded Beard and ProMarketing from participation "at the

table."

23.     Acting at the advice of Navigant and the approval of Lehman Brothers, Beard

spent much of 2003 attempting to lease and/or sell certain non-collateralized assets to further

service the Lehman Brothers' debt. ProMarketing also attempted to lease, and did ultimately

lease and sell inventory and certain convenience stores not collateralized by Lehman Brothers to

increase additional revenues for the benefit and upon the approval of Lehman Brothers. While

there was some limited conversation with Kern and Lehman Brothers directly, and indirectly

through Navigant, generally the communication, especially with regard to the AIG issues,

remained spotty, at best. Beard continued to cause ProMarketing to make all available payments

to Lehman Brothers to service the debt, often through his personal capital injections, in reliance

upon Kern's representations that the AIG negotiation would be ongoing and completed for the

benefit of both Lehman Brothers and ProMarketing. Also, throughout this period, there were

some conversations between Lehman Brothers and the members of ProMarketing regarding a

formal forebearance agreement, which was never memorialized in writing. Throughout this

period, Lehman Brothers continued to accept payments from ProMarketing.

24.     At some point in or about May of 2004, Beard was able to track down Kern to

attempt to find out what, if anything, was progressing with regard to the AIG settlement. Kern

represented to Beard that settlement was very near and that a final settlement would occur
"sooner rather than later."

25.     On June 10, 2004, Beard received a letter via facsimile from an unknown entity
named Jolly Roger, LLC, purporting to be a notice of assignment of the loans from Lehman
Brothers to Jolly Roger. The letter gave no description of the terms of the assignment other than
to list the original amount of the original notes and the loan numbers of each of the five original
loans to ProMarketing. Notably, the letter also gave no indication that any payments or credits
had ever been made or issued toward any of the five loans, either reflecting payments by
ProMarketing or some other source. The letter was also unsigned and gave no contact person
with whom Beard might communicate with regard to the alleged assignment.

26.     Beard, through his own efforts and through that of his counsel, attempted to learn
the status of the loans, to no avail. On June 18, 2004, Kern sent an e-mail to Joel Holsinger
("Holsinger"), the director of Navigant. Kern represented to Holsinger that "ownership of the
ProMarketing loans originated by Lehman has been transferred to AIG. You might be contacted
by one of their representatives, including Larry Carlson of Capital Seven. Feel free to contact me
with any questions." Holsinger then forwarded that e-mail on to Dennis Kelly ("Kelly"), an
employee at ProMarketing. Carlson did in fact contact Holsinger a few days thereafter
requesting financial information on ProMarketing, which was provided approximately thirty (30)
days thereafter.

27.     On June 22, 2004, Kelly, corresponded with Kern via e-mail stating that
ProMarketing had received the Jolly Roger correspondence concerning the alleged assignment
and ProMarketing needed additional information. Specifically, the e-mail reminded Kern that he

had represented to Beard that Lehman Brothers had sold or was about to sell the loans to AIG,

via the environmental insurance policies.  Kelly's e-mail also stated that Kern had repeatedly

represented that Lehman Brothers would attempt to work out a solution with ProMarketing for

the debt pursuant to the negotiations with AIG by and through the resolution of the insurance

claims.  The e-mail further requested that Kern send them information on the sale or transfer

documents related to the assignment, copies of the AIG policies, copies of any documents related

to the settlement of the insurance claim, copies of any appraisal evaluations of the collateral

securing the loans, a breakdown of the loan balances, and the application of any insurance

proceeds to the loans.  Additionally, the e-mail requested the name, address, and telephone

number of the contact persons with Jolly Roger, Capital Seven, and AIG with whom

ProMarketing could contact regarding the loans.  The e-mail further reminded Kern that that

information had been promised previously and was apparently being withheld.

28.     On June 23, 2004, Kern responded to Kelly's e-mail by stating that "Lehman is

not in a position to provide you with any documentation."  The e-mail further stated that "all

Lehman interests in the ProMarketing loans have been transferred to AIG."  Kern then directed

all further questions to Greg Yates ("Yates"), an attorney with Steptoe & Johnson, a law firm in

Washington, D.C., which Kern stated was "engaged by AIG to handle these matters."

29.     On July 1, 2004, counsel for ProMarketing and Beard, Robert E.L. Gilpin

("Gilpin") of Kaufman & Rothfeder, wrote to Yates informing him that Lehman Brothers, by and

through Kern, had led ProMarketing to believe that there would be a work out of the debt with

Lehman Brothers, and that Kern represented the resolution or refinance of the debt could not be

achieved until after Lehman Brothers had concluded its negotiation of its insurance claim with

AIG. The letter further requested that Yates provide documentation as to the ownership of the loans and further stated that ProMarketing wished to reach some resolution of the debt.

30.     On or about July 15, 2004, Gilpin received a letter from Yates stating only that Jolly Roger was now the owner of the ProMarketing loans. Attached to the facsimile was a document captioned as "Assignment of Loan and Loan Documents (ProMarketing, LLC)," which indicated that the loans from Lehman Brothers had been assigned not to AIG, as represented by Kern, but instead to Jolly Roger I, Inc., on or about May 20, 2004. Kern knew his previous representation that the loans had been transferred to AIG was false as the assignment to Jolly Roger I was executed by Kern on behalf of Lehman Brothers.

31.     Over the next several months, Beard and other representatives of ProMarketing continued to attempt to obtain any information from Lehman Brothers, Jolly Roger, or Capital Seven with regard to the AIG loans, the reason why ProMarketing was excluded from the AIG negotiations, or the alleged balance of any of the outstanding loans. Even so, ProMarketing, by and through Beard, continued to work with representatives of Jolly Roger and Capital Seven providing the information and any other documentation requested. No one at Lehman Brothers, including Kern, willingly communicated further with Beard or any other ProMarketing representative, notwithstanding the previous representations as to the plan to keep ProMarketing in the loop with regard to the AIG transaction and to work out a resolution with ProMarketing regarding the loans thereafter.

32.     Over the next several months, there was some limited discussion among Carlson, Navigant and Beard regarding a possible formal forebearance agreement with ProMarketing, which was never executed, and some further discussion regarding the possible liquidation of

some of the convenience stores. Again, none of the information requested regarding the debt was ever provided.

33.    In or about January 2005, there was another meeting in Atlanta attended by, among others, Beard, Carlson, and Peter Fahey, regarding the previous proposals made by ProMarketing and Beard to resolve the debt. At that meeting, Carlson instructed Beard to fire Navigant to further reduce costs, and Beard complied with that demand. Despite Beard's best efforts, that meeting did not provide any further assistance in obtaining the requested information or in consummating the promised deal with AIG concerning the purchase and/or refinance of the collateral stores. Surprisingly, shortly thereafter, Beard received notification from Jolly Roger that there would be no further communication directly between the parties and that all such communication should be directed via the parties' respective counsel.

34.    In January or February of 2005, Midland, upon information and belief, the loan servicing entity for Lehman Brothers, forwarded to ProMarketing an I.R.S. Form 1099-C dated June 21, 2004, in the amount of $4,280,090.37. The 1099-C stated that the "debt description" was for a "Commercial Real Estate Loan." No further information was provided with the 1099-C. Since its receipt, Beard has attempted to obtain information from Jolly Roger, Capital Seven and Lehman Brothers as to the meaning of the 1099-C and the source of the alleged payment of $4,280,090.37, but such further request for information has continued to be denied. Upon information and belief, the 1099-C represents a portion of the payment made by AIG to Lehman Brothers. Further, Beard believes that discovery in the case will show the entirety of the ProMarketing loans may have been satisfied by AIG pursuant to the environmental policy.

35.    Throughout 2005, Beard and ProMarketing continued to work with Jolly Roger

and Capital Seven making all available payments and making numerous attempts to resolve the debt, if any actually still existed. By and large, the requests for additional information and the proposals for settlement were ignored. Also, no documentation regarding the assignment was ever provided, nor has it yet been provided, indicating the process by which Jolly Roger obtained the loan, what role AIG played in the assignment, or what sums had been paid by AIG pursuant to the policy which should be credited to the loan or the loan balance, if any.

36.     In or about January and February of 2006, Peter Fahey of Jolly Roger began making threatening phone calls to employees of ProMarketing, telling them that Jolly Roger would soon be taking over all of the stores and further informing the employees that they should enter into employment agreements with Jolly Roger. Beard contacted Fahey and requested that he not interfere with ProMarketing's relationship with its employees and placed him on notice that Jolly Roger was causing harm to ProMarketing. On or about February 24, 2006, Robert Gilpin (counsel for ProMarketing) wrote to Greg Yates (counsel for Jolly Roger) and demanded that Jolly Roger no longer contact ProMarketing employees directly concerning future employment.

37.     In March, April, May, and June of 2006, ProMarketing, by and through Beard and counsel, has continued to make offers to resolve the alleged debt, without success. The only response to any of the offers came in a March 31, 2006 letter from Fahey of Jolly Roger to counsel for ProMarketing wherein Fahey stated that the loan payoff was the incredible sum of $30,628,580.99 and demanded a payoff by April 7, 2005. Though there have been many calls and correspondence by and between counsel for the parties since that date, there has been no further explanation as to: (1) the inflated payoff amount, (2) the questions regarding the

assignment, or (3) any of the AIG issues. Instead, Jolly Roger began legal advertisements that it intended to foreclose on at least one (1) of the convenience stores, which Beard noticed in the local newspaper.

**COUNT ONE**

**FRAUDULENT MISREPRESENTATION**

38.    The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

39.    Defendant Kern, acting in the line and scope of his employment with Lehman Brothers and in his individual capacity, represented to Beard that the ProMarketing loan could be resolved pursuant to the negotiations between Lehman Brothers and AIG concerning the environmental insurance policy held by Lehman Brothers with AIG. Kern further represented that ProMarketing would be involved with the negotiation, would participate in any settlement related to the loan and that ProMarketing would be in a position to purchase the non-contaminated convenience stores and refinance the debt on the stores for a greatly discounted amount of the original total loan, as described herein above. This action is brought pursuant to *Ala. Code §§ 6-5-100, 6-5-101.*

40.    At the time the representations were made, Lehman Brothers and Kern knew that they were false and did not intend to perform on this promise. Upon information and belief, neither Lehman Brothers nor Kern ever intended to allow ProMarketing to participate in the negotiations with AIG. Moreover, upon information and belief, upon receipt of payment from AIG for the settlement of the environmental claim, those amounts were neither disclosed to ProMarketing nor were they accurately applied to the ProMarketing debt.

41.     The representations made were false and were reasonably relied upon by Beard to his individual detriment, who is now the sole member of ProMarketing.  Moreover, based upon his reliance on the false representations by Lehman Brothers and Kern, Beard agreed to substantially reduce his salary from ProMarketing and further agreed to no longer direct ProMarketing to make payments toward its lease to Beard Family Properties, LLP.  Beard further made other capital injections into ProMarketing, based upon his reliance on Lehman Brothers' and Kern's representations.

42.     As a result of Lehman Brothers' and Kern's fraudulent misrepresentations, Beard has been damaged.

43.     Beard claims punitive damages against Lehman Brothers and Kern in an amount to be determined by a jury in light of the gross, reckless and malicious misrepresentations made by Lehman Brothers and Kern.

44.     Beard claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's misrepresentations.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs.  The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT TWO

## SUPPRESSION

45.     The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

46.     As set forth in the body of this Complaint, and in the previous Count, Kern, acting within the line and scope of his employment with Lehman Brothers and in his individual capacity, suppressed several material facts from Beard, to which Beard, as the sole member of ProMarketing, relied upon to his detriment.

47.     Among other things, Lehman Brothers and Kern suppressed the following facts: Lehman Brothers did not intend to allow ProMarketing to participate in any negotiations with AIG for the purpose of resolving the ProMarketing loan debt, nor would ProMarketing be allowed to refinance the non-contaminated stores as previously represented by Kern. Additionally, Kern suppressed the fact that sums received by AIG pursuant to the loan policies would not be applied to the ProMarketing loan debt. Kern further suppressed the fact that any losses incurred by Beard as a result of Beard's agreement to reduce his salary from ProMarketing or to receive payments pursuant to the lease agreement between ProMarketing and Beard Family Properties, LP, would only increase ProMarketing's ability to make the payments to Lehman Brothers and would not in the end provide any benefit to ProMarketing or Beard.

48.     Due to the confidential relationship between Lehman Brothers, by and through Kern, and ProMarketing and Beard, Lehman Brothers and Kern were under an obligation to communicate these facts to Beard. Such failure to communicate clearly constitutes fraud pursuant to *Ala. Code § 6-5-102.*

49.     As a result of Kern's suppression, Beard has been damaged.

50.     The Plaintiff claims punitive damages against Lehman Brothers and Kern in an amount to be determined by a jury in light of the gross, reckless and malicious suppression of material facts from Beard.

51.    The Plaintiff claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's suppression.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT THREE

## DECEIT

52.    The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

53.    Pursuant to *Ala. Code § 6-5-103*, Kern, acting within the line and scope of his employment with Lehman Brothers and in his individual capacity, deceived and mislead Beard to believe that ProMarketing would be allowed to participate in any negotiations with AIG for the purpose of resolving the ProMarketing loan debt, and ProMarketing would be allowed to refinance the non-contaminated stores as previously represented by Kern. Ala. Code § 6-5-103.

54.    At the time the representations were made, Lehman Brothers and Kern knew that they were false and did not intend to perform as promised.

55.    The representations immediately above were false, deceiving and misleading and were reasonably relied upon and believed by Beard.

56.    As a result of Lehman Brothers' and Kern's deceptive and misleading conduct, Beard has been damaged.

57.    The Plaintiff claims punitive damages against Lehman Brothers and Kern in an

amount to be determined by a jury in light of Lehman Brothers' and Kern's gross, reckless and malicious deceitful conduct.

58.    The Plaintiff claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's deceitful conduct.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs.  The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT FOUR

## FRAUDULENT DECEIT

59.    The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

60.    Pursuant to *Ala. Code § 6-5-104*, Kern, acting within the line and scope of his employment with Lehman Brothers and in his individual capacity, deceived Beard by suggesting the above-referenced facts, when Kern did not believe them to be true.  Specifically, Kern did not intend to allow ProMarketing to participate in the AIG transactions, to benefit from any payments made by AIG related to the ProMarketing loans, and did not intend to allow Beard or ProMarketing to refinance the non-contaminated stores, as described herein above.  Kern's further representations to Beard that he should reduce his salary from ProMarketing and cause ProMarketing to no longer make lease payments pursuant to the agreement with Beard Family Properties, LP, was done in an attempt to fraudulently deceive Beard into believing that such conduct was for the benefit of ProMarketing and Beard.

61.     At the time of the promises and representations above were made, Lehman Brothers and Kern knew that they were false and did not intend to perform as promised.

62.     The representations immediately above were false, deceiving and misleading, and were reasonably relied upon and believed by Beard.  Beard altered his position in reliance upon said promises and representations to his detriment, both individually and as the sole member of ProMarketing.

63.     The Plaintiff claims punitive damages against Lehman Brothers and Kern in an amount to be determined by a jury in light of Lehman Brothers' and Kern's willful, gross, reckless and malicious conduct.

64.     The Plaintiff claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's willfully deceptive conduct.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs.  The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT FIVE

### FRAUDULENT MISREPRESENTATION

65.     The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

66.     In or about January or February of 2005, Kern or Lehman Brothers caused Midland to issue a Form 1099-C to ProMarketing in the amount of $4,280,090.37.  The issuance of that 1099-C was fraudulent in that the amount contained therein was incorrect and was issued

for an improper purpose. As a result of the issuance of the fraudulent form 1099-C, Beard, as the sole member of ProMarketing, has been damaged.

67.    The Plaintiff claims punitive damages against Lehman Brothers and Midland in an amount to be determined by a jury in light of Lehman Brothers' and Midland's gross, reckless and malicious misrepresentations made by Lehman Brothers and Midland.

68.    The Plaintiff claims additional damages for mental anguish resulting from Lehman Brothers' and Midland's misrepresentations.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Midland, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT SIX

## CONSPIRACY

69.    The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

70.    Each of the Defendants, including Lehman Brothers, Kern, Oak Asset, Midland, Jolly Roger, LLC, Jolly Roger I, Inc., Capital Seven, Fahey, and Carlson, directly or by and through their employees and others, have conspired together to, among other things, prevent ProMarketing or Beard from participating in the negotiations with AIG, from benefitting from any settlement between AIG and any of the other Defendants, and for refusing to produce any and all documents related to the AIG policies that may be for the benefit of ProMarketing and Beard as the sole member of ProMarketing. The Defendants further conspired to convince Beard

to reduce his salary from ProMarketing and to cause ProMarketing to no longer make payments pursuant to its lease agreement with Beard Family Properties, LP. The conspiring Defendants further have prevented Beard from obtaining any information related to the purported assignment of the Lehman Brothers' debt to either Jolly Roger or AIG. The conspiring Defendants have also caused a fraudulent form 1099-C in the amount of $4,280,090.37 to be issued to ProMarketing, which directly has caused damage to Beard as its sole member. Such action was wrongful, and in violation of the duties under the Loan Agreements, of the relationships between the various parties, and of applicable law.

71.    The actions of the Defendants were intentional, malicious, oppressive and/or wanton.

72.    As a proximate consequence of said conspiracy involving the Defendants, the Plaintiff has suffered injury as described and alleged in the preceding accounts.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers, Kern, Oak Asset, Midland, Jolly Roger, LLC, Jolly Roger I, Inc., Capital Seven, Fahey, and Carlson, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES**

_____
Lee R. Benton
ASB: 8421-E63L

_____
C. Steven Ball
ASB: 5126-A64C

**OF COUNSEL:**
BENTON & CENTENO, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
Phone: (205) 278-8000
Facsimile: (205) 278-8008

**SERVE DEFENDANTS AS FOLLOWS:**

Lehman Brothers Holdings, Inc. d/b/a
Lehman Capital
c/o Prentice Hall Corporation Sys, Inc.,
Registered Agent
150 S. Perry Street
Montgomery, AL 36104

Midland Loan Services, Inc.
c/o The Corporation Company, Registered
Agent
2000 Interstate Park Dr., Suite 204
Montgomery, Alabama 36109-5413

Capital Seven Recovery, LLC
c/o Corporation Service Company,
Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Jolly Roger, LLC
c/o Corporation Service Company,
Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Jolly Roger I, Inc.
c/o Corporation Service Company,
Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Oak Asset Management, LLC
c/o Jack T. Noe, Registered Agent
2535 Towngate Road Suite, 205
Westlake Village, CA 91361

Peter R. Kern
Vice President
Lehman Brothers
745 Seventh Avenue, 7th Floor
New York, NY 10019

Peter Fahey
Jolly Roger, LLC
243 5th Avenue, Suite 800
New York, NY 10016

Larry W. Carlson
Capital Seven Recovery, LLC
332 Washington Blvd.
Stamford, CT 06902

**[FILED]**

DEC 1 2 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

SAM J. CARROLL, III              )
and GOCO ACQUISITION             )
CORPORATION, an Alabama          )
Corporation,                     )        CIVIL ACTION NUMBER:
                                 )
        Plaintiffs,              )        01-T-981-S
                                 )
                                 )
vs.                              )
                                 )
GERMAN AMERICAN CAPITAL          )        **DEMAND FOR JURY TRIAL**
CORPORATION, a Maryland          )
Corporation, et al,              )
                                 )
        Defendant.               )

### SECOND AMENDED COMPLAINT

**COME NOW** plaintiffs Sam J. Carroll, III, an individual, and GOCO Acquisition

Corporation ("GOCO"), an Alabama corporation, and hereby amend their previously filed Complaint

against defendant German American Capital Corporation ("German American"), a Maryland

corporation, to add Deutsche Banc Alex. Brown, Inc. ("Deutsche Banc"), a wholly owned subsidiary

of Deutsche Bank AG, which is also the parent company of German American ("Deutsche Bank")

(hereinafter collectively referred to as "Defendants"), as a party to this action and to assert additional

causes of action against the Defendants.

### PARTIES

1.      Sam J. Carroll, III is an individual and is a resident of Dale County, Alabama.

2.      Plaintiff GOCO is an Alabama corporation and with its principal place of business

in Dale County, Alabama.

908027 1



EXHIBIT
B

55

3.     German American is a Maryland corporation which does business in the State of Alabama.

4.     German American qualified to do business in the State of Alabama on June 29, 1999.

5.     Deutsche Bank is a Delaware corporation which does business in the State of Alabama.

6.     Peter Fahey and Larry W. Carlson are employees and officers of Deutsche Banc and as such were agents of Deutsche Bank in the conduct described below.

7.     Robert Burns, the person to whom Peter Fahey and Larry Carlson report is a Vice President of German American.

8.     At all times relevant hereto, all agents, officers and employees of German American and Deutsche Banc were acting within the line and scope of their respective authority.

## FACTS

9.     In 1999, Sam J. Carroll, III formed GOCO to acquire and own certain convenience stores.  In 1999, GOCO entered into an agreement to purchase fifteen (15) convenience stores in the States of Alabama and Florida.  Seven of the stores are located in Alabama and eight of the stores are located in Florida.   Until July 1999, Sam J. Carroll, III owned one hundred (100%) percent of GOCO's stock.  Currently Mr. Carroll owns 80% of the stock of GOCO.

10.     In 1998 and 1999, Deutsche Bank, Global Alliance Finance Company (a now defunct Deutsche Bank subsidiary) ("Global Alliance"), German American and/or other related entities were advertising in trade publications for franchise lending, which trade publications are distributed in the State of Alabama. Additionally, Deutsche Bank and its subsidiaries were soliciting business through brokers, consultants or agents. Sam J. Carroll, III, on behalf of GOCO, became aware that Deutsche

Bank, Global Alliance and/or German American were making loans on franchises which loans were to be placed in a securitization pool. Mr. Carroll inquired about obtaining a loan from Deutsche Bank or one of its subsidiaries to finance the purchase of the convenience stores.

11.    Upon information and belief, the officers of Deutsche Bank and its subsidiaries learned in early 1999 of serious problems in the securitized franchise lending market. Deutsche Bank decided to stop making loans through its franchise lending subsidiary Global Alliance and to "get out" of the securitized franchise lending arena. Deutsche Bank did not tell borrowers with which it or its subsidiaries was in negotiation of this intention or that the franchise lending market was having problems.

12.    On December 31, 1998, Sam J. Carroll, III, through a company called S.A. Development, Inc., entered into a contract with Graceville Oil Company to acquire fifteen (15) convenience stores, seven of which were located in Alabama and eight of which were located in Florida. One hundred thousand dollars ($100,000.00) was put up as earnest money and the contract was required to close on or before April 30, 1999. On February 17, 1999, German American issued a proposal to S.A. Development, Inc. to loan it $8,600,000 to acquire the fifteen stores, to remodel the stores and for closing costs. On or about March 25, 1999, Global Alliance, after receipt of a deposit check from plaintiffs in the amount of $43,000, began to process the loan and to undertake due diligence efforts. The fifteen (15) loans were approved on April 16, 1999, with Global Alliance shown as the lender. On April 16, 1999, German American issued a commitment letter to GOCO Acquisition Corporation, (the company to whom the contract with Graceville Oil Company had been conveyed). The commitment letter required the additional payment of $39,250.00 by plaintiffs, and

German American agreed to loan $7.7 million to GOCO for a term of 240 months (20 years) at a fixed interest rate to be determined at the time of closing.

13.    The April 16, 1999 commitment letter mentioned for the first time the requirement of a $1.7 million letter of credit to assure the branding (to be associated with a particular brand of fuel) of the stores. This term was not part of the original proposal; however, under extreme duress and pressure, Sam J. Carroll, III, individually and on behalf of GOCO, agreed to this additional term because he knew that it would be impossible to obtain another source of financing within the contract period. Further, representatives of German American specifically stated that the letter of credit would be released as soon as the items contained in the loan commitment letter were accomplished. In fact, as a result of these discussions, a partial release provision for the letter of credit was added to the commitment. Sam J. Carroll, III also knew that without the loans from Deutsche Bank the contract with Graceville Oil would go into default and he would forfeit the $100,000.00 earnest money provided earlier for the contract. Sam J. Carroll, III, therefore, agreed to provide the $1.7 million letter of credit based on German American's representations that the letter of credit would be released upon the happening of certain events.

14.    The April 16, 1999 commitment letter listed as security for the loan only the mortgages, assignment of leases and rents, and a security interest in all assets of the borrower and specifically did not include the $1.7 million letter of credit as additional security. Rather, the $1.7 million letter of credit was to be given to ensure the branding of the stores and the reduction of the loan to value. There is no provision in the commitment letter that allowed acceleration by default to trigger a prepayment penalty. Further, there is no provision in the commitment letter for the application of the $1.7 million letter of credit to a prepayment penalty. There is no provision in the

commitment letter which requires the waiver of a trial by jury relating to litigation arising under the loan documents. Finally, the commitment letter provides that the loan is to be nonrecourse to the principals of the borrower. An attachment to the commitment letter showed that the Lender would receive an origination fee of $231,000.00 and other fees, all to be paid by GOCO.

15.     On April 30, 1999, it was necessary for the purchase agreement with Graceville Oil to be amended to reflect a closing date of May 31, 1999, which required an additional $100,000 earnest money to be paid by GOCO, which earnest money would be lost if the sale did not close.

16.     Defendants did not tell plaintiffs that a decision had been made for Defendants to exit the securitized franchise lending business. Rather, Defendants went forward with the fifteen (15) loans to GOCO with the knowledge that there were problems in the securitized franchise lending market.

17.     The fifteen (15) loans made by German American rather than Global Alliance, closed on or about May 20, 1999. The loan closings occurred more than a month before German American became qualified to do business in the State of Alabama on June 29,1999. The documents for the loan closings were prepared by Defendants' counsel located in North Carolina, were form securitized lending loan forms, and were not subject to material change or negotiation between the parties. The loan papers were mailed to GOCO's counsel's office located in Dothan, Alabama and the loan documents were signed in Dothan by Sam J. Carroll, III, GOCO's sole shareholder, officer and director at the time, without benefit of further discussions or negotiations with German American.

18.     The loan documents mailed from North Carolina by German American's counsel consisted of Loan Agreements, Promissory Notes, Mortgages and Assignments of Rents and Fixture Filing, Assignments and Security Agreements, a Limited Non-Recourse Carve-Out Guaranty and

Indemnity Agreement, and Financing Agreements (collectively the "Loan Documents") for each of the fifteen (15) loans. Each Loan Agreement was forty-one pages long with additional pages of schedules, extremely lender oriented and not subject to negotiation. The Limited Non-Recourse Carve-Out Guaranty and Indemnity Agreement ("Limited Agreement"), which was nine pages of very small type, provided that Sam J. Carroll, III, would become liable to Lender only "for any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender arising out of or in connection with the following: (a) fraud or intentional misrepresentation by the borrower or Guarantor in connection with any Loan; (b) the gross negligence or willful misconduct by any Borrower; ... (d) the misapplication or conversion by the Borrower of ... (iii) any Rents ... following an Event of Default." All of these documents were prepared by German American's counsel and were not subject to change or negotiation by plaintiffs for the loans to take place.

19.     The Loan Agreements and Limited Agreements contained waivers of the right of borrower to trial by jury, on the 39th page of the 41 page Loan Agreement and on page seven of the nine page Limited Agreement. This provision had never been discussed with Mr. Carroll by German American and was not subject to negotiation.

20.     After the loans closed, GOCO made monthly payments by automatic payment withdrawal pursuant to the terms of the Loan Documents and was never late and never missed a payment. Until October 27, 2000, the convenience stores were operated by Happy Retail, Inc., an Operator approved by Defendants. From October 27, 2000 to April 26, 2001, the stores were managed by ProMarketing, LLC, through an ad hoc arrangement, due to the Defendants' failure to approve another Operator. From April 26, 2001 to present, the stores have been operated by Sam J. Carroll, III, the 80% shareholder of GOCO.

21.    Financial statements required under the Loan Documents were submitted to German American by Happy Retail, Inc. until August 2000. Happy Retail, Inc. operated under a management agreement, a lease and a supply agreement with GOCO, which had been approved by Defendants.

22.    From May 1999 to November 1999, GOCO made certain improvements to the convenience stores and engaged in discussions with gasoline distributors. In November 1999, GOCO entered into an agreement with Coastal Refining & Marketing, Inc. to brand the stores as required under the Loan Documents. The permanent signs were ordered and temporary signs were erected at each of the stores. GOCO sent the gasoline agreement to German American, where it was reviewed by Defendants, and sent notice of the branding of the stores within the six months required under the Loan Documents. Despite this notice, German American did not send a site inspector to inspect the stores, although it was holding $15,000 of GOCO's money to perform the inspection. Also, German American did not make any claim or assertion at that time that the branding and reimaging had not been accomplished pursuant to the Loan Documents within the six month time period.

23.    After the loan closings on May 20, 1999, Defendants never placed the loans in a securitized franchise loan trust because they had decided before May 20, 1999 to "get out of the securitized franchise lending market." From May to November 1999, Defendants tried to sell the loans to Lehman Brothers and others but they were unsuccessful. As described by Larry Carlson, the "asset manager" or "workout person" for Defendants, the policy or charter of German American requires that all loans in its portfolio have an exit strategy to be rid of all loans within six months of the closing date. Therefore, although German American had made a commitment to GOCO for twenty year loans, German American, after a mere six months, was trying to rid itself of the GOCO

loans. The five exit strategies described by the Defendants' asset manager or workout man were: 1) sell the loans; 2) allow the borrower to refinance the loans; 3) restructure the loans; 4) have the loans crammed down in a bankruptcy proceeding; or 5) put the loans in default and accelerate the maturity date. German American never disclosed its policy or charter to only hold loans for six months to Mr. Carroll or GOCO.

24.    Robert D. Burns, a Vice President of German American and the supervisor of Larry Carlson and Peter Fahey, the "workout people" for the Defendants, testified that because the GOCO loans were franchise loans and could not be sold or securitized by the Defendants, the GOCO loans were placed with the workout department of Defendants almost upon their inception. This action was taken through no fault of GOCO, but through circumstances beyond the control of GOCO. In the vernacular, when a loan is placed with the workout man, it is the "kiss of death" for the borrower. Mr. Burns testified that the workout men in his department were managing all the franchise loans made by Global Alliance or German American, even if they were "performing loans" like the GOCO loans. Mr. Burns testified, and Mr. Fahey confirmed, that there were at least three other franchise loans within German American's portfolio, when Deutsche Bank decided to get out of the franchise lending business.

25.    In September or October 2000, Sam J. Carroll, III telephoned Peter Fahey, who was the original account representative with Defendants, to set up a meeting with Mr. Fahey when Mr. Carroll was scheduled to be in New York on other business. The purpose of the meeting with Mr. Fahey was to discuss the release of the $1.7 million letter of credit pursuant to the terms of the Loan Documents and to ask for the approval of a new operator for the stores. Mr. Carroll had no

knowledge that Mr. Fahey had been "promoted" or "demoted" to the position of workout man, and Mr. Fahey did not disclose this to him.

26.    In early October 2000, while in New York on other business, Sam J. Carroll, III met with Peter C. Fahey. Unbeknownst to Mr. Carroll, Mr. Fahey asked Larry W. Carlson, who is also in the collection workout or asset management department of German American and Deutsche Banc, to also meet with Mr. Carroll. There was no reason for Mr. Carlson to have been invited to that meeting based upon the planned discussion and based upon the fact that the loan was a "performing loan". At no time had payments on the loans been delinquent and there had been no notice of default under any term of the Loan Documents. Nonetheless, Mr. Fahey explained that Mr. Carlson had taken over the account. Neither Mr. Fahey nor Mr. Carlson told Mr. Carroll that the GOCO loans, by that time almost sixteen months old  violated German American's policy or charter to only hold loans for six months.

27.    During the course of the October 2000 meeting, Mr. Carroll told Mr. Fahey and Mr. Carlson that he thought by December 31, 2000, GOCO would satisfy the monetary conditions for the release of the $1.7 million letter of credit. GOCO had already satisfied the branding and reimaging requirements of the Loan Documents. Mr. Carroll explained that he wanted to commence the process of having the $1.7 million letter of credit released as soon as the year-end financial data was submitted. Larry W. Carlson, during the course of the discussion, stated - "The letter of credit will never be released. We [German American] never intended to release the letter of credit." This statement was made despite the fact that the Loan Documents contain a provision for release of the $1.7 million letter of credit upon the meeting of certain requirements, including branding of the stores and meeting the specified loan to value.

908027 1

9

28.     Mr. Carlson went further and said, "We want you to pay off this loan."     Obviously, German American had been unable to securitize the loans and the secondary market for selling loans such as the GOCO loans had deteriorated and German American had found it impossible to sell the loans. German American was anxious to "get rid of" the loans because they violated the policy or charter of German American to only hold loans six months, and, therefore, Mr. Carlson encouraged Mr. Carroll to find another source of financing. Mr. Carroll stated that he would consider finding another source of financing, but that it would take some time. Mr. Carlson asked what would be a reasonable time within which Mr. Carroll could secure another source of financing. And then Mr. Carlson said that there was the matter of the " prepayment fee." Mr. Carlson indicated that, according to his calculations, there would be a prepayment fee of approximately $2.2 million to pay off the loan. Mr. Carroll indicated that there was no way that he would pay such an unreasonable penalty to payoff a loan that German American wanted it off its books.

29.     The prepayment penalty contained in the Loan Agreements on page 7, provides that the prepayment of any portion of the loan would require the payment of an amount equal to the greater of 1% of the amount being prepaid or an amount that is calculated by a formula that is approximately one third of a page in length. The formula is impossible to understand and even the Deutsche Banc asset managers admitted they could not calculate the prepayment penalty. The prepayment penalty was included in the form securitized franchise lending documents to protect any bondholders or trusts that would ultimately own the loans in the securitized market. The prepayment penalty bears no relation to damages that would be incurred by German American if the loan was paid off early. In fact, German American only intended to hold the loan for six months and,

therefore, the claimed $2.2 million prepayment penalty has no relationship to damages German American might incur.

30.     Also, during the October meeting with Mr. Carlson and Mr. Fahey, Mr. Carroll asked that German American approve a new operator for the convenience stores. In Mr. Carroll's opinion, the then Operator, Happy Retail, Inc. (owned by Mr. Jim Richardson), was not performing satisfactorily and he was having problems with obtaining updated financial information from Mr. Richardson. German American and ORIX Capital Markets, LLC ("ORIX"), its loan servicer were also having problems with Mr. Richardson and could not obtain current financial information from him. Mr. Carroll asked Mr. Fahey to approve ProMarketing, LLC as the new Operator to remedy the problems that everyone was having with Mr. Richardson. Mr. Carroll explained that he was a part owner of ProMarketing, LLC, and that ProMarketing was in a stronger financial condition than Happy Retail, Inc. and that the principals of ProMarketing had more experience in the operation of convenience stores than the owner of Happy Retail, Inc. Mr. Carlson responded by stating, "I have got you now because we will never approve ProMarketing as the new operator. That is my ace in the hole on you." The conversation became very heated and Mr. Carlson used threatening and abusive language toward Mr. Carroll.

31.     Thereafter, because Mr. Carroll refused to pay the unconscionable prepayment penalty to refinance the loan, because Mr. Carroll and GOCO at year's end could meet the requirements for the release of the $1.7 million letter of credit, and because German American was in violation of its policy or charter to only hold a loan for six (6) months, German American set out to force GOCO into a default and acceleration situation.

908027 1                                    11

32.    Shortly after the October meeting, Happy Retail, Inc. resigned as the operator of the GOCO stores. Mr. Carroll provided German American notice of the resignation, as he was required to do under the Loan Documents, and asked for any recommendations that German American might have regarding a new Operator. Upon information and belief, Mr. Fahey and/or Mr. Carlson contacted Mr. Richardson of Happy Retail, Inc. and plotted with him as to how to put the GOCO loans in default and discussed the possibility of Mr. Richardson acting as the operator for German American if the stores were foreclosed upon.

33.    Before November 1, 2000, Mr. Fahey contacted outside counsel and sought his advice about the resignation of Happy Retail, Inc. Further, he contacted ORIX, the loan servicer, to instruct the ORIX account representative responsible for the GOCO loans not to have any further contact with GOCO or Mr. Carroll. Upon information and belief, in October 2000, Defendants took over the servicing of the loans from ORIX and became the "special servicer". The special servicer was thereafter responsible for sending out the payment notices, reminder notices and to have all contact with the borrower. Further, ORIX was advisee that any future payments made by GOCO should be put in a suspense account rather than being applied to the regular payment. Further, upon information and belief, Mr. Fahey instructed ORIX to require payments to be made by wire transfer, even though they had been made by automatic withdrawal since the inception of the loan and despite the fact that GOCO had requested that the payments continue to be made by automatic withdrawal. Also, ORIX was apparently told by Mr. Fahey not to respond to GOCO's requests for information because ORIX would not return GOCO's calls.

34.    On November 1, 2000, Mr. Fahey, in a letter drafted by outside counsel, wrote GOCO questioning the propriety of the resignation of Happy Retail, Inc. while Mr. Fahey knew about the

908027.1                                   12

problems with Mr. Richardson providing timely financial information. Mr. Fahey nevertheless defended Mr. Richardson so as to follow through on Mr. Carlson's threat of never approving a new operator. Mr. Fahey demanded immediate information on the new operator from Mr. Carroll in his letter, even though he had been given that information during the October meeting with Mr. Carroll and even though GOCO had sixty (60) days under the Loan Documents to secure the approval of a new operator.

35.    Upon Happy Retail's resignation, Mr. Carroll formally asked ProMarketing, LLC to become involved with the management of the stores. Mr. Carroll wrote German American asking that ProMarketing, LLC be approved as the new operator. Even though Mr. Carroll submitted the financial information on ProMarketing to German American during the October 2000 meeting, and submitted a copy of the proposed management agreement for approval in November 2000, German American never approved ProMarketing, LLC as the operator. On January 18, 2001, German American, in a letter prepared by outside counsel, sent a notice to cure providing GOCO thirty days to submit additional information on ProMarketing.

36.    On January 29, 2001, assuming that German American would never approve ProMarketing as the operator, GOCO wrote German American and asking that Mott Oil Company be approved as the Operator of the stores. ProMarketing continued to operate the stores, however, GOCO submitted all of the requested materials to German American. In March 2001, after GOCO inquired of German American as to the status of Mott Oil's approval, Defendants' outside counsel responded by saying that he did not have a copy of the management agreement. GOCO had supplied the form of the agreement to German American in December 2000, which was the form that had been approved by Defendants for Happy Retail, Inc. in 1999. Another copy of the management

agreement form was sent to Defendants' counsel. Then Defendants' counsel questioned the amount of the management fee, claiming that it was too small. (The management fee with Mott Oil was planned to be a small annual fee with a bonus based on performance.) Despite repeated requests, Mott Oil was never approved as the Operator. The failure of such approval caused GOCO damages because ProMarketing continued to operate the stores although GOCO wanted Mott Oil to operate the stores.

37.    By December 31, 2000, Mr. Carroll, on behalf of GOCO, undertook to demonstrate to German American that GOCO had satisfied the conditions contained in the Loan Documents for the release of the $1.7 million letter of credit. On February 2, 2001, Mr. Carroll, through counsel, submitted documents  proving that GOCO had met the financial requirements for the immediate release of the $1.7 million letter of credit and submitted pictures of the branding and reimaging that had been accomplished by November 1999. Thereafter, German American in a March 7, 2001 letter entitled - "Notice to Cure: "1) accused GOCO, through the tone and content of the letter, of falsifying year 2000 financial statements it had provided German American; 2) claimed that GOCO since inception of the loan had not submitted financial statements in accordance with the Loan Documents (even though GOCO had been submitting the financial statements in the same form without complaint for almost two years); 3) demanded that GOCO provide all financial statements and certifications that had not been provided since inception of the loan; 4) erroneously accused GOCO of having three different operators in four months that had not been approved (there had been only one, ProMarketing, which Larry Carlson said he would never approve); and 5) declared the loan in default because German American had not received a copy of the form management agreement (which was the same agreement that German American had approved in May 1999 and had been sent

to German American in November 2000). Notably, the letter did not contain any complaint about branding and reimaging of the GOCO stores, and did not dispute the fact that the other conditions for the release of the $1.7 million letter of credit had been satisfied. Nonetheless, German American did not implement procedures to release the $1.7 million letter of credit.

38.    In response to the March 7, 2001 notice to cure, on March 7, 2001 GOCO's counsel reminded Defendants' outside counsel that the form of the management agreement was the same as had been sent to German American in November 2000 and approved by German American in May 1999. Thereafter, GOCO sent yet another copy of the management agreement.

39.    With regard to the demand for all financial statements that had not been provided, GOCO sent the letter to its outside accountants and asked the accountants to contact German American to find out which statements they had not received and the form in which German American wanted them. The outside accountants tried on numerous occasions between March 14, 2001 and May 1, 2001 to reach someone at German American who would assist them. No one from German American would return their calls. On April 25, 2001, GOCO wrote to Peter Fahey to ask his assistance in resolving the financial statements and certifications issues. Peter Fahey failed to return GOCO's calls. Mr. Fahey had no explanation for failing to return the telephone calls. Further, Larry Carlson did not call any representative of GOCO during the entire period of October 2000 to May 2001. Also, Mr. Fahey and Mr. Carlson had instructed ORIX to have no contact with Mr. Carroll or GOCO.

40.    No further action was taken by German American to have the $1.7 million letter of credit released and, in fact, the letter of credit was never released to GOCO, even though GOCO properly requested that it be released.

41.    Throughout the months of October 2000 through April 2001, German American continued in its efforts to force GOCO into a default situation. First, Deutsche Banc took over the loan as a special servicer, stopped sending loan payment notices, refused to allow automatic withdrawal for payments, refused to allow ORIX to communicate with borrower, and failed to give notice of a missed payment and an opportunity to cure. German American claimed that GOCO had not submitted appropriate financial data and claimed that GOCO had not submitted appropriate material concerning the operator of the stores. GOCO continually tried in good faith to satisfy the requests of German American for additional information to no avail. Since the involvement of Larry Carlson, Deutsche Banc's workout man, and Greg Yates, Deutsche Banc's and German American's outside counsel, there was a constant effort to force the loans to default; the only exit strategy available to Mr. Carlson, if he had any hope of recovering the illegal prepayment penalty.

42.    On or about April 26, 2001, the operator of the convenience stores changed. Pro-Marketing had been the operator and it became necessary for Sam J. Carroll, III to become the operator of the stores. The books and records of GOCO were turned over to Mr. Carroll's accountants from ProMarketing, the former Operator of the convenience stores. The person at Pro-Marketing who had been making payments apparently thought that Mr. Carroll's accountants were going to make the May 1, 2001 loan payment. Mr. Carroll and the accountants believed that the payments were made by automatic authorized withdrawal as the payments had been made since the inception of the loan. Further, the accountants had not yet become familiar with the means by which the previous operator was making payments. Thus, GOCO, through a mere innocent misunderstanding and excusable neglect, inadvertently failed to timely make its May 1, 2001 payment. From May 1, 2001 through May 15, 2001, GOCO had sufficient funds in its account to

make the May payment. Moreover, between at least April 27, 2001 and May 11, 2001, Mr. Carroll

was having ongoing discussions with Mr. Fahey about refinancing the loans. Mr. Fahey did not

advise Mr. Carroll that the May payment had been missed. Further, no one from ORIX called

GOCO to advise it that the May payment had not been made, because ORIX had been instructed not

to communicate with Mr. Carroll. Moreover, GOCO did not receive a payment notice for the month

of May 2001 and received no reminder notice.

43.     On April 27, 2001, Mr. Fahey contacted Greg Brown at ORIX and asked for a payoff

calculation for the GOCO loans as of May 31, 2001 and June 30, 2001. On May 11, 2001, Mr.

Carroll faxed a proposal from Compass Bank to Peter Fahey, which reflected an effort by Mr. Carroll

to refinance the GOCO loans. Mr. Carroll was aware that he could never do enough to satisfy

German American given Mr. Carlson's involvement. He could see the "handwriting on the wall" and

knew that he would have to find another bank to take over the German American loans. Despite

these continued communications, Mr. Fahey did not advise Mr. Carroll that GOCO had missed the

May payment.

44.     On May 15, 2001, Sam J. Carroll, III and GOCO received a Notice of Default signed

by Larry W. Carlson and Robert D. Burns, demanding payment of the following amounts:

| | |
|---|---|
| Principal: | $7,443,345.82 |
| Interest: | $59,360.68 |
| Current Late Charges:<br>(5% of 5/1/01 Payment) | $3,606.32 |
| Default Interest:<br>(5/1/01 - 5/15/01) | $35,883.13 |
| Prepayment Fee: | $2,179,619.14 |
| Total Due (5/16/01): | $9,721,815.09 |

45.    German American did not provide Sam J. Carroll, III and GOCO with any notice or opportunity to cure the inadvertent failure to timely make the May 1, 2001 loan payment and did not provide any Notice of Default other than the demand for full payment, acceleration of the loan and the payment of the exorbitant prepayment penalty. German American had provided two prior notices to cure with respect to other provisions of the Loan Documents and Mr. Burns testified that Defendants allow other borrowers an opportunity to cure upon the inadvertent failure to make a payment even after a thirty-day payment default. From May 1, 2001, until May 16, 2001 (and thereafter), GOCO's bank accounts had sufficient funds to pay the May 1, 2001 loan payment. Had Defendants allowed GOCO to use automatic payment withdrawal for its payments as they allowed all the other borrowers, there would have been no problem with the payment whatsoever.

46.    When Sam J. Carroll, III received the Notice of Default on May 16, 2001, he immediately telephoned Larry W. Carlson and offered to immediately bring the accounts current. Mr. Carlson, on behalf of German American, refused to accept any monies from GOCO stating, "We've got you now big boy. You are going deal with Larry Carlson now. I am driving this bus." Further, Mr. Carlson told Mr. Carroll, "I'm going to take your g____ -d_____ letter of credit; I'm going to take your stores; I'm going to take your inventory." Mr. Carlson also told Mr. Carroll that if he made any payments to bring the account current that they would be applied immediately to the $2.2 million prepayment penalty.

47.    After the telephone call to Mr. Carlson on May 16, 2001, Mr. Carroll wrote Mr. Carlson and offered to pay the total sum of $7,666,645.02, reduced by any proceeds received by drawing on the $1.7 million letter of credit. That amount represented payment in full of the outstanding principal balance due, plus the per diem interest, default interest, a late charge penalty,

the payment due May 1, 2001, and five (5%) percent ($108,000) of the $2.2 million prepayment

penalty calculated by German American. The five (5%) of the prepayment penalty offered exceeded

the $74,000.00 prepayment penalty that would have been earned, (1% ) of the outstanding loan

balance, under the Loan Documents in the absence of securitization. Mr. Carlson, likewise, refused

the tender of the May 16, 2001 letter of the more than the full payment of the loan. In response to

Mr. Carroll's tender, on May 18, 2001, Mr. Carlson had his outside counsel prepare and send to Mr.

Carroll a twenty (20)-page "forbearance agreement" in which Mr. Carlson agreed on behalf of

Defendants to forbear proceeding with the foreclosures on the GOCO stores in exchange for the

payment of the loan in full, plus all accrued interest at the default rate, late charges, a prepayment

penalty in the amount of approximately $587,000.00, and all attorney's fees incurred by Defendants.

Further, the forbearance agreement called for a personal guarantee of Sam Carroll, III, which had

never been required under the Loan Documents and had never been agreed to or considered by Mr.

Carroll. Mr. Carroll refused to enter into Mr. Carlson's "forbearance agreement."

48.    On June 15, 2001, Sam J. Carroll, III received a demand for payment from German

American under the Limited Agreement. The Limited Agreement provided that Sam J. Carroll, III

was personally liable only for losses or damages caused by the occurrence of one of four specific

events:

     a.    Fraud or intentional misrepresentation by the Borrower or Guarantor;
     b.    The gross negligence or willful misconduct by any Borrower;
     c.    The breach of any representations, warranties, covenants or indemnification provisions concerning environmental laws, hazardous substances or asbestos; and
     d.    The misapplication on conversion of insurance proceeds, condemnations, awards, or rents following an event of default by the Borrower.

None of these events has or had occurred. The June 15, 2001 letter demanded payment of all "Rents" from May 15, 2001 and continuing thereafter. Since May 15, 2001, there has been no "Rents" earned by GOCO, therefore, there could be no payments made under the Demand for Payment.

49.    Since May 15, 2001, German American has time and again refused to allow GOCO to bring its account current. On or about May 15, 2001, German American illegally drew down the $1.7 million letter of credit and applied it to GOCO's account. When the letter of credit was drawn down, all payments then due were brought current, leaving an amount in excess of $1.5 million in the account. Nonetheless, German American continued to charge late fees, continued to demand that the loan was delinquent, continued to demand that GOCO pay the exorbitant illegal prepayment penalty, and proceeded to file a foreclosure action in Florida and publish foreclosure notices in Alabama.

50.    After August 1, 2001, the monthly loan payments (including late charges) were reversed and the $1.7 million letter of credit was applied entirely to the illegal prepayment penalty. The Loan Agreements contain no provision authorizing application of the $1.7 million letter of credit to the prepayment penalty.

51.    Defendants have communicated with Jim Richardson-- owner of Happy Retail, Inc. the former operator of the GOCO stores--concerning him taking over the operation of the GOCO stores after the foreclosure. Defendants have provided Mr. Richardson false information and have relied upon false information supplied by Mr. Richardson to harm the plaintiffs.

52.    On July 20, 2001, Sam J. Carroll, III received a notice of payment from ORIX, German American's agent, which constituted an offer to reinstate the loans in exchange for the

payment of $299,324.72 by August 1, 2001. By letter of July 31, 2001, GOCO accepted German American's agent's offer, advising the agent to deduct the payment from the proceeds of the $1.7 million letter of credit. The notice characterized the letter of credit as a prepayment penalty and a "suspense debit."

53.    German American's agent ORIX refused to reinstate the loan, despite its offer and Sam J. Carroll, III's and GOCO's acceptance. ORIX claimed that it made a mistake by sending the payment notice and that making the offer was inadvertent on ORIX's part.

54.    Since May 15, 2001, German American has undertaken actions to foreclose on the convenience store properties in Alabama and Florida, thereby causing plaintiffs to incur substantial expenses, embarrassment and damage to reputation. Specifically, on June 14, 2001, German American filed a foreclosure action in Florida which involved the eight Florida stores. That foreclosure action is currently stayed.

55.    Furthermore, in July 2001, Defendants published foreclosure notices with regard to the seven convenience stores located in the State of Alabama. The foreclosure sales were originally scheduled for August 13, 2001.

56.    Simultaneously with the publishing of the notices of foreclosure in the newspaper, German American sent copies of the notices of foreclosure to the individual stores rather than to GOCO or Sam J. Carroll, III as was provided in the Loan Documents. Defendants knew Sam J. Carroll's address, including his attorney's addresses. Sending the notices to the individual stores was done with the specific intent to harm the business and personal reputation of GOCO and Sam J. Carroll, III. That intent is evidenced, in part, by the fact that Defendants had never sent any notices to the individual stores prior to the notices of foreclosure.

908027.1                                    21

57.    Because of the impending foreclosures, it was necessary for GOCO to seek the protection of the Bankruptcy Court. GOCO representatives had warned Defendants that such action would be necessary if Defendants did not cancel the foreclosures until this Court determined whether the default and loan acceleration were appropriate. Despite that plea, Defendants refused to cancel the foreclosures. As a result, on August 13, 2001, GOCO filed for the protection of the Bankruptcy Court. Such filing has damaged the reputation of GOCO and Sam Carroll, III. Also, the actions of Defendants caused GOCO and Mr. Carroll to incur substantial accounting and legal expenses. Further, complex, unwarranted legal maneuvering of the Defendants has caused GOCO and Mr. Carroll to suffer business losses and missed opportunities. Moreover, Defendants have contacted business creditors of GOCO with whom GOCO continues to do business. Defendants have made derogatory statements about GOCO and seek to interfere with GOCO's business relations with its existing trade creditors.

58.    Since October 2000, during each and every discussion with Mr. Carlson, Mr. Carlson has been belligerent and berating to Sam J. Carroll, III making such statements as - "We've got you now big boy," and "You are going to have to deal with Larry Carlson now." Further, Mr. Carlson has used inappropriate, profane, and foul language. Additionally, Mr. Carlson has called counsel for plaintiffs inappropriate names, has advised Mr. Carroll not to seek the advice of an attorney or to rely on counsel's advice under threat of discontinuing negotiations with him, even though Mr. Carlson relied on Defendants' outside counsel, Greg Yates, at every step. Upon information and belief, Mr. Carlson is entitled to personally receive income or a percentage from the prepayment fee collected on any loan which a prepayment fee is collected.

59.    Plaintiffs contend that, as early as May 20, 1999, and at least by September 6, 2000, German American and its agents had intentionally set out on a course to illegally and improperly force a default under the terms of the GOCO loans and thereby rid itself of a loan that was in violation of its policy or charter to only hold loans within its portfolio for six (6) months and a loan it could not sell on the secondary market.  By putting the loans in default and accelerating the maturity date, Defendants stood to earn an unconscionable and exorbitant prepayment penalty, a portion of which, upon information and belief, would be paid to Mr. Carlson personally.

60.    On or about October 23, 2001, Defendants filed a counterclaim against Sam J. Carroll, III, accusing him of fraud, intentional misrepresentation, gross negligence and/or willful misconduct, and misapplication and conversion of funds.  Such allegations are false and are known by the Defendants to be false.  Such allegations have harmed, and will continue for the rest of his life to harm, the personal and business reputation of Mr. Carroll.

## COUNT I - FRAUD, MISREPRESENTATION, DECEIT,
## FRAUDULENT DECEIT AND SUPPRESSION

Plaintiffs incorporate herein by reference into this Count each and every foregoing paragraph of this Complaint.

61.    German American made affirmative misrepresentations to plaintiffs and suppressed material facts from them concerning the release of the $1.7 million letter of credit in the Loan Documents among other things.  When it demanded the letter of credit prior to the closing of the loans, German American, as disclosed by Mr. Carlson, never intended to release the $1.7 million letter of credit.  Based on Mr. Carlson's statement, German American knew at the time it made the representation that it was false and knew that it had failed to disclose material facts to plaintiffs.

Sam J. Carroll, III, in reliance on the representations made in the Loan documents and those statements made by German American, formed GOCO, which put up the $1.7 million letter of credit and entered into the Loan Agreements with German American.

62.    Further, by May 20, 1999, Defendants knew of problems in the securitized franchise lending market and knew that it would not securitize the GOCO loans. Also, Defendants knew of German American's policy or charter not to hold loans more than six (6) months. As a lender making a loan to a borrower, German American had a duty to disclose these facts to plaintiffs. Despite German American's policy or charter, Defendants made the decision to make fifteen (15) twenty-year loans to GOCO. Defendants failed to advise GOCO or Mr. Carroll of these material facts, and based upon such lack of knowledge, GOCO and Mr. Carroll entered into the Loan Agreements relying on the terms thereof.

63.    Further, at least as of October 2000, Defendants intended to take every action possible to put the GOCO loans in default. Defendants failed to advise plaintiffs of their intent and, as a result, Sam Carroll and GOCO refrained from taking actions that would have protected them from the ultimate harm that was caused by Defendants' actions. Defendants owed plaintiffs a duty to advise them of their intention based upon the implied duty of good faith and fair dealings present in every contract.

64.    As a direct, proximate and foreseeable result of their reliance on Defendants' misrepresentations and suppressions of material facts, plaintiffs have been injured.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental damages and consequential damages, according to proof at trial, plus interests, costs and

attorney's fees. Additionally, plaintiffs demand exemplary or punitive damages, such damages to be determined by a jury.

## COUNT II - BREACH OF CONTRACT

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 64 of this Complaint.

65.     German American has breached its agreements with plaintiffs in the following manner:

   a.     German American has breached its contract with Sam J. Carroll, III and GOCO by refusing to release the $1.7 million letter of credit when GOCO satisfied the conditions of the Loan Documents.

   b.     German American has breached its contract with GOCO by forcing and demanding an unconscionable prepayment penalty.

   c.     German American has breached its contract with GOCO by wrongfully forcing GOCO into a default and accelerating the loan without giving GOCO an opportunity to cure a misunderstanding or an excusable mistake on the part of its operator or accountants.

   d.     German American has breached its contract with Sam J. Carroll, III and GOCO by failing to deal in good faith and failing to treat Mr. Carroll and GOCO in a fair, equitable and ethical manner.

   e.     German American has breached the contract created when GOCO accepted ORIX's, German American's agent's July 20, 2001 offer to reinstate the loan on August 1, 2001.

f.    German American has breached the Loan Agreements with GOCO by applying the proceeds from the $1.7 million letter of credit to the prepayment penalty rather than the principal of the loans.

g.    German American has breached the Loan Agreements with GOCO by failing to approve Mott Oil Company as the Operator of the GOCO stores.

h.    German American has breached the Loan Agreement with GOCO by declaring a default and/or providing a notice to cure and failing to describe the nature of the default, and thereafter failing to return telephone calls inquiring as to the nature of the alleged default.

i.    Defendants have breached German American's contract with GOCO by taking away the loan servicing responsibilities from ORIX thereby becoming special servicer and then failing to perform such functions under the Loan Agreements.

66.    As a direct, foreseeable and proximate result of these breaches of contract, plaintiffs have suffered damages.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental damages and consequential damages, in an amount according to proof at trial, plus interest, costs and attorney's fees.

## COUNT III - UNCONSCIONABILITY

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 66 of this Complaint.

67.    The prepayment fee or penalty provision of the Loan Agreement which provides for a one percent (1%) prepayment penalty or a calculated amount based on an impossibly complex

formula, which has no application to the loan, <u>whichever is larger</u>, is unconscionable. As calculated by Defendants, the prepayment penalty is in excess of $2.1 million. This amount was not bargained for, was not negotiated, is unreasonable and is not connected in any way to any loss which would have been or has been incurred by Defendants if the loan was paid off early. The prepayment penalty is a penalty and, therefore, subject to rigorous scrutiny by the Court.

68.    Moreover, given that Defendants elected to accelerate the maturity date after the innocent mistake that resulted in the failure of GOCO to make the May 2001 loan payment, Defendants has waived its right, if any existed, to receive a prepayment penalty. The acceleration of the maturity date makes the full and complete payment of the loan due on the accelerated date and therefore there would be no prepayment. The definition of the prepayment fee and the provision that acceleration can constitute a prepayment creates an ambiguity within the Loan Agreements.


69.    Due to the waiver by acceleration and the ambiguity in the Loan Agreements, it is unconscionable for Defendants to seek the payment of the prepayment penalty. In addition, the prepayment penalty is unreasonable and unconscionable, as it in no way reflects the actual damage that would have been suffered by the Defendants as a result of one untimely payment. Furthermore, the prepayment penalty is unconscionable as it was intended to punish the plaintiffs rather than fairly compensate the Defendants.

70.    As a direct and proximate result of the unconscionable provision, plaintiffs have been injured.

WHEREFORE, plaintiffs ask that such prepayment penalty be stricken from the Loan Documents, and demand judgment against Defendants for compensatory damages, incidental and

consequential damages in an amount in excess of two million dollars according to proof at trial, plus interest, costs, and attorney's fees.

## COUNT IV - DECLARATORY JUDGMENT

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 70 of this Complaint.

71.    Plaintiffs hereby ask the Court, pursuant to Rule 57 of the Federal Rules of Civil Procedure, to declare that: (1) the prepayment penalty is unconscionable and is due to be stricken from the Loan Documents, and (2) the Defendants waived any right to the prepayment penalty through their election to accelerate the maturity dates of the loans.

WHEREFORE, plaintiffs' request that the Court declare that: (1) the prepayment penalty is unconscionable and is due to be stricken from the Complaint, and (2) the Defendants waived any right to the prepayment penalty through their election to accelerate the maturity dates of the loans. Further, plaintiffs ask the Court to award attorney's fees, interest and costs against Defendants.

## COUNT V - BREACH OF CONTRACT

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 71 of this Complaint.

72.    Defendants has breached the Limited Agreement by making demand upon Sam J. Carroll, III under such Limited Agreement without one of the four triggering events to make the Guaranty applicable.  Based upon the Limited Agreement, Defendants have filed a counterclaim against Sam J. Carroll, III, accusing him of fraud, intentional misrepresentations, gross negligence or willful misconduct, and misappropriation or conversion of funds.  Such allegations are false, and Defendants know they are false.  Further, on May 16, 2001, Sam J. Carroll, III and GOCO tendered

to Defendants the full amount of the loan, late fees, default interest rate, and $108,000.00 as a prepayment penalty. Defendants refused the tender of the payment in full under the Loan Documents, demanding instead over $500,000 in an illegal prepayment penalty and a personal guarantee from Sam J. Carroll, III. Defendants have failed to mitigate its losses and cannot now claim under the Limited Agreement. Further, Defendants have suffered no losses as a result of the false and inaccurate accusations. No amounts are due under the Limited Agreement. As a direct, foreseeable and proximate result of this breach of contract, Sam J. Carroll, III's personal and business reputation has been damaged. Additionally, the Limited Agreement is void because the Defendants failed to qualify to do business in the State of Alabama prior to Sam J. Carroll, III signing the Limited Agreement.

WHEREFORE, plaintiff demands judgment against Defendants for compensatory damages, incidental and consequential damages in an amount in excess of two millions dollars according to proof at trial, plus interest, costs, and attorney's fees.

## COUNT VI - DECLARATORY JUDGMENT

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 72 of this Complaint.

73.    Plaintiffs hereby ask the Court, pursuant to Rule 57 of the Federal Rules of Civil Procedure, to declare that no Guaranteed Obligations are due under the Limited Agreement provided by Sam J. Carroll, III on May 20, 1999 to Defendants.

WHEREFORE, plaintiffs request the Court to declare, pursuant to Rule 57 of the Federal Rules of Civil Procedure, that no Guaranteed Obligations are due under the Limited Agreement provided by Sam J. Carroll, III on May 20, 1999 to Defendants.

## COUNT VII - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 70 of this Complaint.

74.    Based on all the conduct described above, Defendants have breached their obligation to deal in good faith implied in every contract as set forth under the law. Further, the actions of the Defendants as alleged herein were unconscionable and in bad faith. As a direct and proximate result of those improper actions, plaintiffs were damaged.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental and consequential damages in an amount in excess of two million dollars according to proof at trial, plus interest, attorney's fees, and costs.

## COUNT VIII - BREACH OF FIDUCIARY DUTY AND GOOD FAITH

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 74 of this Complaint.

75.    Defendants, a lender in a fiduciary or quasi-fiduciary relationship with its borrower GOCO, breached its fiduciary or quasi-fiduciary duty owed to GOCO and its 80% shareholder Sam J. Carroll, III. As a direct and proximate result, GOCO and Sam J. Carroll, III were injured. Specifically, under the Loan Agreements, Defendants were required to engage in certain conduct which created a duty beyond that of a strictly lender/borrower relationship. For example, Defendants was holding a $1.7 million letter of credit that belonged to GOCO. Also, Defendants were required to approve operators of the store and to take other actions in regards to the loans. This heightened responsibility on the part of Defendants imposed a fiduciary duty on Defendants to safeguard the funds of GOCO and not to misuse or misapply the funds. When Defendants drew on the $1.7

million letter of credit and applied the proceeds therefrom to the illegal prepayment penalty, Defendants breached the fiduciary duty owed to GOCO. Also, Defendants' failure to release the $1.7 million letter of credit when GOCO had met the obligations of the Loan Agreements constituted a breach of fiduciary duty, as did Defendants' obligation to consider and approve an operator for the stores. Finally, Defendants' deliberate attempts to force GOCO into default also constituted a breach of the fiduciary duty owed to GOCO.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental and consequential damages in an amount in excess of two million dollars according to proof at trial, plus interest, attorney's fees and costs. Additionally, plaintiffs demand exemplary or punitive damages in an amount a jury may assess against the Defendants.

## COUNT IX - INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 75 of this Complaint.

76.    There presently exists a business relationship between Sam J. Carroll, III, GOCO, and those individuals who manage and who are employed at the convenience stores.

77.    Defendants are aware of the business relationship that exists between Sam J. Carroll, III, GOCO, and those individual store managers and employees.

78.    Defendants have intentionally interfered with those relationships through their action of directing the notices of foreclosure to the individual stores rather than to GOCO or Sam J. Carroll, III at the address provided for notices in the Loan Agreements.

79.    There is a complete absence of justification for Defendants' intentional interference.

80.    Defendants are aware of the relationships that exist between GOCO and its trade creditors. During the pendency of the bankruptcy, Defendants have contacted the trade creditors and have made derogatory remarks to the trade creditors about GOCO. Such interference was not justified and was done only to gain a better bargaining position in the bankruptcy proceeding.

81.    Deutsche Banc is aware of the relationship between German American and GOCO and Mr. Carroll. Employees of Deutsche Banc have intentionally interfered with the relationship between German American and GOCO and Mr. Carroll by engaging in the above-described wrongful conduct that has caused GOCO and Mr. Carroll damage.

82.    GOCO and ORIX had a borrower/loan servicer relationship with regards to the Loan Agreements. Deutsche Banc interfered with the relationship between GOCO and ORIX to GOCO's detriment.

83.    The intentional interference by Defendants with Sam J. Carroll, III's and GOCO's business and contractual relations has proximately resulted in injuries and damages to GOCO and Mr. Carroll.

84.    The plaintiffs claim punitive damages of Defendants because of the intentional, wanton and/or gross or reckless nature of the intentional interference with their business relations.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental and consequential damages in an amount a jury may assess against the Defendants according to proof at trial, plus interest, costs and attorney's fees. Additionally, plaintiffs demand exemplary or punitive damages in an amount a jury may assess against the Defendants.

908027.1

32

## COUNT X - WAIVER OF CONTRACT PROVISION

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 84 of this Complaint.

85.     After the innocent mistake which resulted in missing the May 1, 2001 loan payment, Defendants consciously elected to accelerate the maturity date of the loans.

86.     Due to that affirmative election on Defendants' part, they have waived any right to recover a prepayment penalty from the plaintiffs since there was in fact no prepayment of the loans.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental and consequential damages in an amount a jury may assess against the Defendants according to proof at trial, plus interest, costs and attorney's fees.

## COUNT XI – CONSPIRACY

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 86 of this Complaint.

87.     Defendants through their employees, namely Larry Carlson and Peter Fahey wrongfully conspired with Jim Richardson, owner of Happy Retail, Inc., the former operator of the GOCO stores, to put the GOCO loans in default. Specifically, Larry Carlson and Peter Fahey communicated with Jim Richardson to find out information about GOCO, when they would not call Mr. Carroll directly. Further, the above named individuals and their counsel have worked together to force GOCO into default based upon Defendants's promise to Jim Richardson that they would have him manage the GOCO stores after foreclosure. Such action was wrongful, and in violation of duties owed under the Loan Agreements and under the relationships between the parties. GOCO and Mr. Carroll have been damaged by the wrongful conduct of the Defendants and Jim Richardson.

88.    The actions of the Defendants were intentional, malicious, oppressive and/or wanton.

89.    As a proximate consequence of said conspiracy involving the Defendants, the plaintiffs have suffered injury and were damaged as alleged in the preceding counts.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental and consequential damages in an amount a jury may assess against the Defendants according to proof at trial, plus interest, costs and attorney's fees.  Additionally, plaintiffs demand exemplary or punitive damages in an amount a jury may assess against the Defendants.

## COUNT XII – CONVERSION

Plaintiffs hereby incorporate by reference and reallege in this Count Paragraphs 1 through 89 of this Complaint.

85.    By drawing on the $1.7 million letter of credit and applying it to the illegal prepayment penalty, Defendants have intentionally and  wrongfully taken and converted property belonging to GOCO.

86.    As a result of Defendants' conversion, plaintiffs have been damaged.

WHEREFORE, plaintiffs demand judgment against Defendants for compensatory damages, incidental and consequential damages and punitive damages in an amount a jury may assess against the Defendants according to proof at trial, plus interest, costs and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, plaintiffs pray as follows:

1.    That this Court take jurisdiction of the subject matters and the parties hereto;

2.      That a judgment be entered against Defendants for compensatory damages, including, but not limited to, incidental and consequential damages in an amount in excess of nine million dollars, according to proof at trial;

3.      That a judgment be entered against Defendants for punitive and exemplary damages in an amount to be determined by the jury, according to proof at trial;

4.      That a judgment for an award of a reasonable attorney's fee, interest and costs be entered against Defendants;

5.      That the Court grant the requested declaratory relief; and

6.      For such other appropriate and just relief as this Court deems just and proper.

Carol H. Stewart (STE134)
Robert E. Battle (BAT026)
Stephen J. Bumgarner (BUM001)

Attorneys for Plaintiffs
Sam J. Carroll, III and GOCO Acquisition
Corporation

OF COUNSEL:

BURR & FORMAN LLP
P. O. BOX 830719
BIRMINGHAM, AL 35283-0719
(205) 251-3000

PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY.

Of Counsel

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Second Amended Complaint has been served on the following by directing same to their office addresses through first-class, United States mail, postage prepaid, on this the ___ day of December, 2001:

James H. Anderson, Esq.
Beers, Anderson, Jackson, Hughes & Patty, P.C.
250 Commerce Street, Suite 100
P. O. Box 1988
Montgomery, Alabama 36102

Greg R. Yates
Stephen Davidson
George Calhoun
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Of Counsel

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION FILED

AUG 1 2 2002

CLERK COURT
U. S. DISTRICT COURT
MIDDLE DIST OF ALA.

SAM J. CARROLL, III, and )
GOCO ACQUISITION CORPORATION, )
an Alabama Corporation, )
)
   Plaintiffs, )
)
) CIVIL ACTION NO. 01-T-981-S
)
GERMAN AMERICAN CAPITAL )
CORPORATION, a Maryland )
Corporation, etc., et al., )
)
   Defendants. )

ORDER

Plaintiffs Sam J. Carroll, III ("Carroll") and GOCO

Acquisition Corporation ("GOCO") bring this lawsuit against

defendants German American Capital Corporation ("German

American") and Deutsche Banc Alex.Brown ("Deutsche Banc AB").

The plaintiffs' state-law claims, arising out of a series of

franchise-mortgage loans made to GOCO by German American,

include fraud, misrepresentation, deceit, fraudulent deceit,

suppression, unconscionability, breach of contract and

fiduciary duty, breach of the duties of good faith and fair

dealing, intentional interference with business relations,

waiver of contract provision, conspiracy, and conversion.

EOD    8/12/02

EXHIBIT
C

German American has counterclaimed for declaratory judgment and breach of contract. This cause is now before the court on the plaintiffs' motion to dismiss the defendants' counterclaims, filed September 24, 2001 (Doc. no. 21); the defendants' motion for judgment on the pleadings, filed November 6, 2001 (Doc. no. 28); the defendants' motion to dismiss the plaintiffs' second amended complaint, filed February 5, 2002 (Doc. no. 77); the plaintiffs' motion to strike exhibits, filed February 28, 2002 (Doc. no. 88); the plaintiffs' motion to dismiss second amended counterclaims, filed March 5, 2002 (Doc. no. 91); the defendants' motion for summary judgment, filed April 17, 2002 (Doc. no. 105); and the plaintiffs' motion for partial summary judgment and summary judgment on second amended counterclaims, filed April 17, 2002 (Doc. no. 107). This court has jurisdiction pursuant to 28 U.S.C.A. § 1332 (diversity of citizenship) because the citizenship of all plaintiffs is diverse from that of all defendants, and the amount in controversy exceeds $75,000. For the following reasons, the motions will be granted in part and denied in part.

## I.   SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986); <u>see</u> <u>also</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993).   In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

## II.   FACTS

### A.  Background

This case arose out of a series of franchise loans made by German American to GOCO in conjunction with GOCO's acquisition of 15 convenience stores in Alabama and Florida.   Carroll originally owned 100% of GOCO's stock and now owns 80% of its

3

stock.    German American and Deutsche Banc AB are both subsidiaries of Deutsche Bank Americas Holding Corporation ("Deutsche Bank"), which is based in New York and is one of the two largest banks in the world.    German American is a wholly owned subsidiary of Deutsche Bank, and Deutsche Banc AB is a 40%-owned subsidiary of Deutsche Bank.    German American does not have any employees but is operated and run by employees of Deutsche Banc AB.

In 1998 and 1999, Deutsche Bank was involved in franchise securitized lending through its subsidiary Global Alliance Finance Company, L.L.C. ("Global Alliance").    Global Alliance had developed a franchise loan program and had 15 to 20 Deutsche Banc AB employees assigned to it to implement and operate its franchise program.    Franchise lending, which was prevalent in the late 1990s, was a means by which credit was extended on the basis of the value of a "franchise."    In the case of the franchise loans at issue in this lawsuit, franchise lending involved loans for which the collateral was the business and realty interests of convenience stores with fuel pumps.

Franchise lenders such as Global Alliance would typically make the franchise loans with the intent of securitizing the

4

loans.  Securitization is a process of bundling loans into a pool and then assigning them to a trust, which in turn creates and sells certificates to institutional investors.  The certificates, which are much like bonds, are thus backed or secured by cash flow from a specific pool of individual loans. The franchise loans were typically for a term of 20 years and the loans could not be prepaid for the first ten years without a prepayment penalty or fee, which would compensate the certificate holders for the loss of the cash flow which they expected and for the costs associated with unbundling the pool or trust to allow the early payoff of the loan.

Global Alliance selected Deloitte & Touche, L.L.P. ("Deloitte & Touche") to perform its valuations of franchises, which provided the basis to determine the amount that would be loaned to the franchisee borrower.  The valuations were a combination of the value of the business and of the real property on which the business was located.  The loan amount was not typically based on the purchase price, but rather on the reported cash flow of the business or franchise.  In securitized franchise lending, the lender made money on both ends of the loans.  First, the lender charged an origination fee (in this case 3% of the loan amount) and other lender fees

on the front end (when the loan was made to a borrower). Then, the lender collected a fee when a loan was pooled or placed into the trust and sold to the certificate holders.

At some point in the first half of 1999, Deutsche Bank decided that it no longer wanted to be in the franchise securitization lending business, and, as a result, Global Alliance stopped making franchise loans. Robert Burns, a vice president of German American, testified that he believed that Deutsche Bank had learned of problems in the franchise lending industry and decided to cease Global Alliance's franchise lending activities, because the franchise business was not profitable and there were "tremendous credit risks with franchise loans." Another employee testified that another reason was that the Deloitte & Touche valuations were "flawed." Although it had already made the decision to exit the franchise lending business, Deutsche Bank, through its subsidiary German American, made 15 franchise loans to GOCO on May 20, 1999. According to the Deutsche Banc AB account representative who worked on the GOCO loans, it is believed that these were the last franchise loans made by any Deutsche Bank entity.

## B. The Loan Application

In the fall and winter of 1998-99, Carroll, a south Alabama businessman, was negotiating with Graceville Oil Company, Inc., for the purchase of certain convenience stores located in Alabama and Florida. On December 31, 1998, Carroll, through a company called S.A. Development, Inc., whose stock is owned 100% by Carroll, paid $100,000 in earnest money and entered into a contract with Graceville to purchase 15 convenience stores for $6,000,000. The contract required that the purchase be closed on or before April 30, 1999.

Carroll contacted Marc Freed, a loan originator and securitization specialist employed by Global Alliance, to inquire about obtaining a loan for the purchase of the stores and to pay for improvements to the stores. On February 17, 1999, Freed sent a loan proposal to S.A. Development on German American letterhead proposing that German American or one of its affiliates loan S.A. Development up to $8,600,000 or 70% of the combined business enterprise and real estate value as determined by an appraiser chosen by German American. The loan was to be used for the purchase of the stores ($5,500,000), remodeling of the stores ($2,725,000) and the closing costs ($375,000).

7

In response to the proposal, an initial fee in the amount of $43,000 was paid to German American, and a Global Alliance loan application was filled out by Freed and signed by Carroll on or about March 4, 1999. On March 25, 1999, Global Alliance sent Carroll a letter acknowledging receipt of the $43,000 deposit and the signed proposal letter, and setting forth an outline of the further information that would be needed to process the loan application. At some point in the application process, Carroll mailed to Freed three years of financial data for the Graceville stores and other financial data. Also, on April 5, 1999, Carroll faxed a handwritten personal financial statement to Freed and mailed a letter to him setting forth Carroll's personal employment history, explaining certain items on the handwritten financial statement, and enclosing Carroll's personal tax returns for the previous three years. Freed used the collected information to complete the franchise loan package for Deutsche Bank, which included the resume for Carroll. Some parts of the resume for Carroll prepared by Freed were erroneous. Also during late March or early April, Deloitte & Touche performed valuations on the stores which reflected a total value of $10,000,000, including a business valuation of $3,420,000 and a realty valuation of $6,580,000.

8

The Franchise Credit Acquisition Report ("Franchise Report"), which was the document prepared by Global Alliance and submitted for the loan application's approval, was finalized on or about April 16, 1999. The Franchise Report also set forth the proposed terms of the loans, and reflects that the loans would be made to GOCO, which had been formed by that time and which was the company to which S.A. Development had conveyed its contract with Graceville. The loans would be made by Global Alliance or one of its affiliates in the total amount of $7,700,000 for a 20-year term at a fixed interest rate. The loan as approved was to be non-recourse to the principals of the borrowers and have no guarantors. The Franchise Report also contained a requirement that appears in the records for the first time that it would be necessary for the borrower to put up a $1.7 million letter of credit as collateral in addition to the first mortgage security in the stores. The letter of credit was to be released upon the following conditions: the borrower would complete branding and remodeling of the stores within six months after the closing date, the borrower's consolidated FCCR (fixed charge coverage ratio) would be at least 1.45 for a specified time period, and the LTV (loan to value ratio) would not exceed 70%. Finally,

the Franchise Report also required that the lender review and approve the management agreement with the operator of the convenience stores prior to the closing.

The approval of the loans on April 16, 1999, was conveyed to GOCO by a commitment letter of the same date. The commitment letter reflected that the loan would be made by German American or one of its affiliates, rather than Global Alliance. The commitment letter set forth the terms of the proposed loan, including the requirement of a $1.7 million letter of credit to be pledged to German American until certain conditions were met. Consistent with the Franchise Report, these conditions included the branding of the stores and achievement of a 70% loan to value ratio. The commitment letter also confirmed that the loans would be non-recourse to the principal of GOCO except with respect to certain events which included fraud, willful misconduct, gross negligence, and misappropriation of funds.

Although Carroll did not want to enter into the loan commitment with German American because of the newly imposed requirement of the $1.7 million letter of credit, he did not have an alternative lender that could provide the needed funds within the window of time of the Graceville contract and the

10

extension that Carroll was able to negotiate on that contract (until May 31, 1999, with payment of an additional $100,000 in earnest money).  If Carroll had not accepted the commitment, he would have lost the $100,000 earnest money he had paid to Graceville and the $43,000 he had paid to German American.

## C.  Negotiations Regarding the Stores' Operator

When Carroll was negotiating to purchase the convenience stores from Graceville, he was searching for a business associate to either buy the stores from him at a profit, or a partner who would be part-owner of the stores and would operate them.  Carroll was employed full time with W.L. Petrey Company, a grocery wholesaler to convenience stores, and did not intend to operate or manage the Graceville stores himself.  Shortly after entering into the contract with Graceville, Carroll was introduced to James L. Richardson.  Richardson owned part-interest in and operated a group of convenience stores through a company called Happy Stores, Inc.  Carroll entered into negotiations with Richardson initially to purchase the Graceville stores from S.A. Development.  Eventually, by the time the loan commitment was issued, it was determined that Carroll would own 100% of the stock of a newly created company

11

called GOCO, and Happy Stores, Inc., or a related entity would manage the 15 stores. German American reserved the right to approve the documents related to the management relationship between GOCO and Happy Stores, Inc., and any subsequent operator. It was ultimately determined that the operator of the 15 stores would be Happy Retail, LC, a Richardson-affiliated entity created for the purpose of operating the GOCO stores.

By the time of closing the loans, Richardson had decided that he wanted to own a portion of GOCO's stock. German American had indicated that Richardson could own up to 20% of the stock without altering the commitment. It was agreed that Richardson would purchase the inventory in the stores which was approximately $650,000 and that for the contribution of the inventory to GOCO, Richardson would receive 20% of GOCO's stock. On the date of the loans' closing, May 20, 1999, Happy Retail and GOCO entered into several agreements under which Happy Retail was to (1) lease the 15 stores from GOCO to operate, (2) manage the stores for a fee, and (3) supply fuel to the stores. All of the documents were reviewed, revised, and approved by German American's legal counsel. On or about May 20, 1999, Richardson borrowed $644,000 from CJJ Inc., a

12

Carroll-affiliated entity, to purchase the inventory from the stores and executed a 30-day note reflecting the same.  Within 30 days, Richardson had paid off the loan and on July 1, 1999, 20% of the GOCO stock was transferred to Richardson.

## D.  The Loans

On or about May 20, 1999, GOCO entered into 15 individual loan agreements with German American for the financing of the Florida and Alabama convenience stores, under which German American loaned an aggregate principal amount of $7.7 million. As security for the loans, GOCO executed mortgages and security agreements for each of the 15 properties.  As additional security, GOCO was required to post a $1.7 million letter of credit which would be released by German American within 30 days of GOCO's meeting certain requirements set out in schedule 10 of the loan agreements.  German American has made no other loan since 1995 in which it required a letter of credit such as the one for the GOCO loans.  In addition, Carroll was required to sign a limited non-recourse carve-out guaranty and indemnity agreement ("guaranty"), which provided in part that Carroll would indemnify German American for losses it incurred by reason of (a) any fraud or intentional misrepresentation of

13

GOCO or Carroll; (b) gross negligence or willful misconduct by GOCO; or (c) misapplication or conversion by GOCO of any rents following an event of default.

The loan agreements, the guaranty, and the other loan documents for the 15 loans executed on May 20, 1999, were prepared by German American's counsel located in North Carolina, were form securitized lending loan forms, and were not subject to material change or negotiation between the parties. The loan documents were mailed to GOCO's counsel in Alabama, and signed in Alabama by Carroll, without any further discussions or negotiations with German American. Because the 15 loan agreements are the same, for ease of reference in this opinion the court will refer to "the loan agreement" in the singular rather than plural.

As will be discussed in further detail below, German American has demanded a prepayment fee or penalty from GOCO, asserting its authority to do so under the loan agreement. The parties dispute whether the loan agreement explicitly authorizes a prepayment fee. German American representatives Robert Burns and Larry Carlson have testified that the voluntary prepayment fee provisions were included in the loan agreement to protect the interests of future certificate

14

holders in the event of securitization.  German American has never collected a prepayment fee in excess of 1% of the principal loan value.  The prepayment fee demanded by German American in this case represents approximately 29% of the principal loan value.


### E.   German American's Handling of the Loans

Larry Carlson testified that it was the charter or policy of German American to hold loans for up to six months only, and in no event, for longer than twelve months.  The Franchise Report states that the "primary exit strategy" for the GOCO loans was "securitization of the loan with a secondary strategy of a whole loan sale."  German American's "primary exit strategy" for the GOCO loans was securitization (even though it had gone out of the franchise securitization business) with a secondary strategy of a whole loan sale.  This exit strategy was memorialized on the Franchise Report prepared by Global Alliance.

German American was unable to securitize or sell the GOCO loans.  As a result, in 2000, within one year of the loans' inception, the loans were placed in a "Legacy" book - Deutsche Bank's and German American's designation for business that was

no longer viable, whether the loans were performing or nonperforming. The GOCO loans were viable and performing, in that GOCO paid every monthly payment on time and in full every month through May 2001, yet the GOCO loans were placed in the Legacy book. Ordinarily, performing loans were not assigned to "asset managers" until 30 days after a borrower missed a payment. The GOCO loans, however, went to Peter Fahey, an asset manager, in the same month they were made. Because Peter Fahey reported to Larry Carlson, another asset manager, the loans were under Carlson's supervision almost from their inception. Carlson was assigned as the asset manager for the GOCO loans sometime thereafter. Once in the Legacy book, and under an asset manager's direction, the loans could be removed from this designation through restructuring, sale, forced or voluntary pay-off, default, acceleration, or foreclosure.

Robert Burns, a German American vice president and the supervisor of Carlson and Fahey, instructed Fahey and Carlson to monitor the loans, and if some "issue with performance" arose, they should get the loans paid off. Carlson testified that as an asset manager, he would place the loan in default as soon as possible, even upon a one-day payment default. Burns testified that he typically would not involve an asset

16

manager until over 30 days after a payment default and that he would expect his asset managers to telephone borrowers prior to sending borrowers a notice of default to try to have them bring the account current. In the case of the GOCO loans, however, Burns endorsed and agreed with Carlson's action (described below) to place the GOCO loans in default after a 15-day payment default, with no telephone reminder providing an opportunity to cure.

## F. GOCO's Handling of the Loans

After the loans closed on May 20, 1999, GOCO made monthly payments by automatic payment withdrawal pursuant to the terms of the loan documents. GOCO was never late and never missed a payment. By November 20, 1999, within the six-month time period allowed in the loan documents, the GOCO stores had been branded and re-imaged under the "Coastal" brand of stores. This information was conveyed to German American.

By January 2000, GOCO and Carroll were having problems with the operator of the stores, Happy Retail, LC and James Richardson. German American was also having problems obtaining requested financial statements from Richardson's controller, Weldon Tollison, and Happy Retail. In February 2000, Carroll

proposed that German American approve his transfer of his 80% interest in GOCO to Richardson. German American never responded to the request. In May 2000, Carroll notified German American that he was planning to terminate Happy Retail as the operator, and Carroll had discussions via letter and telephone with Peter Fahey concerning the problems he was having with Richardson and Happy Retail.

In September 2000, Carroll telephoned Fahey to set up a meeting when Carroll was scheduled to be in New York on other business. Carroll's purpose in requesting the meeting was to discuss the release of the $1.7 million letter of credit pursuant to the terms of the loan agreement and to ask for the approval of a new operator for the stores. Fahey and Larry Carlson (who also participated in the meeting) testified that they understood the meeting's purpose to be discussing refinancing the loans with another lender. Fahey did not disclose to Carroll prior to the meeting that Fahey was now acting as an asset manager on the loans. Carroll also did not know that Carlson had been assigned to the account, or that Deutsche Bank was no longer in the franchise lending business.

## G.  The New York Meeting

In late September or early October 2000, Carroll met with Fahey and Carlson.  Fahey explained that Carlson had taken over the account.  Neither Fahey nor Carlson told Carroll that the GOCO loans, by that time almost 16 months old, violated German American's policy to hold loans for only six months, and neither told Carroll that the loans had been placed in the Legacy book.

During the course of this meeting, Carlson told Carroll that German American needed to have the GOCO loans paid off. German American had been unable to securitize or sell the loans, but wanted to rid itself of them in accordance with its policy not to hold loans longer than six months.  Carlson therefore encouraged Carroll to find another source of financing.  Carroll told Carlson that it was possible he could find another lender and asked Carlson if he could have until the end of the year to do so.  Carlson told Carroll he did not see a problem with that.  Carlson then said to Carroll that there was the matter of the prepayment fee, which he calculated would be in excess of $1 million.  Carroll told Carlson that there was no way that he would pay such an unreasonable penalty to pay off a loan that German American wanted paid off.

19

Carlson became visibly upset with Carroll as a result of his refusal.

Thereafter, Carroll told Carlson that he thought that by December 31, 2000, GOCO would satisfy the monetary conditions for the release of the $1.7 million letter of credit, since the branding and re-imaging had already occurred.    Carroll explained that he wanted to commence the process of having the letter of credit released as soon as the year-end financial data was submitted.    According to Carroll, Carlson was still upset by Carroll's refusal to pay off the loan and pay a prepayment fee, and said, "[Y]our letter of credit that you put up, the bank never intended to release that, and you won't ever have that released. I'll end up getting that."  Carlson denies making this statement.

Carroll also asked that German American approve a new operator for the convenience stores.    Carroll felt that the problems he had been having with Richardson and Happy Retail, which he had already reported to German American, were severe. German American and ORIX Capital Markets L.L.C., the loan servicer for German American, were also having problems with the operator and could not obtain current financial information.    Thus, at the meeting, Carroll asked Carlson and

Fahey to approve a new operator, ProMarketing, L.L.C., to remedy the problems. He explained to them that in March 2000 he had entered into a business arrangement with ProMarketing, which had extensive experience in convenience store operation. Carroll explained that ProMarketing's balance sheet was strong, and gave Carlson and Fahey a copy of ProMarketing's first quarter financial statement. Carroll testified that Carlson responded, "As far as the lease management agreement ... that is my ace in the hole on you because you've got to go through me for me to accept a new operator, and I will never accept another manager." Carlson denies making this statement. Carroll further testified that at that point the conversation became very heated. The meeting quickly ended.


## H. Further Events

When Carroll returned to Alabama, he met with Richardson and told him that he could either submit the GOCO company books to a forensic audit or he could resign. Carroll had suspected that there were problems with the cash flow of the GOCO stores. Richardson chose to resign. Thereafter Richardson had telephone calls with Carlson and Fahey. Neither Carlson, Fahey, nor Richardson remembers the complete substance of these

calls, and the portions they remember are inconsistent with one another.

Between the New York meeting in September or October 2000 and November 1, 2000, Fahey contacted Greg Yates, German American's outside counsel. Fahey testified in his deposition that at that time, he was "extremely troubled" over the status of the loans, even though the payments were current. Fahey also instructed ORIX, the loan servicer responsible for GOCO's loans, not to have any communication with GOCO and to refer any contact with GOCO or Carroll to German American.

By November 6, 2000, Fahey and Carlson had taken over the servicing of the loans from ORIX and became the "special servicer" - a term used by ORIX, but not by German American, to indicate that ORIX itself no longer performed certain functions. Fahey and/or Carlson, not ORIX, were thereafter responsible for sending out the payment notices, reminder notices, and to have all contact with the borrower. ORIX's responsibility was merely to maintain the loan history on its own loan system and to provide any information to German American if requested. ORIX normally allows automatic withdrawal payments, but those were not allowed after ORIX no longer performed the primary loan servicing functions. The

22

plaintiffs contend that German American no longer allowed the automatic withdrawals, but the defendants contend that it was ORIX which no longer allowed them, and the evidence is not entirely clear either way.

Although Richardson resigned as operator of the stores in October 2000, German American never approved ProMarketing or any other new operator for the GOCO stores.  On January 18, 2001, German American sent a notice to cure stating that the GOCO loans were in default because a new operator had not been approved.  The notice stated that German American had not received any information on the financial condition or operating experience of ProMarketing, and it allowed GOCO 30 days to obtain approval for a substitute manager.  It also pointed out an apparent mistake in the management fee section of the draft agreement, in that the original operator was receiving a management fee of $106,000, while the ProMarketing draft agreement provided that ProMarketing would receive only $18,000.

ProMarketing and GOCO apparently did not work out a mutually satisfactory operating agreement, and on January 29, 2001, GOCO's counsel sent in another application for approval of a different operator, Mott Oil Company.  The cover letter

23

stated that the requested information on Mott Oil Company was enclosed. It also stated that the draft agreement between GOCO and Mott Oil Company would be the same as that between GOCO and ProMarketing. Despite the fact that GOCO repeatedly provided all requested information concerning Mott Oil Company, German American continued to withhold approval. Peter Fahey himself testified in his deposition that he refused to take any phone calls from GOCO's accountants, who were calling in an attempt to resolve the situation. Fahey provided no explanation for his refusal to take the calls. German American never approved Mott Oil Company as the operator of the stores.

By December 31, 2000, Carroll, on behalf of GOCO, undertook to demonstrate to German American that GOCO had satisfied the conditions contained in the loan agreement for the release of the letter of credit. On February 2, 2001, Carroll's attorney submitted documents stating that GOCO had met the financial requirements for the release of letter of credit and pictures of the branding and re-imaging that had been accomplished by November 18, 1999. However, German American never undertook to release the letter of credit, and it never was released. Rather, after German American received the letter requesting it to release the letter of credit, it

24

sent GOCO a notice to cure dated March 7, 2001, stating that the loan was in default because GOCO had not complied with the loan documents' financial reporting requirements since the inception of the loans. This was the first notice that GOCO had received from German American in almost two years that the format of the financial statements did not meet the loan agreement's requirements. In April 2000, the financial statements for 1999 were submitted in the same format as for 2000, and German American did not object to the format.

The March 7, 2001 notice to cure also stated that German American was "extremely concerned regarding the Borrower's ability to protect the collateral securing the Loan," since the property appeared to have been managed by three different managers within the last four months without the lender's consent, and the draft management agreement between GOCO and Mott Oil Company had not been provided. The notice then stated, "Since you have not complied with the terms of the Loan Documents regarding this issue and have gone past the 30 day cure period we noticed in our January 18, 2001 letter, the Loan is in default."

## I.  The Missed Payment

On May 1, 2001, GOCO inadvertently failed to make its monthly installment payment to German American.  Near the end of April 2001, Carroll had taken over the stores and appointed a new accounting firm to manage GOCO's books and records. Carroll believed that the monthly payments were being automatically withdrawn from the bank accounts, but unbeknownst to him, that process stopped when Carlson and Fahey took over the servicing of the loans.  Carroll had been discussing with Fahey the possibility of refinancing the loans from at least April 27, 2001 to May 11, 2001, and had received a loan proposal from Compass Bank which would have allowed GOCO to pay off the loan.  Although Carroll had been having these discussions with Fahey, and had not, in the previous two years, missed a single payment or been late on any payment, neither Fahey, Carlson, nor any other representative of German American or Deutsche Banc informed Carroll of the missed payment or inquired as to why the payment had been missed.

Because German American had taken over the loan servicing, neither German American nor ORIX sent out a payment or reminder notice.  Had German American allowed ORIX to continue servicing the loan, ORIX would have sent out a payment notice, would have

allowed GOCO to pay by automatic payment withdrawal, and would have called Carroll a few days after May 1, 2001, to remind him that the payment had not been received. From May 1, 2001, through May 15, 2001, GOCO had sufficient funds in its account to make the May payment, yet GOCO never received a payment notice, reminder notice, or telephone call from Fahey, Carlson, or ORIX. The loan agreement does not require that GOCO be sent payment reminders or permitted an opportunity to cure.

On May 15, 2001, German American faxed a notice of default to GOCO, demanding accelerated payment of the principal, interest, late charges, default interest, and a prepayment penalty of nearly $2.2 million. The notice stated that the loans were in default because the borrower failed to make its May 1, 2001 payment or to cure items noted in the notices to cure dated January 18, 2001, and March 7, 2001. The notice of default was sent to Carroll before Carlson or Fahey received the payment history from ORIX. German American therefore gave no consideration to GOCO's excellent payment history. The notice of default demanded payment of the following amounts:

| | |
|---|---|
| Principal: | $7,443,345.82 |
| Interest: | $59,360.68 |
| Current late charges: | $3,606.32 |
| (5% of 5/1/01 payment) | |
| Default interest: | $35,883.13 |
| (5/1/01 - 5/15/01) | |
| Prepayment fee: | $2,179,619.14 |
| Total Due (5/16/01): | $9,721,815.09 |

The following day, May 16, 2001, Carroll called Carlson and begged Carlson to allow him to pay the May payment with a late fee. Carroll explained to Carlson that the payment had been missed because there was a change in the provider of accounting services and the current accountant believed that the payments were being automatically withdrawn. Carlson refused to allow Carroll to make the May payment, and told him that if he made any payments to German American, they would be immediately applied to the prepayment penalty. On the same day, Carroll wrote a letter to Carlson agreeing to pay $7,666,645.02, which would have paid off the entire loan and all accrued interest and late penalties, including $108,000 as a prepayment penalty. Carlson refused to accept this payment.

On May 18, 2001, German American drew on the $1.7 million letter of credit and deposited it in an account with ORIX. The ORIX account documents reflect that in June, the money was applied to the past due payments for May and June and to the

28

late fees and interest, leaving a balance in the account of $1,476,408.04. At some time after June 20, 2001, however, at the instruction of Peter Fahey, ORIX reversed those payment applications, backdated the assessment of the prepayment fee to June 20, 2001, and applied the entire $1.7 million toward the prepayment fee. German American contends that section 8.7, "Set-off," authorized the application of the letter of credit to the prepayment fee. Section 8.7 permits the lender to "set off ... and apply against [any due] amount any and all deposits ... and any other credits, indebtedness, or claims ... held or owing by the Lender or any branch or agency thereof to or for the credit or the account of the Borrower."

On June 15, 2001, Carroll received a demand for payment from German American under the limited non-recourse carve-out guaranty and indemnity agreement ("guaranty"). The guaranty provides that Carroll was personally liable under it only upon the happening of one of four specific events: (a) fraud or intentional misrepresentation by the borrower or guarantor; (b) the gross negligence or willful misconduct by any borrower; (c) the breach of any representations, warranties, covenants or indemnification provisions concerning environmental laws, hazardous substances or asbestos; and (d) the misapplication

on conversion of insurance proceeds, condemnations, awards, or rents following an event of default by the borrower. Carroll contends that none of these events had or has occurred. The June 15, 2001, letter also demanded payment of all "rents" from May 15, 2001, and continuing thereafter. However, GOCO owned the properties in fee simple; none of the GOCO properties was leased and GOCO did not stand as "landlord" to any of the convenience stores.

German American undertook actions to foreclose on the convenience store properties in Alabama and Florida. On June 14, 2001, German American filed a foreclosure action in Florida which involved the eight Florida stores. In July 2001, German American published foreclosure notices for the seven Alabama stores. The foreclosure sales were originally scheduled for August 13, 2001. On August 13, 2001, GOCO filed for the protection of the Bankruptcy Court. On December 19, 2001, because German American refused to accept any proposed plan of reorganization in the Bankruptcy Court, GOCO had to move to dismiss the bankruptcy and relinquish control of the stores to German American.

German American immediately turned the stores over to James Richardson, owner of Happy Retail, and his affiliates to

manage on behalf of German American.  Richardson received a management fee, which represented the actual expenses of running the stores plus 10 percent. Richardson is not currently managing the stores. During this litigation, Carlson, Fahey, and Yates have communicated with Richardson concerning various matters.

## III.  CLAIMS

### A.  Plaintiffs' Claims

The plaintiffs' claims, as amended, are:

Count 1, for fraud, misrepresentation, deceit, fraudulent deceit, and suppression, by both plaintiffs against both defendants, alleges that German American (a) never intended to release the $1.7 million letter of credit, but Carroll and GOCO relied on the intent to release the letter when they entered into the loan agreement; (b) knew it did not intend to securitize the GOCO loans or to hold the loans more than six months, yet did not disclose these material facts to Carroll or GOCO; and (c) intended to take every action possible to put the GOCO loans in default, yet failed to advise Carroll and GOCO of this.

31

Count 2, for breach of contract, by GOCO against both defendants, alleges that German American breached the contract by (a) refusing to release the $1.7 million letter of credit; (b) forcing and demanding an unconscionable prepayment fee; (c) forcing GOCO into a default and acceleration of the loan without giving GOCO an opportunity to cure a mistake on the part of its operator or accountants; (d) failing to deal in good faith and failing to treat Carroll and GOCO in a fair, equitable and ethical manner; (e) breaching the contract created when GOCO accepted German American's agent's July 20, 2001 offer to reinstate the loan on August 1, 2001; (f) applying the proceeds from the letter of credit to the prepayment penalty rather than to the loan principal; (g) failing to approve Mott Oil Company as the operator of the GOCO stores; (h) declaring a default and/or providing a notice to cure and failing to describe the nature of the default, and thereafter failing to return telephone calls inquiring as to the nature of the alleged default; and (i) taking away the loan servicing responsibilities from ORIX, thereby becoming special servicer, and then failing to perform such functions under the loan agreements.

Count 3, for unconscionability, by GOCO against German American, alleges that the prepayment fee or penalty provision of German American's loan documents is unconscionable because the amount is unreasonably large, was not bargained or negotiated for, and is unconnected to any loss which would have been or has been incurred by the defendants if the loan was paid off early; it also alleges that the defendants have waived their right to collect such a penalty because they elected to accelerate the loan, thereby making the entire payment due on the payment date.

Count 4, for declaratory judgment, by GOCO against German American, asks the court to declare, pursuant to Rule 57 of the Alabama Rules of Civil Procedure, that the prepayment penalty is unconscionable and to strike it from the loan agreement.

Count 5, for breach of contract, by Carroll against both defendants, alleges that German American has breached the limited non-recourse carve-out guaranty and indemnity agreement by (a) making demand upon Carroll under the guaranty without one of the four triggering events to make it applicable; (b) filing a counterclaim against Carroll based on the guaranty that is based on false allegations; and (c) failing to mitigate its losses by accepting tender from Carroll or GOCO. It also

33

alleges (d) that the guaranty is void because the defendants failed to qualify to do business in the state of Alabama prior to Carroll signing it.

Count 6, for declaratory judgment, by Carroll against both defendants, asks the court to declare, pursuant to Rule 57 of the Alabama Rules of Civil Procedure, that there are no guaranteed obligations due under the guaranty.

Count 7, for breach of the duties of good faith and fair dealing, by GOCO against both defendants, alleges that German American owed those duties to GOCO and breached them.

Count 8, for breach of fiduciary or quasi-fiduciary duty and duty of good faith, by both plaintiffs against both defendants, alleges that German American owed the plaintiffs a duty beyond that of a strictly lender/borrower relationship, which it breached when it drew on the letter of credit, failed to release the letter of credit, and failed to approve an operator for the stores.

Count 9, for intentional interference with business relations, by both plaintiffs against both defendants, alleges that German American intentionally interfered with the business relationships (a) between Carroll, GOCO, and the convenience store managers and employees, by directing the notices of

34

foreclosure to the individual stores rather than to GOCO or Carroll at the address provided for notices in the loan agreements; (b) between GOCO and its trade creditors, by contacting the trade creditors and making derogatory remarks to them about GOCO; and (c) between GOCO and ORIX, the loan servicer. It also alleges that defendant Deutsche Bank interfered with the relationship between German American, Carroll, and GOCO.

Count 10, for waiver of contract provisions, by GOCO against both defendants, alleges that after the innocent mistake which resulted in the missed May 2001 loan payment, German American consciously elected to accelerate the loan payments and therefore has waived any right to recover a prepayment penalty.

Count 11, for conspiracy, by both plaintiffs against both defendants, alleges that the defendants, through their employees, wrongfully conspired with James Richardson, the former GOCO stores' operator, to put the loans in default.

Count 12, for conversion, by GOCO against both defendants, alleges that by drawing on the $1.7 million letter of credit and applying it to the illegal prepayment penalty, the defendants converted GOCO's property.

## B.  Defendants' Counterclaims

The defendants' counterclaims, as amended, are:

Counterclaim 1, for declaratory judgment against Carroll, asks the court to declare that (a) the limited non-recourse carve-out guaranty and indemnity agreement is valid and enforceable, and (b) Carroll is liable to German American for amounts due under the guaranty.

Counterclaim 2, for breach of contract against Carroll, alleges that Carroll breached the guaranty by failing and refusing to indemnify German American.

Counterclaim 3, for breach of contract against GOCO, alleges that GOCO has failed and refused to pay the amount due after its default of $9,721,815.90 and has breached the loan agreement.


## IV.  DISCUSSION

### A.  Plaintiffs' Motion for Partial Summary Judgment and Motion for Summary Judgment on Counterclaims  (Doc. no. 107)

#### 1.  Applicable Law

The parties agree that as the contract provides, New York law controls claims arising under the contract.  Alabama law permits contracting parties to apply the law of another state

to the contract so long as the law does not violate the public policy of this state.  <u>Allied Sales & Serv. Co. v. Global Indus. Technologies, Inc.</u>, 2000 WL 726216 (S.D. Ala. 2000).

### 2.  Applicability of Prepayment Fee

The parties dispute whether the loan agreement authorizes the application of the prepayment fee to the loan default.  The plaintiffs contend that the commitment letter, which was the precursor to the loan agreement, prohibited "voluntary prepayments," and contained no provision by which a prepayment fee could be imposed upon default and acceleration of the loan. According to the plaintiffs, the remedies set forth in the commitment letter for late payments did not include default, acceleration, and the assessment of a prepayment penalty. Moreover, there was nothing in the commitment letter that authorized the application of the $1.7 million letter of credit to a prepayment fee.

The loan agreement itself refers to a prepayment fee in three specific sections.  The term "prepayment fee" is defined in section 1.1, "Defined Terms"; discussed in section 2.5, "Voluntary Prepayment"; and discussed in section 2.9, "Compensation."

37

Section 1.1, "Defined Terms," includes this definition of

"Prepayment Fee":

> "with respect to any prepayment of all or
> any portion of the principal amount of the
> Loan (whether pursuant to Section 2.5, by
> acceleration or otherwise), an amount equal
> to the greater of (1) one percent (1%) of
> the principal amount of the Loan to be
> prepaid and (2) the positive difference (if
> any) between (i) the present value on the
> date of prepayment of the sum of (A) the
> scheduled principal installments of the
> Loan to be prepaid on such date (assuming
> that such principal installments are paid
> in full on the dates and in the amounts set
> forth in the amortization Schedule attached
> as Schedule I to the Promissory Note)
> plus (B) the amount of interest that would
> become due and payable on such principal
> installments pursuant to subsection 2.6
> during the period from (and including) such
> date to (but excluding) the Maturity Date
> (assuming that such principal installments
> are paid in full on the dates and in the
> amounts set forth in the amortization
> Schedule attached as Schedule 1 to the
> Promissory Note), discounted to such date
> utilizing a rate per annum equal to the
> Applicable Treasury Rate (as defined below)
> and (ii) the principal installments of the
> Loan to be prepaid on such date."

The section goes on at length to define the "Applicable

Treasury Rate" and a component of that rate, the "Remaining

Weighted Average Life to Maturity."

Section 2.5, "Voluntary Prepayment," states in relevant

part:

"On and after the Permitted Prepayment Date of the Loan, the Borrower may prepay the entire principal balance of the Loan (unless the Lender otherwise consents in writing), upon at least 30 (thirty) days prior written notice to Lender, specifying the proposed date of prepayment (which date shall be an Installment Payment Date occurring not more than ninety (90) days after the date such notice is given); concurrently with such prepayment, the Borrower shall also pay to the Lender the Prepayment Fee for such prepayment, all accrued interest on the Loan being prepaid to the date of prepayment, all amounts owing under subsection 2.9 in connection with such prepayment and all other Obligations relating to the Loan then due and payable hereunder or under any other Loan Document...."

Finally, section 2.9, "Compensation," describes various scenarios in which the borrower must compensate the lender, including "if any prepayment (including any prepayment made pursuant to subsection 2.5 or as a result of an acceleration of the Loan pursuant to Section 7) is not made on any date specified in a notice of prepayment given by the Borrower (or any date otherwise required pursuant hereto)."

Section 7, "Events of Default," authorizes the lender, upon any of the specified "events of default" by the borrower, to accelerate the loan and to "enforce all other remedies available to [the lender] under the Loan Documents or under

applicable law."   However, neither Section 7 nor any other section of the Loan Agreement explicitly provides for the assessment of a prepayment fee under circumstances other than voluntary prepayment by the borrower.  Although the definition of the term "prepayment fee" includes the term "by acceleration or otherwise," there is no operative language in the loan agreement or any other loan document authorizing the assessment of a prepayment fee on default and acceleration.  Neither does the loan commitment letter contain such a provision.

For their claimed authority to impose the prepayment fee, the defendants rely upon the definitional paragraph in Section 1.1, and specifically the phrase "with respect to any prepayment of all or any portion of the principal amount of the Loan (whether pursuant to Section 2.5, by acceleration, or otherwise), an amount equal to..." (emphasis added).  They also rely upon section 7's authorization of German American, upon GOCO's default, to both accelerate the loan and enforce all other remedies available to it under the Loan Documents or under applicable law.  The defendants argue that to conclude that these sections do not authorize the prepayment fee would be to "disregard" them in contravention of the principle that a contract should be interpreted to give force and effect to

40

all of its provisions.  However, the defendants cite no case for the principle that a contract which merely defines a term necessarily gives effect to that term.  Under such a principle, a contract would never need to have any sections other than a set of definitions.  It should be obvious that there is no equivalence between "A prepayment fee is defined as X" and "The lender may impose a prepayment fee under X conditions."  To give effect to the definition of prepayment fee, as the defendants argue the court should do, is only to conclude that the parties agreed to accept that definition; it would be unreasonable to further assume that the definition itself provides authority to impose the fee.  As the contract is written, the parties apparently did agree to accept the definition of "prepayment fee," but there is no basis for this court to conclude that the parties agreed that the lender could impose a prepayment fee upon acceleration or default.

New York law does not support the defendants' interpretation of the contract.  First, the common law does not allow prepayment of a loan prior to its stated maturity date.  Arthur v. Burkich, 520 N.Y.S.2d 638, 639 (N.Y. App. Div. 1987).  Any such right must be expressly and specifically created in the written instruments governing the loan.  Id. at 639; see

41

also <u>Troncone v. Canelli</u>, 538 N.Y.S.2d 39, 40 (N.Y. App. Div. 1989) (presence in mortgage of phrase "unless sooner paid" insufficient to establish right to prepay loan).  Under New York law, prepayment clauses are included in mortgage agreements strictly for the benefit of the mortgagor. <u>Poughkeepsie Galleria Co. v. Aetna Life Ins. Co.</u>, 680 N.Y.S.2d 420, 422 (N.Y. Sup. Ct. 1998).  A lender's attempt to invoke a prepayment provision upon default, because it is in contravention of both the common law and the original exceptions to the common law rule, must be specifically authorized by the express provisions of the loan documents. <u>See</u> <u>In re United Merchants & Mfrs., Inc.</u>, 674 F.2d 134, 140 (2nd Cir. 1982) (citing verbatim to provision of loan agreement authorizing collection of prepayment charge at option of note holder); <u>In re Financial Center Assoc. of East Meadow, L.P.</u>, 140 B.R. 829, 835 (Bankr. E.D. N.Y. 1992) ("It is not disputed that the agreement between the parties specifically provides for the pre-payment charge even in the event of acceleration"); <u>3C Assocs. v. IC & LP Realty Co.</u>, 524 N.Y.S.2d 701 (N.Y. App. Div. 1988) (no right to prepayment upon acceleration where documents silent on topic).

The defendants argue that the loan documents are not "silent" on the topic because the term "prepayment fee" is defined and discussed in the sections already mentioned. The court cannot agree. The mere inclusion of a definition of the term "prepayment fee," without language anywhere else in the contract along the general lines of "Upon acceleration, the borrower <u>must pay</u> a prepayment fee to the lender," renders the contract effectively silent on the topic of whether a prepayment fee must be paid. Section 2.5 clearly permits the lender to impose a prepayment fee upon voluntary prepayment by the borrower. The parenthetical phrase in Section 1.1's definition of prepayment fee, i.e. "whether pursuant to Section 2.5, by acceleration or otherwise," is clearly insufficient to create separate authority to also <u>impose</u> a prepayment fee in the event of "acceleration or otherwise." First, it does not sufficiently provide "a basis upon which to conclude that" the right to such a fee "is readily discernable from the mortgage instrument. <u>Troncone</u>, 538 N.Y.S.2d at 39. Second, as already pointed out, the phrase itself is contained in the definition section, not in the operative rights and remedies section of the loan agreement. For this reason, it can only establish that to the extent the contract authorizes the collection of

43

a prepayment fee upon acceleration, which it does not, the (involuntary) prepayment fee shall be calculated in the same manner as a voluntary prepayment fee. Without such separate authorization or remedy, this section does not have the "effect" the defendants wish it to.

In short, the defendants have cited the court to no case or principle establishing that a contract which includes only a definition of "prepayment fee" or "prepayment penalty" plus an operative provision that such a fee or penalty may be charged upon voluntary prepayment necessarily authorizes a prepayment fee or penalty in the event of involuntary prepayment or at any other time. The issue is thus squarely controlled by <u>3C Assocs. v. IC & LP Realty Co.</u>, 524 N.Y.S.2d 701, 702 (N.Y. App. Div. 1988) (the prepayment fee is "an obligation which becomes due and payable only if there is a voluntary exercise of the right to prepay.").

Finally, the parties to a loan agreement are deemed to intend only what is evident from the plain language of their agreement. Any doubts as to the meaning or effect of the terms of their agreement must be resolved in favor of the debtor and against the secured party who drafted the instruments. <u>Bostwick-Westbury Corp. v. Commercial Trading Co.</u>, 404 N.Y.S.2d

44

968, 971 (N.Y. Civ. Ct. 1978) (citations omitted). As the drafter of the loan documents here, the defendants could have chosen to include a provision expressly authorizing the imposition of a prepayment fee upon involuntary acceleration of the loan, the same as they did for the voluntary prepayment fee provision. They chose not to do so. The court finds that the prepayment fee is not authorized by the contract. Because the applicability of the prepayment fee is an underlying issue as to several of the counts, the court will address each count separately, below.

### 3. Unconscionability, Declaratory Judgment, and Waiver (Counts 3, 4, and 10)

The plaintiffs also claim that the prepayment fee provision is unconscionable and request the court to issue a declaratory judgment to that effect, as well as to strike the prepayment fee from the loan agreement. Because the court has determined that the loan agreement did not authorize the defendants to charge a prepayment fee in the event of the lender's acceleration or the borrower's default, the issue of unconscionability is moot and the court will not reach it. Moreover, there is no need to reach the issue of whether the

45

demanded prepayment fee is unenforceable because it is cumulative to the defendants' other remedies, or whether the defendants have waived their right to enforce the fee based on their voluntary acceleration of the loan. The plaintiffs' motion for summary judgment will therefore be granted as to counts 3, 4, and 10.

### 4. Breach of Fiduciary Duty (Count 8)

Carroll and GOCO claim that German American and Deutsche Banc AB breached the fiduciary duty they owed to the plaintiffs when they applied the $1.7 million letter of credit to the prepayment fee. The plaintiffs argue in support of this claim that the fiduciary duty, if not pre-existing, was created when Peter Fahey directed ORIX to draw down the letter of credit and hold the funds in an escrow account for the benefit of GOCO. It is undisputed that the letter of credit could be drawn upon in an event of default, though German American apparently failed to meet the requirement to certify that one or more of the events set forth in schedule 10 of the loan agreement had occurred.

The plaintiffs rely on the deposition testimony of Greg Brown, an ORIX employee who was responsible for servicing the

46

loans during part of the relevant time period, for their contention that the escrow account was "for the benefit of GOCO," but Brown's testimony does not clearly establish this point. Larry Carlson has testified that it was for the benefit of German American. Regardless, however the "benefit" is characterized is not material to resolving the issue of whether a fiduciary duty exists because the evidence does clearly show that the letter of credit was paid for by GOCO, drawn upon from the issuing bank by German American after GOCO missed its payment, and ultimately applied by German American to the prepayment fee rather than the loan balance due. As an initial matter, no section of the loan agreement authorized German American's application of the letter of credit to the prepayment fee, not least because the prepayment fee itself was unauthorized. At a minimum, then, the application was a breach of the loan agreement.

German American argues that no fiduciary duty existed between it and the plaintiffs under both the loan agreement and the law. New York law holds that the relationship between a bank and its debtors and guarantors is a contractual relationship and no fiduciary duty exists absent special circumstances. <u>Geler v. Nat'l Westminster Bank</u>, 770 F. Supp.

47

210, 214 (S.D. N.Y. 1991); <u>Bauer v. Mellon Mortgage Co.</u>, 680 N.Y.S.2d 397, 401 (Sup. Ct. 1998).  At the same time, in <u>Broadway Nat. Bank v. Barton-Russell Corp.</u>, 585 N.Y.S.2d 933 (N.Y. Sup. 1992), the court held that "[a] bank's fiduciary duties clearly are recognized in certain contexts, including when a bank 'acts as an agent or trustee,' or as an escrow agent or agent holding for the benefit of another." <u>Id</u>. at 944 (internal citations omitted).

German American also cites section 8.13 of the loan agreement, which states in part that "the relationship between the Borrower and the Lender is solely that of debtor and creditor," to refute the claim of fiduciary duty.  However, section 7(p)(2) of the loan agreement more accurately applies to the situation here, in that it addresses the lender's responsibilities in the event of the borrower's default. Section 7(p)(2) allows the lender to pay or otherwise perform any of the borrower's obligations upon the occurrence of a default "in any form and manner deemed reasonably expedient by the Lender <u>as agent or attorney-in-fact</u> of the Borrower..." (emphasis added).  The court agrees with the plaintiffs that this provision imposes an agency relationship upon German American in regard to the actions it took after GOCO's default.

48

Moreover, the law is clear that an agent stands in a fiduciary relation to his principal. Andrew J. Corsa & Son, Inc. v. Harnett, 400 N.Y.S.2d 1009, 1012 (N.Y. Sup. Ct. 1977). After German American drew upon the letter of credit, it stood in both a debtor-creditor relationship to GOCO, with respect to the franchise loans, and a principal-agent relationship to GOCO, with respect to the funds from the letter of credit. It is obviously conceivable that both types of relationship could co-exist. Moreover, to give effect to both section 7(p)(2) and section 8.13 of the loan agreement is not inconsistent in that the relationship between the borrower and lender itself would not give rise to the principal-agent relationship, as section 8.13 makes clear, but the special circumstances anticipated by section 7(p)(2), which were contingent upon an event of default, would.

The court in Broadway Nat. Bank held that "[a] fiduciary duty generally must arise out of a relationship of confidence, trust, or superior knowledge or control, ... and may exist where one entity is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Id. at 945 (citations omitted); see also Nat'l Westminster Bank v. Ross, 130 B.R. 656, 679 (S.D. N.Y. 1991).

49

Here, German American gives as its justification for drawing upon the letter of credit from the issuing bank the duty imposed upon it by section 7(p)(2) of the loan agreement to pay GOCO's obligation. Assuming without deciding that such a duty existed, as a matter of law the letter of credit funds were thus held for the benefit of GOCO before they were applied to GOCO's balance due. Initially, the $1.7 million was properly applied to the past due payments, late fees, and interest. Yet at some time after June 20, 2001, Fahey directed that the payment applications be reversed, the assessment of the prepayment be backdated to June 20, 2001, and the entire $1.7 million be applied to the prepayment fee.

As previously stated, the loan agreement authorized neither the prepayment fee nor the application of the letter of credit funds to it. Although these directions were carried out by ORIX, which held the funds in a separate account, German American had control over the funds and applied them in an unauthorized manner. Its actions were those of an agent, under section 7(p)(2) of the loan agreement and New York law, and additionally were a breach of the fiduciary duty owed to GOCO. The fact that GOCO and Carroll were not parties to the letter of credit is immaterial; the funds were obviously to be used

50

to pay down GOCO's debt.  The plaintiffs' motion for summary judgment on the breach of fiduciary duty claim will therefore be granted.

### 5.  Breach of the Duty of Good Faith and Fair Dealing (Counts 2, 7)

The plaintiffs have moved for summary judgment on both their claim in count 2(d) that the defendants breached the contract by failing to deal in good faith and failing to treat Carroll and GOCO in a fair, equitable, and ethical manner, as well as on their claim in count 7 that the defendants breached their duty of good faith and fair dealing.  There is an implied covenant of good faith and fair dealing in every contract under New York law.  M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990).  A claim for breach of the contract by failing to deal fairly and a claim for breach of the covenant of fair dealing therefore duplicate one another.  Fasolino Foods Co., Inc. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992); W.S.A., Inc. v. ACA Corp., 1996 WL 551599, *9 (S.D. N.Y. 1996).  According to the court in W.S.A., "every court confronted with such a complaint brought under New York law has dismissed the claim for breach of the covenant of fair

dealing." Id. This court accordingly will grant summary judgment to the defendants on count 7, the claim for breach of the covenant of fair dealing, and will consider only the claim in count 2(d) that the defendants breached the contract by failing to deal in good faith and to treat Carroll and GOCO in a fair, equitable, and ethical manner.

The defendants' chief argument against this claim is that all of the actions they took were authorized by the loan agreement, and the loan agreement's terms cannot be altered by a claim that those actions violated the covenant of good faith and fair dealing. However, under New York law, discretionary terms within a contract must be exercised in a manner consistent with the covenant of good faith. Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995). Even otherwise "absolute rights" granted by contract are subject to, and conditioned upon, satisfaction of the fundamental obligation to treat the other party to the contract fairly and honestly. See Components Direct, Inc. v. European American Bank & Trust Co., 572 N.Y.S.2d 359 (N.Y. App. Div. 1991) (bank breached covenant of good faith by terminating credit without notice, even though loan documents gave bank "absolute right" to do so); Sterling Nat'l Bank v. Goldberg, 715 N.Y.S.2d 409 (N.Y.

App. Div. 2000) (reversing summary judgment for bank on issue of whether lender breached covenant of good faith by cutting off debtor's line of credit without notice); <u>The Connecticut Nat'l Bank v. Chern</u>, 1992 WL 196780 (S.D. N.Y. 1992) (six month's notice deemed sufficient to comply with duty of good faith).

Here, the loan agreement vested considerable discretion in German American in the event of default.  Robert Burns, the director and vice-president of Deutsche Banc AB with primary responsibility for the GOCO loans, testified in his deposition that the decision whether or not to default upon a missed or late payment was "totally discretionary" within the bank.  The loan agreement itself begins section 7, "Events of Default," with this language: "If any of the Events of Default listed below in this Section ... shall occur and be continuing, the Lender <u>may</u> ..." (emphasis added).  The loan agreement also contains a late fee provision, which indicates the discretionary nature of German American's remedies, since there would be no need for a late fee if German American immediately defaulted every loan upon its first late payment.  Moreover, the evidence (and common sense) shows that it is the lending industry's ordinary business custom, in the event of a solitary

53

missed payment, to contact the borrower, inquire as to the reason the payment was missed, and to allow the borrower to make up the missed payment. Greg Brown, the ORIX employee who had responsibility for servicing the GOCO loans at one time, testified that had he been servicing the loans at the time of the missed May 2001 payment, he would have contacted Carroll to inform him of the potential problem. Robert Burns also testified that it would be normal business practice to call the borrower and say, "Where's the payment?", and that it would always be a good idea to have a conversation with the borrower before taking further legal action.

However, by May 2001, ORIX had been specifically instructed by German American not to contact GOCO and to refer any contact by GOCO to German American. German American had taken over the servicing of the GOCO loans, and Fahey and Carroll were in regular contact. At the same time that Fahey was communicating with Carroll about refinancing the GOCO loans with another lender, neither he nor Carlson told Carroll that the May 2001 payment had not been received and that they intended to default the loans, accelerate the outstanding loan payments, draw upon the $1.7 million letter of credit and apply the proceeds to a $2.1 million prepayment penalty.

54

None of the cases cited by the defendants justify such harsh actions, and in fact they support the plaintiffs' case rather than the defendants'. First, in Fasolino Foods Co., Inc. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1056-57 (2d Cir. 1992), the court held that the defendant bank's duty to act in good faith and the implied agreement created by the parties' course of dealing did not obligate the bank to extend additional lines of credit to the lender, nor prohibit it from accelerating payments or insisting upon the provision of greater security. However, the court relied in significant part upon the reason for the bank's refusal to extend additional credit, which was that the borrower "was rarely in compliance with ... conditions [required under the contract] and was routinely in an overdraft situation notwithstanding the lack of an overdraft line of credit" with the bank. Id. at 1054. The court noted that the borrower's "payments were on average thirty-six days late through the summer of 1989" (apparently since January 1989). Id. Even assuming arguendo the truth of German American's assertion that GOCO had defaulted on its loans not only by missing its payment but also by failing to meet certain conditions of the loan agreements, German American has not disputed that GOCO had never missed or

55

even been late on a payment in the two-year life of the loan until the May 2001 missed payment. This fact alone makes GOCO's missed payment and German American's response a substantially different case than that confronted by the court in Fasolino Foods.

Second, in Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 679-80 (S.D. N.Y. 1991), the court did grant the bank's motion for summary judgment on the borrower's breach of duty of good faith claim, finding that the loan agreements at issue "establish that the Bank was contractually entitled to sever its lending relationship with [the borrower] at its discretion, for any reason or for no reason at all." The court thus "refuse[d] to imply an obligation of good faith inconsistent with other express terms of the parties' contractual relationship." Id. The court then distinguished the contrary holding in a Sixth Circuit case, K.M.C. Co. v. Irving Trust Co., 757 F.2d 752 (6th Cir. 1985), significantly holding that the Sixth Circuit's decision relied upon the failure of the lender to give any notice of termination of the lending relationship, whereas "[h]ere, the Bank did not abruptly terminate its lending relationship with [the borrower]." Id. at 680. Rather, the evidence indicated

56

> "that rather than terminate the lending
> relationship without notice, arbitrarily or
> capriciously call a demand obligation
> without notice, or refuse to advance an
> amount without notice, the Bank forbeared
> [sic] from exercising its full panoply of
> rights under the Loan Agreements in
> consideration of [the borrower's] expressed
> concern over finding alternate financing."

Id. at 681.  The bank's conduct toward the borrower in Nat'l Westminster Bank thus stands in stark contrast to German American's treatment of Carroll and GOCO in this case.

Finally, the defendants cite Matter of Nicfur-Cruz Realty Corp., 50 B.R. 162, 168 n.6 (Bankr. S.D. N.Y. 1985) for the proposition that a lender does not owe a duty of generosity simply because the borrower's default was inadvertent.  As the defendants point out, the Nicfur-Cruz Realty court quotes Graf v. Hope Building Corp., 254 N.Y. 1 (1930) for this proposition. Yet the defendants fail to mention that the entire footnote indicates that the Graf dissent may state a better principle. The rest of the footnote is so apropos to this case (though, obviously, not controlling, since the court did not follow Graf) that it is worth quoting in full:

> "The Graf decision was not unanimous and
> Judge Cardozo wrote a strong and reasoned
> dissent to the opinion. In his dissent he
> stated:

57

'When an advantage is unconscionable depends upon the circumstances. It is not unconscionable generally to insist that payments shall be made according to the letter of a contract. It may be unconscionable to insist upon adherence to the letter where the default is limited to a trifling balance, where the failure to pay the balance is the product of mistake, and where the mortgagee indicates by his conduct that he appreciates the mistake and has attempted by silence and inaction to turn it to his own advantage. The holder of this mortgage must have understood that he could have his money for the asking. His silence, followed, as it was, by immediate suit at the first available opportunity, brings conviction to the mind that he was avoiding any act that would spur the mortgagor to payment.' 254 N.Y. at 12, 171 N.E. 884.

Although there appears to be an evolving trend in the New York lower courts to adopt the reasoning of Judge Cardozo's dissent, see e.g., Karas v. Wasserman, 91 App. Div. 2d 812, 458 N.Y.S.2d 280 (3d Dept. 1982); Fairmont Associates v. Fairmont Estates, 99 App. Div. 2d 895, 472 N.Y.S.2d 208 (3d Dept. 1984), it cannot be said that Judge Cardozo's dissent is now the law of New York as the matter has not been readdressed by the Court of Appeals nor has it been dealt with by the legislature."

Matter of Nicfur-Cruz Realty Corp., 50 B.R. at 168 n.6.

It is consistent with both the loan agreement and the implied covenant of good faith and fair dealing it contains to conclude that as a matter of law, the defendants have breached

58

the contract by failing to deal with the plaintiffs fairly and in good faith. The plaintiffs are entitled to summary judgment on this claim.

### 6. Defendants' Counterclaims

#### a. Qualification to do business in Alabama

Carroll and GOCO argue that German American is precluded from enforcing the limited non-recourse carve-out guaranty and indemnity agreement, which is the basis for counterclaims 1 and 2, because it did not qualify to do business in Alabama until after the parties entered into the guaranty. Under 1975 Ala. Code § 10-2B-15.02, foreign corporations not qualified to do business in Alabama are barred from enforcing their contracts in Alabama courts. Accordingly, Alabama courts will not enforce a foreign corporation's contract if (1) at the time the contract was entered into, the foreign corporation had not been qualified by the Secretary of State to do business in Alabama, and (2) the foreign corporation was doing business of an intrastate nature in Alabama pursuant to the contract. S & H Contractors, Inc. v. A.J. Taft Coal Co., Inc., 906 F.2d 1507, 1510 (11th Cir. 1990). As this rule suggests, there is an interstate business exception: under the United States

Constitution's commerce clause, Article I, § 8, cl. 3, Alabama courts may not prohibit foreign corporations from enforcing their contracts in Alabama courts if the corporation is engaged in interstate, not intrastate, commerce. <u>Cornwall & Stevens Southeast, Inc. v. Stewart</u>, 887 F. Supp. 1490, 1492 (M.D. Ala. 1995) (Albritton, J.) (citations omitted).

It is undisputed that German American was doing business in Alabama and that it had not been qualified by the Secretary of State to do so when it entered into the guaranty. However, Carroll and GOCO have not shown that that business was intrastate. The cases they cite in which courts have found that corporations were conducting intrastate business are inapposite. In each, the corporations had taken significant steps to establish a presence and maintain contacts with the State of Alabama. <u>See Camaro Trading Co. v. Nissei Sangyo Amer., Ltd.</u>, 628 So.2d 463, 466 (Ala. 1993) (corporation had an office and agents and received commission payments in Alabama in connection with the agreement); <u>SAR Mfg. Co., Inc. v. Dumas Bros. Mfg. Co.</u>, 526 F.2d 123, 1286 (5th Cir. 1976) (corporation purchased a warehouse and maintained two vehicles in Alabama, and employed Alabama residents full-time); <u>Sanjay, Inc. v. Duncan Constr. Co.</u>, 445 So.2d 876, 881 (Ala. 1995)

60

(corporation incorporated solely for the purpose of acquiring the Alabama property at issue and had no other business); S & H Contractors, Inc., supra (contract was for assembly of machinery in Alabama); TSR, Inc. v. Quincy Compressor Div., 742 So. 2d 792, 792-93 (Ala. Civ. App. 1998) (mechanic traveled to Alabama for four days to install part and repair carousel).

Here, German American did not maintain any office or employees in Alabama; its representatives with whom Carroll and GOCO dealt all work and maintain their offices in New York, New York. German American's attorneys who prepared the loan documents were located in North Carolina, and did not come to Alabama to prepare, negotiate, or finalize the loans. GOCO and Carroll's business itself was interstate; the loans were for convenience stores in both Alabama and Florida. This contract therefore falls squarely within the interstate business exception. See Cornwall & Stevens Southeast, 887 F. Supp. at 1494. German American's failure to qualify to do business in Alabama does not warrant summary judgment on the first and second counterclaims.

b.   Tender of Payment

Carroll contends that because German American refused his
tender of payment on the day after the loan default in May
2001, it may not enforce the guaranty, and thus he is due
summary judgment on counterclaim 1(a). The evidence shows that
on the day Carroll received the notice of default, May 16,
2001, he telephoned German American and offered to immediately
pay the May 1, 2001 loan payment, a late charge penalty, and
per diem interest.  The evidence also shows that GOCO had
enough money in its account to make this payment at that time.
Also on May 16, 2001, Carroll wrote a letter to German American
and offered to pay in full the outstanding principal balance,
plus default interest, a late charge penalty, the May 1, 2001
loan payment, and per diem interest.  In his deposition,
Carroll testified that it would have taken him a couple of days
to get together enough money to make this payment.

§ 3-604 of the Uniform Commercial Code provides in
relevant part that (1) any party making tender of full payment
to a holder when or after it is due is discharged to the extent
of all subsequent liability for interest, costs and attorney's
fees, and (2) the holder's refusal of such tender wholly
discharges any party who has a right of recourse against the

62

party making the tender. N.Y. Commercial Law § 3-604 (McKinney 2001). Courts have interpreted "tender" generally as not just an offer to pay, but the act of producing and offering the amount due to the person to whom it is owed, without any stipulation or conditions. Carroll v. Miller, 624 N.Y.S.2d 627, 696 (N.Y. App. Div. 1995). See also Baldwin's Bank of Penn Yan v. Smith, 215 N.Y. 76, 79 (Ct. App. 1915) (valid tender where debtor had sufficient funds in his account and had given bank order to make payment); Hohn v. Morrison, 870 P.2d 513, 518 (Colo. Ct. App. 1993) (valid tender where debtor had sufficient funds set aside in escrow account to make payment and made funds available to lender). Under this fairly narrow definition, Carroll's second, written offer to pay the entire loan balance, plus interest, etc., does not constitute a tender because according to his testimony, he did not actually have that amount available and would have needed a couple of days to get it. Nor could his first offer to bring the loans current have qualified as tender under the assumption that the loans were already in default at that point, so the entire balance was due (not just the May 2001 payment and associated late fees and interest). Summary judgment is therefore not warranted on this basis.

63

Because the court has found that neither the failure to qualify to do business in Alabama nor the alleged tender of payment renders the guaranty invalid or unenforceable, Carroll's motion for summary judgment will be denied on German American's counterclaim 1(a).

c. Triggers for the guaranty

Counterclaims 1(b) and 2 are based on German American's contention that Carroll is liable under the limited non-recourse carve-out guaranty and indemnity agreement. As already stated, the guaranty provides in part that Carroll will indemnify German American for losses it incurs by reason of (a) any fraud or intentional misrepresentation; (b) gross negligence or willful misconduct; or (c) misapplication or conversion of any rents following an event of default. German American alleges that all three events have occurred. The court has examined the record and finds that German American has failed to produce any evidence actually supporting its contentions that any of these events have occurred, and thus no genuine issue of material fact exists.

First, German American has shown no fraud or intentional misrepresentation. There is no evidence that Carroll

64

misrepresented the ownership of GOCO, that Carroll never intended to comply with the loan agreement, or that he misrepresented his own experience and qualifications. The testimony and documents relied upon by German American for these contentions simply do not prove them. Second, as to gross negligence or willful misconduct, the evidence shows at most that GOCO missed one payment by fifteen days in two years; even if, as German American claims, GOCO submitted incomplete financial information and had an undisclosed side agreement with ProMarketing, none of the evidence in the record as to these claims comes even close to the level required for gross negligence or willful misconduct. Finally, there is no evidence that GOCO misapplied or converted rents because GOCO owned the properties in fee simple; none of the GOCO properties were leased and GOCO did not stand as landlord to any of the convenience stores. German American has provided no evidence to refute this fact. In short, no evidence supports the claim that any of the provisions triggering the guaranty occurred, and thus there is no genuine issue of material fact as to the first two counterclaims. Summary judgment for Carroll and GOCO will be granted on counterclaims 1(b) and 2.

### d. Breach of contract

Counterclaim 3 alleges that GOCO breached the loan agreement when it failed and refused to pay the amount due after its default of $9,721,815.90. GOCO's motion for summary judgment argues that the doctrine of prevention of performance bars German American and Deutsche Banc AB's recovery for breach of contract under this counterclaim.

The evidence supporting GOCO's argument is necessary to recount here. In November 2000, Peter Fahey and Larry Carlson took over the servicing of the GOCO loans from ORIX, the regular loan servicer. Fahey and Carlson were responsible for sending out payment notices, reminder notices, and for all communications with GOCO. At this time, Fahey instructed ORIX not to have any further contact with GOCO or Carroll. Although James Richardson had resigned as operator as of October 27, 2000, German American refused to approve a new operator, either ProMarketing or Mott Oil Company. Despite the fact that GOCO provided all requested information concerning Mott Oil Company, German American still withheld approval. Fahey's own testimony is that he refused to take any phone calls from GOCO's accountants, who were calling in an attempt to resolve the situation. Fahey and Carlson also implemented a major change

66

in the method by which GOCO made its installment payments. Whereas ORIX had automatically debited the amounts from GOCO's account for over eighteen months, once German American took over servicing of the loans, ORIX no longer automatically debited the payments. As a result, ProMarketing, on behalf of GOCO, was required to initiate separate wire transfers for each payment. ProMarketing did this for several months, then stopped when Carroll's accountants took over, and it was apparently around the time of this transition that the missed payment occurred.

A party seeking damages for breach of contract must establish that it fulfilled its own obligations under the contract. Among these is the implied covenant of good faith and fair dealing. "Every contract implies that neither party will do anything to prevent performance by the other party and a party who violates this rule, which is founded in fair dealing, may not rely on such failure to excuse his own non-performance." Bass v. Sevits, 433 N.Y.S.2d 245, 247 (N.Y. App. Div. 1980). Thus, "a party to a contract cannot rely on the failure of another to perform when he has frustrated or prevented the performance." Hidden Meadows Dev. Co. v.

<u>Parmelee's Forest Prods., Inc.</u>, 734 N.Y.S.2d 264, 266 (N.Y. App. Div. 2001) (citation omitted).

The evidence clearly shows that Fahey and Carlson's actions exacerbated GOCO's management problems and rendered GOCO's performance under the loan agreements increasingly difficult, if not impossible. Their refusal to approve two separate companies who stood ready and willing to assume management responsibilities (including the loan payments), combined with their changes to the practice regarding installment payments, evinces bad faith in violation of the contract. GOCO has thus shown that German American's actions greatly disrupted its performance. <u>See</u> <u>Young v. Whitney</u>, 490 N.Y.S.2d 330 (N.Y. App. Div. 1985) (reversing jury verdict in part due to trial court's improper instruction concerning prevention of performance); <u>A-1 Gen. Contr. v. River Mkt. Commodities</u>, 622 N.Y.S.2d 378, 382 (N.Y. App. Div. 1995) (disruption and frustration necessary to excuse nonperformance different from impossibility). The test has also been phrased as whether the offending party "hindered" performance under the contract. <u>Shuster v. First Nat'l Monetary Corp.</u>, 450 N.Y.S.2d 711 (N.Y. Civ. Ct. 1982). German American and Deutsche Banc AB provide no facts to contest GOCO's claims, but only argue

68

that the cases cited are inapposite because they arise in the context of construction contract disputes.  Regardless, the reasoning of the cases is applicable here.  German American and Deutsche Banc AB have not provided evidence to dispute the clear conclusion that their actions not only hindered, but greatly disrupted GOCO's performance of its obligations under the loan agreement.  GOCO is due summary judgment on counterclaim 3, for breach of contract.


### B.  Defendants' Motion for Summary Judgment (Doc. no. 105)

### 1.  Liability of Deutsche Banc Alex.Brown

The defendants have moved for summary judgment on all claims as alleged against defendant Deutsche Banc Alex.Brown ("Deutsche Banc AB"), on grounds that the corporate veil may not be pierced.  In Townley v. Emerson Elec. Co., 681 N.Y.S.2d 741, 742-45 (Sup. Ct. 1998), aff'd as modified on other grounds, 702 N.Y.S.2d 728 (N.Y. App. Div. 2000), the court affirmed well-settled law on corporate liability:

> "As a general rule, the law treats corporations as having an existence separate and distinct from that of their shareholders and, consequently, will not impose liability upon shareholders for the acts of the corporation.  Indeed, the

69

avoidance of personal liability for obligations incurred by a business enterprise is one of the fundamental purposes of doing business in the corporate form.  It is true that, on occasion, the courts will disregard the separate legal personality of the corporation and assign liability to its owners where necessary 'to prevent fraud or to achieve equity.'  But, such liability can never be predicated solely upon the fact of a parent corporation's ownership of a controlling interest in the shares of its subsidiary. At the very least, there must be direct intervention by the parent in the management of the subsidiary to such an extent that 'the subsidiary's paraphernalia of incorporation, directors and officers' are completely ignored.

. . . .

'The corporate veil will be pierced (1) to achieve equity, even absent fraud, where the officers and employees of a parent corporation exercise control over the daily operations of a subsidiary corporation and act as the true prime movers behind the subsidiary's actions, and/or (2) where a parent corporation conducts business through a subsidiary which exists solely to serve the parent.

To pierce the corporate veil between a parent corporation and subsidiary, the parent corporation must exercise complete domination and control in the matter. Stock control, interlocking directors and interlocking officers are in and of themselves insufficient facts to justify the imposition of such liability on the parent corporation.  Control by the parent over the subsidiary's everyday operations

70

will, however, render the parent liable for
the subsidiary's acts."

Townley, 681 N.Y.S.2d at 742-745 (internal citations omitted).

The defendants point out that German American is the real party in interest in this case, since German American made the loans, received any benefits due under those agreements, and would be liable for any damages the plaintiffs allege as a result of those agreements. However, the defendants do not dispute a plethora of facts indicating that Deutsche Banc AB "exercises complete dominion and control" over German American's everyday operations and specifically over the present matter. The majority of these facts come from deposition testimony of the defendants' own officers and employees, as follows.

First, the day-to-day management of the GOCO loans has been handled entirely by the following people: Angela Gioia, who was an employee of Deutsche Bank Securities, Inc., a predecessor in name only to Deutsche Banc AB (she no longer works for the bank); Peter Fahey, an asset manager, assistant vice president, and employee of Deutsche Banc AB; Larry Carlson, also an asset manager and vice president of Deutsche Banc AB; and Robert Burns, a vice president, director of

71

underwriting, and employee of Deutsche Banc. All actions taken in connection with the asset management of the GOCO loans, from their inception to the May 2001 default and afterward, were performed by one or more of these four people, each of whom testified separately to this fact.

Most importantly, the record is undisputed that German American has no employees of its own, but is operated solely by employees of Deutsche Banc AB. There is no evidence in the record that any German American officers were involved in any aspect of the GOCO loans. Both of these facts have been testified to by the defendants' own employees. In fact, Robert Burns has filed a declaration in support of a motion to quash notices of deposition in this case in which he declares that he is a director of Deutsche Banc AB. He claims no affiliation, employment relationship, or other identification with German American. He states that Larry Carlson and Peter Fahey, whom he recognizes as responsible for the GOCO loans' day-to-day management, are officers of Deutsche Banc AB, and report solely to him. Burns's declaration goes on to say that Jon Vaccaro and Donna Milrod are officers of German American, but have no management involvement whatsoever with the GOCO loans (or indeed, apparently, any loans made by German

72

American).  Burns's declaration makes it obvious that Deutsche Banc AB and its officers and employees exercised total control over the day-to-day operations of German American, and that Deutsche Banc AB employees Fahey and Carlson were the "prime movers" behind German American's actions in this case.

The defendants have made no effort to contradict these facts or to provide any evidence that German American was not totally controlled by Deutsche Banc AB and its officers and employees, other than to vaguely characterize the relationship between the two corporations as the employees of one reporting to the officers of another.  This characterization is belied by the deposition testimony of the defendants' own employees. The defendants rely chiefly on the fact that Deutsche Banc AB was not a party to the GOCO loan agreements.  This point is insufficient when the evidence so overwhelmingly demonstrates that the legal requirements for piercing the corporate veil have been met.  Deutsche Banc Alex.Brown is a proper defendant and may be held liable on all claims raised by the plaintiffs against German American.

## 2. Applicable Law

The plaintiffs' complaint brings both tort and contract claims. The loan documents contain choice of law provisions establishing that New York law governs the rights and obligations of the parties under the agreements. As previously stated, Alabama law recognizes the enforceability of these choice of law provisions. Thus, New York law applies to the contract claims. The defendants argue that New York law should also govern the tort claims because the language of the contract is broad enough to encompass the tort claims as well. The court disagrees. Section 8.11 of the loan agreements provides only, "The rights and obligations of the parties under this agreement and the notes shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, including sections 5-1401 and 5-1402 of the general obligations law of the State of New York." This language does not state, as some choice-of-law provisions do, that any and all claims arising out of the relationship between the parties shall be governed by New York law. In Sunbelt Veterinary Supply, Inc. v. Int'l Business Sys. U.S., Inc., 985 F. Supp. 1352, 1355-56 (M.D. Ala. 1997) (Albritton, J.), the court held that while a choice-of-law clause may require the

74

parties to apply the specified state law to contract claims, additional tort claims were not controlled by the choice-of-law clause and were to be decided according to the law of the forum state (in that case, Alabama).  This decision is based on Alabama's _lex loci delicti_ rule that tort claims brought in Alabama are to be decided according to the law of the state where the injury occurred.  _Id_. at 1355.  _See also_ _Burger King Corp. v. Austin_, 805 F. Supp. 1007 (S.D. Fla. 1992). Accordingly, the non-contract claims are governed by Alabama law.

### 3.  Fraud, Misrepresentation, Deceit, Fraudulent Deceit, and Suppression (Count 1)

The abovegoing veil-piercing analysis disposes of Deutsche Banc AB's argument that it owed the plaintiffs no duty to disclose facts since it was not a party to the loan agreements; summary judgment will not be granted on this ground.  The defendants further argue as to count 1 of the complaint that the plaintiffs are improperly attempting to transmogrify a claim for breach into a claim for fraud.  The defendants argue that the plaintiffs have not alleged that the defendants breached a duty independent of the contractual relationship,

75

because German American did not have any duty independent of the contract to release the letter of credit. Thus, the defendants argue, German American's failure to release the letter of credit could only serve as the basis for a breach of contract claim, not fraud.

Count 1 does not merely encompass German American's non-release of the letter of credit. The additional alleged actions forming the grounds for this count are obvious from paragraphs 61, 62, and 63 of the plaintiffs' second amended complaint (Doc. no. 55) and will not be reprinted here. These allegations clearly go beyond a claim that the defendants never intended to perform the contract. Moreover, Alabama law permits a plaintiff to prosecute both fraud and breach of contract claims in the same action. This court held in Braswell v. Conagra, Inc., 1990 WL 605643, *6 (M.D. Ala. 1990) (Thompson, J.), that "'Alabama law is clear that where the plaintiff does not seek to rescind a contract based upon fraud, but rather sues for breach of contract and fraud by the defendant in performing the contract, then both the contract and tort claims are proper for submission to the jury'" (citations omitted). The New York cases cited by the

76

defendants do not foreclose simultaneous breach of contract and fraud claims.

The complaint's allegations in counts 1 and 2 regarding the non-release of the letter of credit are materially different from each other. Count 1 alleges in part that German American made affirmative misrepresentations to the plaintiffs and suppressed material facts from them concerning the release of the $1.7 million letter of credit in the loan documents among other things, that German American never intended to release the letter of credit, and that the plaintiffs relied on the misrepresentations about the letter of credit. Count 2 alleges in part that German American refused to release the letter of credit when GOCO satisfied the conditions of the loan documents, therefore breaching the agreement. Thus, as in Braswell, the plaintiffs have sued both for breach of contract and fraud by the defendant in performing the contract, and both claims will be permitted to go forward. The defendants' motion for summary judgment will be denied as to count 1 of the second amended complaint.

## 4. Breach of Contract (Count 2)

German American and Deutsche Banc AB's defense to count 2, a multi-faceted breach of contract claim, is that the alleged breaches were in fact all authorized by the loan agreement. Of the nine actions alleged by the plaintiffs to have breached the loan agreement, summary judgment has already been granted to the plaintiffs as to three of them. The remaining six will be discussed here.

First, the defendants argue with regard to count 2(a) that they did not breach the loan agreement by refusing to release the $1.7 million letter of credit when GOCO had satisfied the loan document conditions because the facts show that GOCO had not met the conditions. Schedule 10, "Additional Affirmative Covenants," of the loan agreement provides that the lender shall release the letter of credit

> "upon 30 days prior written request of the Borrower certifying, to the Lender's satisfaction, the satisfaction of all of the following conditions: a) the Borrower shall have completed the branding and re-imaging in respect of each Pledged Unit within six (6) months after the Closing Date and submitted evidence of the completion of such branding/re-imaging of the Associated Units, b) the Borrower's Consolidated Fixed Charge Coverage Ratio shall be at least 1.45 to 1.00 for the period equal to the lesser of (A) 12 full

78

calendar months immediately preceding the
date of such request or (B) the number of
full calendar months having then elapsed
after the Closing Date, and c) ratio of the
Associated Loans to the aggregate
Valuations of the Associated Units shall
not exceed 70%."

The defendants point out that the plaintiffs'
interrogatory responses make only the conclusory statement that
"the branding and reimaging of the GOCO stores were
accomplished before November 18, 1999, in accordance with the
loan documents," without providing evidence thereof. Also, the
correspondence from GOCO's attorney dated February 2, 2001
contained only undated pictures, and the submitted financial
information was prepared according to the income-tax basis
rather than GAAP (generally accepted accounting principles).
Thus, the defendants argue, the facts show that schedule 10's
requirements were not met, justifying the refusal to release
the letter of credit.

However, a letter dated November 18, 1999 from GOCO's
then-attorney to Angela Gioia, who was then handling the GOCO
loans for German American, states that an agreement with
Coastal was signed by Jim Richardson on November 15, 1999 and
temporary signs had been placed at each of the stores
identifying them as Coastal stores. Also, Craig Scarborough,

a certified public accountant who apparently worked with Carroll on GOCO's accounts, testified via deposition that according to his calculations, the FCCR of the GOCO stores was 1.59 and the loan-to-value ratio was "around 70 percent." Thus, there are certainly disputed facts regarding whether GOCO had met the requirements of schedule 10 for the release of the letter of credit.  In addition, those requirements do not specify what method must be used for preparing the financial statements.  Thus the defendants' argument that GOCO failed to comply with the loan agreement when it provided financial statements based on the income-tax method is irrelevant to this claim.  Summary judgment for the defendants will be denied on count 2(a).

As to count 2(c), which alleges that German American wrongfully forced GOCO into a default and accelerated the loan without giving GOCO an opportunity to cure a misunderstanding or an excusable mistake on the part of its operator or accountants, the defendants argue that default and acceleration were authorized by the loan agreement and an opportunity to cure was not required.  Without rehashing the facts already set out at length above, the court concludes that there exists substantial, uncontroverted evidence, the vast majority of

80

which was provided by the defendants' employees' testimony and by documents in the record, that the defendants treated the GOCO loans differently from other loans and at odds to customary business practice, that they took specific actions calculated to force GOCO into default, and that they accelerated the loan without providing an opportunity to cure. The defendants cite <u>Matter of Nicfur-Cruz Realty Corp.</u>, 50 B.R. 162, 168 n.6 (Bankr. S.D. N.Y. 1985) in support of their argument that because the loan documents do not require an opportunity to cure the default, German American was not required to be generous. As discussed previously, this case does not provide unqualified support for the principle advanced by the defendants, and none of the other cases cited for the same principle are on point. The plaintiffs have met their burden to show the existence of a genuine factual dispute and may proceed with count 2(c).

The defendants next argue that as to count 2(e), German American did not breach a separate contract to reinstate the loan because no such contract existed as a matter of law. The documents at issue in count 2(e) are an account statement from ORIX dated July 20, 2001, two letters from Carroll to ORIX and German American dated July 31, 2001, and a reply from ORIX to

81

Carroll characterizing the account statement as an error. The
defendants argue that the account statement does not contain
language that could be construed as an offer to reinstate the
loan, and that GOCO did not accept because it never sent
payment. Rather, GOCO requested to have proceeds from the
letter of credit applied as payment, which the defendants argue
is at best a counter-offer. Finally, the defendants argue that
the purported contract lacked consideration as GOCO was already
under a legal obligation to pay German American the money
indicated on the account statement as the total payment due.
Under this interpretation, with no offer, acceptance, or
consideration, as a matter of law, no contract exists.

   To the contrary, however, the account statement may be
considered an offer under New York law. Correspondence may
function as an offer so long as the promises and performances
to be rendered by the sender and recipient are reasonably
certain. Valashinas v. Koniuto, 125 N.Y.S.2d 554, 558 (N.Y.
App. Div. 1953), aff'd, 124 N.E.2d 300 (N.Y. 1954); Parkway
Inn, Inc. v. First Fed. Sav. & Loan Assoc., 269 N.Y.S.2d 730
(N.Y. Sup. Ct. 1966). In the account statement, ORIX offered
to reinstate the GOCO loans upon two conditions: (1) payment

                              82

of $299,324.72 to ORIX (2) on or before August 1, 2001.  These conditions suffice as reasonably certain.

Carroll's letters to ORIX and German American dated July 31, 2001, clearly constitute an acceptance as a matter of law. In his letter to ORIX, of which copies were sent to German American, Carroll agreed to the material terms of the account statement's offer, which were to bring the account current by paying the full amount requested by ORIX on the specified due date.  Carroll's separate letter to German American contained the same agreement.  Carroll's letters were sent via overnight and fax, and they were received on or before August 1, 2001. In the letters, Carroll requested that the funds to make the payment be transferred from the suspense account in which the funds from the letter of credit were held.

Under New York law, "if the acceptance of an offer is initially unconditional, the fact that it is accompanied with a direction or a request looking to the carrying out of its provisions, but which does not limit or restrict the contract, does not render it ineffectual or give it the character of a counteroffer."  Valashinas, 125 N.Y.S.2d at 558.  Carroll's acceptance did not question the amount or due date, or otherwise limit or restrict the contract.  The acceptance was

83

accompanied by a direction or request to apply the funds that the account statement represented were being held in a suspense account, and was therefore not a counter-offer.

The plaintiffs contend that consideration was furnished in Carroll's separate letter to German American, in which he indicated that in exchange for reinstatement of the loan, he would consider posting additional security and foregoing various legal options available to him. They argue that while promises to comply with an existing legal obligation cannot serve as consideration for a contract, Carroll had no obligation to post additional security and his willingness to do so was valid consideration, as was forbearance from pending or potential legal action, under <u>Williamsville Cent. Sch. Dist.</u> <u>v. New York State Urban Dev. Corp.</u>, 530 N.Y.S.2d 402 (N.Y. App. Div. 1988).

The application of the law to these facts is a stretch, since the actual sentence in the letter reads, somewhat vaguely, "We would be pleased to discuss with you the security that was provided by the $1.7 million letter of credit that you improperly applied to the prepayment penalties and the options available to us." The law would more clearly support the claim that consideration was furnished if the letter's language were

84

as clear as the plaintiffs' restatement of it.  Nevertheless, the interpretation is plausible; the plaintiffs have met their burden to show that a genuine issue of material fact exists as to this point and summary judgment is not appropriate on count 2(e).

Finally, the defendants argue that rather than breaching the contract, their failure to approve Mott Oil Company as the operator of the GOCO stores, as alleged in count 2(f), was in compliance with the loan agreement.  They point out that schedule 10 of the loan agreement provides that in the event of the termination of the management agreement between the borrower and Happy Retail, L.C., "the Borrower will enter into a comparable replacement management contract ... in form and substance satisfactory to the Lender, with a third party acceptable to the Lender."  Thus, the defendants state, the alleged failure to approve Mott Oil Company was merely an exercise of German American's contractual right to approve the form and substance of the management agreement as well as the identity of the proposed management company.

Again, however, without reprinting the facts already set forth above, the plaintiffs have provided sufficient evidence that the information they submitted on Mott Oil Company

85

complied with the loan agreement, that German American employees refused to return phone calls or otherwise communicate regarding the plaintiffs' attempts to secure approval of a new operator, and that German American's refusal to approve a new operator was arbitrary and made in bad faith. The defendants' motion for summary judgment will not be granted as to count 2(f). The defendants have not addressed the remaining two claims in count 2, regarding German American's declaration of default and its failure to service the loans, and thus summary judgment on these claims will not be granted either.

### 5. Breach of Contract and Declaratory Judgment Regarding Guaranty (Counts 5, 6)

Carroll and GOCO allege in count 5, for breach of contract, that German American has breached the guaranty by (a) making demand upon Carroll under the guaranty without one of the four triggering events to make the guaranty applicable, (b) filing a counterclaim against Carroll based on the guaranty that is based on false allegations, and (c) failing to mitigate its losses by accepting tender from Carroll or GOCO; and (d) that the guaranty is void because the defendants failed to

86

qualify to do business in the state of Alabama prior to Carroll signing it. In count 6, the plaintiffs request the court to declare, pursuant to Rule 57 of the Alabama Rules of Civil Procedure, that there are no guaranteed obligations due under the guaranty. The plaintiffs have conceded that because GOCO is not a party to the guaranty, counts 5 and 6 are brought only on behalf of Carroll. The court will accordingly dismiss these counts as to GOCO. Deutsche Banc AB raises the same argument regarding its non-participation in the guaranty as it did for the loan agreement, but under the same corporate-liability analysis, Deutsche Banc AB is a proper defendant on these claims.

The abovegoing resolution of the defendants' counterclaims applies to these allegations. The court has already found that there is no evidence that any of the four triggering events occurred to make the guaranty applicable, and that the counterclaims' allegations are not supported by the evidence. Therefore, summary judgment will not be granted for the defendants on counts 5(a) and 5(b) (except as to plaintiff GOCO). Also, summary judgment will not be granted on count 6 (also except as to plaintiff GOCO). Count 5(c) and 5(d), however, fail because the court has already determined that as

87

a matter of law, the offers by Carroll to bring the account current and to pay the entire balance due do not qualify as "tender," and that German American's failure to qualify to do business in Alabama does not render the guaranty unenforceable. Summary judgment for the defendants is appropriate on counts 5(c) and 5(d).

### 6.   Intentional Interference with Business Relations (count 9)

Carroll and GOCO have alleged that both defendants interfered with their business relations in three main ways: the defendants directed the notices of foreclosure to the individual stores rather than GOCO or Carroll, they contacted GOCO's trade creditors and made derogatory remarks about GOCO, and they interfered with the relationship between GOCO and ORIX, the loan servicer.   Carroll and GOCO also allege that defendant Deutsche Banc AB interfered with their relationship with German American.   The defendants' motion for summary judgment addresses only the allegation that the defendants directed the notices of foreclosure to the individual stores rather than GOCO or Carroll, arguing that Alabama law requires evidence of "criminal or fraudulent conduct" and that the

sending of foreclosure notices to the stores was authorized by the loan agreement.

Under Alabama law, which governs the tort claims in this case, the elements for a cause of action for intentional interference with business relations are:  (1) the existence of a business relation, (2) the defendant's knowledge of the business relation, (3) intentional interference by the defendant with the business relation, and (4) damage to the plaintiff as a result of the defendant's interference. Springhill Lighting & Supply Co. v. Square D Co., 662 So.2d 1131, 1150 (Ala. 1995).  Also, the plaintiff must show some evidence of fraud, force, or coercion on the defendant's part. Joe Cooper & Associates, Inc. v. Central Life Assur. Co., 614 So.2d 982, 986.

First, the defendants' argument that criminal or fraudulent conduct must be shown overstates the intent requirement.  The language in Joe Cooper & Associates, supra, that the plaintiffs must show some evidence of fraud, force, or coercion, is based on prior Alabama case law holding that some affirmative intentional act by the defendant must be shown, and a failure to act, no matter how culpable, will not give rise to liability.  See, e.g., Brown v. Chem Haulers,

89

Inc., 402 So.2d 887, 891 (Ala. 1981) (alleged acts of intentional interference with business relations must indicate "an affirmative, intentional, malicious, unjustified or unlawful interference with a contractual right"). Carroll and GOCO have easily met the intent requirement by alleging that the defendants deliberately mailed foreclosure notices, telephoned trade creditors, and otherwise acted affirmatively. None of these allegations are based on a failure to act.

Second, the loan agreement contains no authorization to send the foreclosure notices to the individual stores. Section 8.2 of the loan agreement requires the lender to send "all notices, requests and demands" to the borrower "at its address specified on Schedule 1." Schedule 1, which is titled "Borrower Information; Effective Date; Pledge Unit(s) Information," states that "borrower's principal place of business" is an address in Petry, Alabama. The individual stores' addresses are listed in a separate section further down the page titled "Supplier; Description of Pledged Unit and Associated Units; Supply Documents." A jury could reasonably conclude that the "address specified on Schedule 1" refers to the borrower's principal place of business rather than the fifteen addresses of the associated units.

90

The plaintiffs have sufficiently alleged facts relating to the other elements of an intentional interference with business relations claim.  The defendants have provided no basis for summary judgment and therefore they will not be granted summary judgment on count 9.

### 7.  Conspiracy (Count 11)

As grounds for their conspiracy claim, Carroll and GOCO allege that Larry Carlson and Peter Fahey conspired with James Richardson, owner of Happy Retail, to put the GOCO loans into default.  They allege that Carlson and Fahey communicated with Richardson to find out information about GOCO when they would not call Carroll directly, and that they worked together with German American's counsel to force GOCO into default based upon their promise to Richardson that they would have him manage the GOCO stores after foreclosure.  The defendants' motion for summary judgment argues that the plaintiffs have failed to allege any wrongful conduct that legally suffices to meet the definition of conspiracy, and that there are no facts to support the conspiracy claim.

Under Alabama law, a prima facie case of civil conspiracy is "the combination of two or more persons to do (a) something

that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means." Johnson v. Shirley, 539 So.2d 165, 169 (Ala. 1988) (citation omitted). Any behavior sufficient for the imposition of civil liability is "unlawful," as that term is used in the context of civil conspiracy claims. Eidson v. Olin Corp., 527 So.2d 1283, 1285 (Ala. 1988); Barber v. Stephenson, 69 So.2d 251 (Ala. 1953).

The plaintiffs' allegation that Carlson, Fahey, and Richardson conspired to force the GOCO loans into default is legally sufficient for a conspiracy claim, since forcing loans into default would obviously be grounds to impose civil liability. In addition, the plaintiffs have alleged more than enough facts to support the claim. Because the facts regarding German American's contact with Richardson are scattered throughout the record, and in light of the fact that a conspiracy may (and in many cases must) be proved through circumstantial evidence and the relationship of the parties, Eidson, 527 So.2d at 1287, the court will recount them here.

92

By January 2000, GOCO and Carroll were having problems with Happy Retail and Richardson. German American was also having problems obtaining requested financial statements from Richardson's controller and Happy Retail. In May 2000, Carroll notified German American that he was planning to terminate Happy Retail as the operator, and Carroll informed Peter Fahey via letter and telephone conversation about the problems with Richardson and Happy Retail. In September 2000, Carroll arranged a meeting with Fahey, one of the purposes of which was to ask for the approval of a new operator for the stores. At the meeting with Fahey and Carlson, Carroll again informed them of the severe problems with Richardson and asked them to approve a new operator. Carroll testified that Carlson said he would never approve a new operator.

Immediately after the New York meeting, Carroll told Richardson he could either submit the GOCO books to a forensic audit or resign. Carroll had suspected that there were problems with the cash flow of the GOCO stores. Richardson chose to resign rather than undergo the audit. After Richardson's resignation, he had telephone conversations with both Carlson and Fahey. Neither Carlson, Fahey, nor Richardson remembers the complete substance of these calls, and the

93

portions they remember are inconsistent with one another.  The
plaintiffs assert that there was no legitimate reason for Fahey
and Carlson to maintain a dialogue with Richardson after his
resignation.  Fahey and Carlson had already been informed of
the problems Carroll was having with Richardson and his
operation, and they knew that he had resigned under allegations
of fraudulent bookkeeping.  Carlson talked to Richardson about
taking over operation of the GOCO stores in the event of
foreclosure.  After taking the GOCO stores in the bankruptcy
court, German American turned them over to Richardson to
manage.  Although Richardson is no longer managing the stores,
he was receiving a management fee of all costs of management
plus 10%.

The defendants have brought forward no evidence to refute
any of these allegations other than Carroll's deposition
testimony that he does not know whether Happy Retail, Happy
Stores, or Richardson ever supplied false information to the
defendants about him, or whether the defendants ever supplied
false information about him to Richardson, et al.  The
defendants provide no reason why Carroll's knowledge or lack
thereof would be fatal to the conspiracy claim, nor is it in
light of the legal standard and the other evidence in the

94

record.  The court concludes that these allegations provide sufficient grounds for the conspiracy claim to proceed to trial, and summary judgment will be denied on count 11.

### 8.  Conversion (Count 12)

Carroll and GOCO allege in this claim that the defendants converted their property by drawing on the $1.7 million letter of credit and applying it to the illegal prepayment fee.  The defendants argue first that the claim for conversion duplicates the previous claim for breach of contract, and thus is barred as a matter of law.  Second, they argue that the plaintiffs have not properly pled the elements of a conversion claim because they are not parties to the letter of credit itself (the parties being German American as beneficiary and SouthTrust as the issuing bank), and therefore have no ownership rights in it.

In support of their first argument, the defendants cite New York and Eleventh Circuit (based on Florida) law precluding a conversion claim where the claim duplicates that of a breach of contract.  Alabama law properly controls this tort claim, and under Alabama law a plaintiff may bring a conversion claim that is based, wholly or in part, on breach of contract.

95

<u>Gabrielson v. Healthcorp of Eufaula, Inc.</u>, 628 So.2d 411 (Ala. 1993) (affirming recovery on conversion claim based on breach of contractual obligation to return medical records).  The plaintiffs may therefore properly maintain their conversion count in addition to their breach of contract count.

To maintain an action for conversion, the plaintiff must show that the defendant converted specific personal property to his own use and enjoyment, or that the defendant destroyed or exercised dominion over property to which, at the time of the conversion, the plaintiff had a general or specific title and of which the plaintiff was in actual possession or to which the plaintiff was entitled to immediate possession.  <u>Rice v. Birmingham Coal & Coke Co.</u>, 608 So.2d 713, 714 (Ala. 1992). Intangible property rights may properly be the subject of a conversion claim.  <u>Nat'l Surety Corp. v. Applied Sys., Inc.</u>, 418 So.2d 847 (Ala. 1982).

The plaintiffs have sufficiently pled all the required elements of conversion.  The letter of credit is not the subject matter of the conversion claim, it is the mechanism by which the defendants allegedly took and converted the plaintiffs' property - namely, the funds used to secure the letter of credit.  The claim is therefore that by drawing upon

96

the letter of credit, the defendants wrongfully deprived the plaintiffs of specific funds to which the plaintiffs had a general or specific title, and in which the plaintiffs held an immediate right of possession, converting those funds to their own use in the form of the prepayment fee rather than paying down GOCO's debt.  Because intangible property rights can be the subject of a conversion claim, Nat'l Surety Corp., supra, there is no reason why a letter of credit, or funds in an account that were to be used to pay GOCO's debt, might not form the basis of a conversion claim.  The defendants' motion for summary judgment will be denied on count 12.

## C.  Other Pending Motions

### 1.  Dispositive Motions

There are several pending motions which duplicate or are encompassed by the motions discussed above, so that the court's rulings resolve them entirely.  These motions include Carroll and GOCO's motion to dismiss the defendants' counterclaims (Doc. no. 21); German American's motion for judgment on the pleadings with respect to Counts 1-4 and 7-10 (Doc. no. 28); German American and Deutsche Banc's motion to dismiss the second amended complaint (Doc. no. 77); and Carroll and GOCO's

97

motion to dismiss defendants' second amended counterclaims (Doc. no. 91). The court will deny these motions as moot.

### 2. Motion to Strike

Carroll and GOCO have filed a motion to strike (Doc. no 88) exhibits D and E from the defendants' motion to dismiss second amended complaint (Doc. no. 77). The plaintiffs seek to strike the exhibits on grounds that they are evidentiary material outside the scope of the pleadings and may not be considered on a Rule 12(b)(6) motion to dismiss. The exhibits are two letters written by Carroll and an ORIX bill (Ex. D) and a letter and attached financial statements and copies of photographs of the GOCO stores submitted to German American by plaintiffs' then-counsel R. Eugene Clenney, Jr. (Ex. E).

As to Exhibit D, the letters and ORIX bill were made exhibits to both parties' motions for summary judgment (Doc. nos. 105 and 107). Part of Exhibit E, the letter and financial statements for the year 2000, were also made part of the plaintiffs' evidentiary submission in support of their motion for summary judgment (Doc. no. 109). The pictures of the GOCO stores were not re-filed, but their presence or absence from the record has no bearing on any of the issues in

the lawsuit.  The motion to strike both of these exhibits will therefore be denied as moot.

### IV.  CONCLUSION

For the abovegoing reasons, it is ORDERED as follows:

(1) The partial motion for summary judgment and motion for summary judgment on the second amended counterclaims, filed by plaintiffs Sam J. Carroll, III and GOCO Acquisition Corporation on April 17, 2002 (Doc. no. 107), is:

> (A)  Denied as to count 1(a) of the second amended counterclaims;
>
> (B)  Granted as to counts 2(b), 2(d), 2(f), 3, 4, 8 (except in count 8 as to the failure to approve Mott Oil Company as operator of the GOCO stores), and 10 of the second amended complaint; and
>
> (C)  Granted as to counts 1(b), 2, and 3 of the second amended counterclaims;

(2) The motion for summary judgment, filed by defendants Deutsche Banc Alex.Brown and German American Capital Corporation on April 17, 2002 (Doc. no. 105), is:

> (A)  Denied as to counts 1, 2(a), 2(c), 2(e), 2(g), 2(h), 2(i), 5(a), 5(b), 6 (as to plaintiff Sam

99

Carroll), 9, 11, and 12 of the second amended complaint;

(B) Granted as to counts 3, 4, 5(c), 5(d), 6 (as to plaintiff GOCO), 7, and 10 of the second amended complaint; and

(C) Granted as to count 1(a) of the second amended counterclaims;

(3) Plaintiffs' motion to dismiss defendants' counterclaims, filed September 24, 2001 (Doc. no. 21), is denied as moot;

(4) Defendants' motion for judgment on the pleadings, filed November 6, 2001 (Doc. no. 28), is denied as moot;

(5) Defendants' motion to dismiss plaintiffs' second amended complaint, filed February 5, 2002 (Doc. no. 77), is denied as moot;

(6) Plaintiffs' motion to strike exhibits, filed February 28, 2002 (Doc. no. 88), is denied as moot;

(7) Plaintiffs' motion to dismiss the second amended counterclaims, filed March 5, 2002 (Doc. no. 91), is denied as moot.

DONE, this the 12th day of August, 2002.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE