IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
------------------------------------------------------------ *
BEN F. BEARD,                                                *
                                                            *
              Plaintiff,                                    *
                                                            *
vs.                                                         *
                                                            *     Civil Action No:
                                                            *        2:06-CV-653-A
LEHMAN BROTHERS HOLDINGS INC.,                              *
d/b/a LEHMAN CAPITAL, PETER R. KERN,                        *
OAK ASSET MANAGEMENT, LLC,                                  *
MIDLAND LOAN SERVICES, INC.,                                *
JOLLY ROGER, LLC, JOLLY ROGER I, INC.,                      *
CAPITAL SEVEN RECOVERY, LLC,                                *
PETER FAHEY, LARRY W. CARLSON,                              *
                                                            *
              Defendants.                                   *
------------------------------------------------------------ *
```

## MOTION BY DEFENDANTS LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, PETER R. KERN, OAK ASSET MANAGEMENT, LLC, AND MIDLAND LOAN SERVICES, INC., TO TRANSFER VENUE

The Defendants, Lehman Brothers Holdings Inc., d/b/a Lehman Capital, Peter R. Kern,

Oak Asset Management, LLC, and Midland Loan Services, Inc., would move the Court pursuant

to 28 U.S.C. § 1404(a), to transfer the venue of this action against Defendants to the United

States District Court for the Southern District of New York.  In support of their motion and

attached hereto are the Affidavit of Michael E. Jones and the Memorandum of Law in support of

said Motion.

/s/ Terry L. Butts_____
Terry L. Butts (BUT009)
P. O. Drawer 272
Luverne, Alabama 36049
(334) 335-2262

1

/s / Michael E. Jones
Michael E. Jones (JON039)
Jones & Coots, LLC
P. O. Box 367
Luverne, Alabama 36049
(334) 335-6534

Attorneys for Defendants
Lehman Brothers Holdings Inc.
d/b/a Lehman Capital, Midland Loan
Services, Inc., Peter R. Kern and
Oak Asset Management, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following:

Lee R. Benton, Esq.
C. Steven Ball, Esq.
Benton & Centeno, LLP
2019 Third Avenue North
Birmingham, Alabama 35203

by placing a copy of the same properly addressed, postage prepaid in the United States Mail, first class delivery this 1st day of August, 2006.

/s/ Michael E. Jones
Of Counsel

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
-------------------------------------------------------- *
BEN F. BEARD,                                            *
                                                        *
                 Plaintiff,                              *
                                                        *
vs.                                                     *
                                                        *   Civil Action No:
                                                        *      2:06-CV-653-A
                                                        *
LEHMAN BROTHERS HOLDINGS INC.,                          *
d/b/a LEHMAN CAPITAL, PETER R. KERN,                    *
OAK ASSET MANAGEMENT, LLC,                              *
MIDLAND LOAN SERVICES, INC.,                            *
JOLLY ROGER, LLC, JOLLY ROGER I, INC.,                 *
CAPITAL SEVEN RECOVERY, LLC,                            *
PETER FAHEY, LARRY W. CARLSON,                          *
                                                        *
                 Defendants.                             *
-------------------------------------------------------- *
```

## AFFIDAVIT OF MICHAEL E. JONES

STATE OF ALABAMA        )
                  ss.:
COUNTY OF CRENSHAW)

        MICHAEL E. JONES, being duly sworn, deposes and says:

        1.      I am an attorney admitted to the Bar of this Court and am a member of

Jones & Coots, LLC, attorneys for defendants Lehman Brothers Holdings Inc., d/b/a Lehman

Capital, Peter R. Kern, Oak Asset Management, LLC, and Midland Loan Services, Inc.

(collectively "Defendants") in the above-captioned action.  I am familiar with the matters set

forth herein.  I submit this affidavit in support of Defendants' Motion to Transfer Venue for the

purpose of placing documents before the Court that relate to the Motion.  Defendants do not

thereby waive any objection that they may have as to the admissibility of the attached documents.

2.    Attached hereto as Exhibit A is a true and correct copy of the Complaint in the above-captioned action, filed on June 14, 2006.

3.    Attached hereto as Exhibit B is a true and correct copy of the Loan Agreement for loan number 217000029, evidencing obligations between ProMarketing and Lehman.  ProMarketing and Lehman entered into four additional Loan Agreements numbered 217000030, 217000031, 217000032, and 217000033.  Each of the other four Loan Agreements contains identical forum selection and choice of law clauses.

4.    Attached hereto as Exhibit C is a true and correct copy of the Promissory Note for loan number 217000029, evidencing the promise by ProMarketing to repay $4,519,000 of the total $25,000,000 debt.  ProMarketing and Lehman entered into four additional Promissory Notes relating to the Loan Agreements numbered 217000030, 217000031, 217000032, and 217000033.  Each of the other four Promissory Notes, evidencing the promise to repay the remaining portion of the $25,000,000 loan, contains identical forum selection and choice of law clauses.

5.    Attached hereto as Exhibit D is a true and correct copy of the Guaranty to loan number 217000029, evidencing the promise by four individuals, including plaintiff Ben F. Beard, personally to repay the loan.  Ben F. Beard signed four additional Guaranties relating to the Loan Agreements numbered 217000030, 217000031, 217000032, and 217000033.  Each of the Guaranties to the other loans contains identical forum selection and choice of law clauses.


/s/ Michael E. Jones
Michael E. Jones

2

STATE OF ALABAMA
COUNTY OF CRENSHAW

Before me, the undersigned Notary Public, in and for said State and County, personally

appeared **MICHAEL E. JONES**, who first being duly sworn says that the foregoing is true and

correct.

SWORN to and subscribed before me this 1st day of August, 2006.

/s/ Leesa Fleming
Notary Public

My Commission Expires: 10-23-09

3

Exhibit A



**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

DDZ / ALL
Transmittal Number: 4575452
Date Processed: 06/22/2006

| | |
|---|---|
| Primary Contact: | Mia Howard- Offc of Genrl Cnsl<br>Lehman Brothers Inc.<br>1301 Avenue of the Americas<br>Floor 5th<br>New York, NY 10019 |

| | |
|---|---|
| Entity: | Lehman Brothers Holdings Inc.<br>Entity ID Number 1651924 |
| Entity Served: | Lehman Brothers Holdings, Inc. d/b/a Lehman Capital |
| Title of Action: | Ben F. Beard vs. Lehman Brothers Holdings, Inc. d/b/a Lehman Capital |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court: | Circuit Court of Pike County , Alabama |
| Case Number: | CV06-135 |
| Jurisdiction Served: | Alabama |
| Date Served on CSC: | 06/22/2006 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Certified Mail |
| Sender Information: | Lee R. Benton<br>205-278-8000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

2711 Centerville Road  Wilmington, DE 19808  (888) 690-2882  |  sop@cscinfo.com

| State of Alabama<br>Unified Judicial System<br><br>C-34J  4R2 | **SUMMONS**<br>**– CIVIL –** | Case Number<br>_CV 06 - 135_<br>ID    YR    NUMBER |
|---|---|---|

N THE _____ CIRCUIT _____ COURT OF _____ PIKE _____ COUNTY

Plaintiff  BEN F. BEARD  v. Defendant   LEHMAN BROTHERS, et al.

NOTICE TO Lehman Brothers Holdings, Inc., c/o Prentice Hall Corporation Sys, Inc., 150 S. Perry Street, Montgomery, Alabama  36104

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFF'S ATTORNEY - **C. STEVEN BALL** - WHOSE ADDRESS IS 2019 3rd Avenue N., Birmingham, Alabama 35203

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN __30__ DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

☐    TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either rules 4.1(b)(2) or 4.2(b)(2) or 4.4(b)(2) of the Alabama Rules of Civil Procedure: You are hereby commanded to serve this summons and a copy of the complaint in this action upon defendant.

☒    This service by certified mail of this summons is initiated upon the written request of  _Plaintiff_ pursuant to Rule 4.1(c) the Alabama Rules of Civil Procedure.

_10/21/06_ _____        _Brenda M. Peacock_ By: _____
Date                                                                Clerk/Register

RETURN ON SERVICE:

☐    Certified mail return receipt received in this office on (Date)_____.
       (Return receipt hereto attached.)

☐    I certify that I personally delivered a copy of the Summons and Complaint to _____
       _____ in _____ County, Alabama on
       (Date)_____.

_____                         _____
Date                                                          Server Signature

_____                         _____
Address of Server                                        Type of Process Server

_____

## IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

| | |
|---|---|
| BEN F. BEARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. CV06-135 |
| | ) |
| LEHMAN BROTHERS HOLDINGS, INC., | ) |
| d/b/a LEHMAN CAPITAL, PETER R. | ) |
| KERN, OAK ASSET MANAGEMENT, LLC, | ) |
| MIDLAND LOAN SERVICES, INC., | ) |
| JOLLY ROGER, LLC; JOLLY ROGER I, INC., | ) |
| CAPITAL SEVEN RECOVERY, LLC, | ) |
| PETER FAHEY, LARRY W. CARLSON, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW Ben F. Beard, an individual, and files his Complaint against Defendants,

Lehman Brothers Holdings, Inc., d/b/a Lehman Capital, Peter R. Kern, Oak Asset Management,

LLC, Midland Loan Services, Inc., Jolly Roger, LLC, Jolly Roger I, Inc., Capital Seven

Recovery, LLC, Peter Fahey, and Larry W. Carlson, and in support thereof would show the Court

the following:

    1.    The Plaintiff, Ben F. Beard ("Beard"), is an individual, who is the managing

member of ProMarketing, LLC ("ProMarketing"), a limited liability company formed under the

laws of Alabama on March 9, 2000, for the purpose of, among other things, acquiring, owning

and managing convenience stores. ProMarketing is headquartered in Troy, Alabama.

    2.    The Defendant, Lehman Brothers Holdings, Inc., d/b/a Lehman Capital ("Lehman

Brothers"), is, upon information and belief, a Delaware corporation which does business in the

state of Alabama.

3.    The Defendant, Peter R. Kern ("Kern"), is, upon information and belief, an adult individual residing in the state of New York.

4.    The Defendant, Oak Asset Management, LLC ("Oak Asset"), is, upon information and belief, a California limited liability company which does business in the state of Alabama.

5.    The Defendant, Midland Loan Services, Inc., ("Midland"), is, upon information and belief, a Missouri corporation which does business in the state of Alabama.

6.    The Defendant, Jolly Roger, LLC, ("Jolly Roger"), is, upon information and belief, a Delaware limited liability company which does business in the state of Alabama.

7.    The Defendant, Jolly Roger I, Inc., ("Jolly Roger I"), is, upon information and belief, a Delaware corporation which does business in the state of Alabama.

8.    The Defendant, Capital Seven Recovery, LLC, ("Capital Seven"), is, upon information and belief, a Delaware limited liability company which does business in the state of Alabama.

9.    The Defendant, Peter Fahey ("Fahey"), is, upon information and belief, an adult individual residing in the state of New York.

10.    The Defendant, Larry W. Carlson ("Carlson"), is, upon information and belief, an adult individual residing in the state of Connecticut.

11.    At all times relevant hereto, each of the respective individual Defendants were acting as agents of Lehman Brothers, Oak Asset, Midland, Jolly Roger, Jolly Roger I, and/or Capital Seven, and were acting as agents within the line and scope of their legal authority. The tortious conduct of the Defendants described hereinbelow took place in Pike County, Alabama.

## FACTS

12.     In or about early 2000, representatives for ProMarketing, including Beard and Sam J. Carroll, III, began searching for financing for twenty-eight (28) convenience stores located in the states of Alabama, Florida, and Georgia.  Ultimately, it was determined that Lehman Brothers, would be the lender for the transaction.

13.     On March 24, 2000, Lehman Brothers agreed to loan to ProMarketing the sum of Twenty-five Million Dollars ($25,000,000.00) for the financing of the above-referenced convenience stores.  The transaction included five separate loans for the total sum of $25,000,000.00, as follows: (1) loan number 217000029 in the amount of $4,519,000.00; (2) loan number 217000030 in the amount of $5,389,000.00; (3) loan number 217000031 in the amount of $5,313,000.00; (4) loan number 217000032 in the amount of $5,303,000.00; and (5) loan number 217000033 in the amount of $4,276,000.00.  Each separate loan required the execution of a separate Promissory Note; Mortgage, Security Agreement, Financing Statement & Fixture Filing; Loan and Security Agreement (collectively, the "Loan Agreement"); and various other financing documents presumably for the purpose of securing the debt and the real and personal property collateralizing the debt (primarily the convenience stores themselves), the real property upon which the convenience stores were located, and certain other vendor agreements that were related to the convenience stores.  Importantly, Lehman Brothers also required two separate guaranties of the debt, the first being a guaranty executed by James W. Jackson, Jr., Robert Warren Jackson, Sam J. Carroll, III, and Ben F. Beard ("the Carroll & Beard Guaranties") and the second being a guaranty executed by BFB, LLC ("the BFB Guaranties"), both conditional

recourse guaranties.[1]  There were a total of five separate Carroll & Beard Guaranties and five separate BFB guaranties executed for the total debt, one for each loan.

14.     From the distribution of the loan proceeds on March 24, 2000 forward, ProMarketing made each of its monthly payments pursuant to the Notes to Lehman Brothers. However, after the national tragedy of September 11, 2001 ("9/11"), the economic impact upon the convenience store industry, and specifically the gasoline industry, was significant. Also, there were numerous other entrants into the market, including the emergence of the "big box" retailers led by Wal-Mart. Shortly after 9/11, ProMarketing began to struggle with the servicing of its debt to Lehman Brothers, among others. However, ProMarketing continued to make its monthly payments of approximately $240,000.00 to Lehman Brothers.

15.     On or about February 1, 2002, Beard contacted representatives of Lehman Brothers to discuss the financial difficulties of ProMarketing and the possibility of some forebearance agreement. On or about February 6, 2002, Beard began communicating with Kern, a vice-president at Lehman Brothers. The purpose of the contact was to establish an open line of communication between the representatives of ProMarketing and Lehman Brothers to discuss the financial difficulties facing ProMarketing, and to also make Lehman Brothers aware that ProMarketing intended to do all in its power to honor its obligations pursuant to the Loan Agreements. For several months thereafter, ProMarketing continued to make payments to Lehman Brothers, though the payments made caused ProMarketing to operate at a deficit.

16.     However, the state of the depressed industry environment and the general national

---

[1]At the inception of the loan transactions, ProMarketing had several members who later transferred their respective interests to Beard. Beard is now the sole member of ProMarketing.

economy continued to decline, and ultimately ProMarketing was unable to pay the October 1,

2002 payment to Lehman Brothers. On October 1st, Beard contacted Kern at Lehman Brothers

to discuss ProMarketing's status. Additionally, on that date, Beard wrote to Kern telling him of

ProMarketing's plan to attempt to restructure by liquidating certain assets of ProMarketing that

did not serve as collateral to the Lehman Brother's debt and to further restructure ProMarketing

with the guidance and acceptance of Lehman Brothers. Beard also informed Kern of

ProMarketing's intention to obtain other potential investors and to obtain certain financial

professionals' assistance in the restructuring of the business to maximize the value of the assets

and goodwill. Kern, in his individual capacity and as a representative of Lehman Brothers,

agreed to forebear any immediate attempt to collect the debt. In fact, Kern admitted to Beard that

the economic issues facing ProMarketing were common throughout the industry and that Lehman

Brothers had numerous non-performing loans that required ongoing cooperation between the

lender and borrower. Kern also told Beard that because of the problems with this and other

similarly situated Lehman Brothers loans, it was important to attempt to maintain the

ProMarketing loan as a performing, non-default loan on the Lehman Brothers' books. As such,

in or about early October 2002, Lehman Brothers, by and through Kern, began and maintained an

ongoing discussion with Beard to fashion a plan to keep the ProMarketing convenience stores

operating and to protect the collateral.

17.    In the months of October and November 2002, Beard, as a representative of

ProMarketing, continued to communicate with Lehman Brothers, by and through Kern, via

several telephone conferences and meetings, both in Alabama and Atlanta, Georgia. During this

period, Kern, along with Paul Sven ("Sven"), another vice-president at Lehman Brothers in

charge of workouts and financial restructuring, a representative of Midland and others, traveled to Troy, Alabama to meet with Beard to attempt to work out a plan for payment and to inspect some of the collateral properties. Among other things, Lehman Brothers demanded that ProMarketing hire a consulting firm to monitor its operations, analyze cash flow, assets and liabilities, and to assist with possible future restructuring. Upon information and belief, Oak Asset was retained by Lehman Brothers for essentially the same purpose and to further assist Lehman Brothers in overseeing the restructuring of ProMarketing and was acting as the agent for Lehman Brothers. At the direction of Lehman Brothers, ProMarketing sought a consultant and ultimately hired Navigant Consulting, Inc. ("Navigant"), for that purpose.

18.     During one of those meetings, upon information and belief the November 7, 2002, meeting in Atlanta, attended by Beard, Kern, representatives of Navigant, and Gerard J. Maughan ("Maughan") of Oak Asset, Lehman Brothers began making additional demands upon ProMarketing to further reduce its expenses. Among other things, Lehman Brothers demanded that Beard reduce his salary as manager of ProMarketing and that ProMarketing cease making any further rental payments on its office headquarters pursuant to its lease with Beard, pursuant to his ownership of the building housing the office headquarters.

19.     Moreover, Kern represented to Beard that Lehman Brothers believed a vast majority of the collateralized convenience stores were contaminated by environmental issues from gas storage tanks and other industry related issues. Kern also represented to Beard that Lehman Brothers had purchased an environmental protection insurance policy from, upon information and belief, American International Group, Inc. ("AIG") to cover such contamination. Kern represented to Beard that environmental assessments performed by Lehman Brothers led

them to believe that approximately 70% of the stores were contaminated and that Lehman was

working on settlement with AIG wherein AIG would take over the contaminated stores, pursuant

to the obligations in the insurance policy, and that ProMarketing would be able to get a "good

deal" on the contaminated properties and to also retain the remaining 30% of the non-

contaminated stores via some restructuring or refinance. Kern further represented to Beard that

ProMarketing would be involved with the negotiations with AIG to protect its interests and to

negotiate the transaction wherein ProMarketing would have up to one (1) year to refinance the

remaining 30% of the stores for the approximate fair market value of the non-contaminated

stores (presumably no more than 30% of the $25 million debt) and would be able to negotiate a

below market value price with AIG for the contaminated stores. Kern further represented to

Beard that any attempt to refinance the ProMarketing loans would be delayed until after the

resolution of the claim with AIG and agreed that ProMarketing could make nominal or interest

only payments until the AIG claim settled, as long as the collateralized stores remained

operational. These various representations were later confirmed and restated by Kern to Beard in

telephone conferences.

20.    In an attempt to induce Beard to continue to maintain the operations of

ProMarketing and keep the collateralized stores operating, including those with allegedly

substantial environmental damage, Kern represented to Beard that ProMarketing would be "at the

table" when all negotiations were ongoing with AIG. Further, upon information and belief, Kern

made that representation to induce Beard to continue to inject his personal capital into

ProMarketing's operations and Beard further agreed to reduce his salary and caused

ProMarketing to cease making lease payments to Beard for the ProMarketing office headquarters.

As a result of Kern's representation, Beard did not entertain any possible liquidation of

ProMarketing. Further, because of Lehman Brothers's requirement that a consultant be hired,

ProMarketing began payments to Navigant, which cost ProMarketing fees and other expenditures

in excess of $400,000.00 over the next two years.

21.    From approximately October of 2002 through June of 2004, Beard had only

sporadic communication with Kern or anyone from Lehman Brothers. Throughout this period,

Beard continued to try to obtain information regarding the claim with AIG and to determine if

any settlement had been reached with regard to the environmental insurance policy. Upon

information and belief, throughout this period, representatives of Lehman Brothers, Oak Asset

and, perhaps, Navigant, had numerous meetings with AIG regarding the contaminated properties

and the subject insurance policy. Despite the representations of Kern, and Beard's request to be

included in any such discussions, neither Beard nor any representative of ProMarketing was ever

a part of such discussions nor were they consistently advised of the status of the negotiations.

Infrequently, Kern and other representatives of Lehman, often by and through Oak Asset, would

discuss generally the AIG negotiations and would send word through Navigant that settlement

was soon coming. Upon information and belief, the purpose of forwarding such communication

was merely to make sure that Beard maintained ProMarketing's operation of the collateral stores.

22.    Throughout 2003, Beard continued to attempt to keep ProMarketing afloat and

make payments to service the Lehman Brothers' debt. Essentially, communications with

Lehman Brothers were virtually nonexistent, other than the occasional flow of information from

Oak Asset to Navigant, and ProMarketing continued to struggle in a rapidly declining market.

Expecting that ProMarketing would at some point hear from Lehman Brothers regarding the AIG

settlement, Beard continued to cause ProMarketing to operate, though at a substantial loss, in anticipating that Kern's representations that ProMarketing would be allowed to refinance and restructure via the non-contaminated stores. Upon information and belief, Lehman Brothers and Oak Asset, and perhaps agents of Jolly Roger, continued to negotiate with AIG for their own respective benefit and purposely excluded Beard and ProMarketing from participation "at the table."

23.    Acting at the advice of Navigant and the approval of Lehman Brothers, Beard spent much of 2003 attempting to lease and/or sell certain non-collateralized assets to further service the Lehman Brothers' debt. ProMarketing also attempted to lease, and did ultimately lease and sell inventory and certain convenience stores not collateralized by Lehman Brothers to increase additional revenues for the benefit and upon the approval of Lehman Brothers. While there was some limited conversation with Kern and Lehman Brothers directly, and indirectly through Navigant, generally the communication, especially with regard to the AIG issues, remained spotty, at best. Beard continued to cause ProMarketing to make all available payments to Lehman Brothers to service the debt, often through his personal capital injections, in reliance upon Kern's representations that the AIG negotiation would be ongoing and completed for the benefit of both Lehman Brothers and ProMarketing. Also, throughout this period, there were some conversations between Lehman Brothers and the members of ProMarketing regarding a formal forebearance agreement, which was never memorialized in writing. Throughout this period, Lehman Brothers continued to accept payments from ProMarketing.

24.    At some point in or about May of 2004, Beard was able to track down Kern to attempt to find out what, if anything, was progressing with regard to the AIG settlement. Kern

represented to Beard that settlement was very near and that a final settlement would occur
"sooner rather than later."

25.    On June 10, 2004, Beard received a letter via facsimile from an unknown entity
named Jolly Roger, LLC, purporting to be a notice of assignment of the loans from Lehman
Brothers to Jolly Roger. The letter gave no description of the terms of the assignment other than
to list the original amount of the original notes and the loan numbers of each of the five original
loans to ProMarketing. Notably, the letter also gave no indication that any payments or credits
had ever been made or issued toward any of the five loans, either reflecting payments by
ProMarketing or some other source. The letter was also unsigned and gave no contact person
with whom Beard might communicate with regard to the alleged assignment.

26.    Beard, through his own efforts and through that of his counsel, attempted to learn
the status of the loans, to no avail. On June 18, 2004, Kern sent an e-mail to Joel Holsinger
("Holsinger"), the director of Navigant. Kern represented to Holsinger that "ownership of the
ProMarketing loans originated by Lehman has been transferred to AIG. You might be contacted
by one of their representatives, including Larry Carlson of Capital Seven. Feel free to contact me
with any questions." Holsinger then forwarded that e-mail on to Dennis Kelly ("Kelly"), an
employee at ProMarketing. Carlson did in fact contact Holsinger a few days thereafter
requesting financial information on ProMarketing, which was provided approximately thirty (30)
days thereafter.

27.    On June 22, 2004, Kelly, corresponded with Kern via e-mail stating that
ProMarketing had received the Jolly Roger correspondence concerning the alleged assignment
and ProMarketing needed additional information. Specifically, the e-mail reminded Kern that he

had represented to Beard that Lehman Brothers had sold or was about to sell the loans to AIG, via the environmental insurance policies. Kelly's e-mail also stated that Kern had repeatedly represented that Lehman Brothers would attempt to work out a solution with ProMarketing for the debt pursuant to the negotiations with AIG by and through the resolution of the insurance claims. The e-mail further requested that Kern send them information on the sale or transfer documents related to the assignment, copies of the AIG policies, copies of any documents related to the settlement of the insurance claim, copies of any appraisal evaluations of the collateral securing the loans, a breakdown of the loan balances, and the application of any insurance proceeds to the loans. Additionally, the e-mail requested the name, address, and telephone number of the contact persons with Jolly Roger, Capital Seven, and AIG with whom ProMarketing could contact regarding the loans. The e-mail further reminded Kern that that information had been promised previously and was apparently being withheld.

28.    On June 23, 2004, Kern responded to Kelly's e-mail by stating that "Lehman is not in a position to provide you with any documentation." The e-mail further stated that "all Lehman interests in the ProMarketing loans have been transferred to AIG." Kern then directed all further questions to Greg Yates ("Yates"), an attorney with Steptoe & Johnson, a law firm in Washington, D.C., which Kern stated was "engaged by AIG to handle these matters."

29.    On July 1, 2004, counsel for ProMarketing and Beard, Robert E.L. Gilpin ("Gilpin") of Kaufman & Rothfeder, wrote to Yates informing him that Lehman Brothers, by and through Kern, had led ProMarketing to believe that there would be a work out of the debt with Lehman Brothers, and that Kern represented the resolution or refinance of the debt could not be achieved until after Lehman Brothers had concluded its negotiation of its insurance claim with

AIG. The letter further requested that Yates provide documentation as to the ownership of the loans and further stated that ProMarketing wished to reach some resolution of the debt.

30.     On or about July 15, 2004, Gilpin received a letter from Yates stating only that Jolly Roger was now the owner of the ProMarketing loans. Attached to the facsimile was a document captioned as "Assignment of Loan and Loan Documents (ProMarketing, LLC)," which indicated that the loans from Lehman Brothers had been assigned not to AIG, as represented by Kern, but instead to Jolly Roger I, Inc., on or about May 20, 2004. Kern knew his previous representation that the loans had been transferred to AIG was false as the assignment to Jolly Roger I was executed by Kern on behalf of Lehman Brothers.

31.     Over the next several months, Beard and other representatives of ProMarketing continued to attempt to obtain any information from Lehman Brothers, Jolly Roger, or Capital Seven with regard to the AIG loans, the reason why ProMarketing was excluded from the AIG negotiations, or the alleged balance of any of the outstanding loans. Even so, ProMarketing, by and through Beard, continued to work with representatives of Jolly Roger and Capital Seven providing the information and any other documentation requested. No one at Lehman Brothers, including Kern, willingly communicated further with Beard or any other ProMarketing representative, notwithstanding the previous representations as to the plan to keep ProMarketing in the loop with regard to the AIG transaction and to work out a resolution with ProMarketing regarding the loans thereafter.

32.     Over the next several months, there was some limited discussion among Carlson, Navigant and Beard regarding a possible formal forebearance agreement with ProMarketing, which was never executed, and some further discussion regarding the possible liquidation of

some of the convenience stores. Again, none of the information requested regarding the debt was ever provided.

33.     In or about January 2005, there was another meeting in Atlanta attended by, among others, Beard, Carlson, and Peter Fahey, regarding the previous proposals made by ProMarketing and Beard to resolve the debt. At that meeting, Carlson instructed Beard to fire Navigant to further reduce costs, and Beard complied with that demand. Despite Beard's best efforts, that meeting did not provide any further assistance in obtaining the requested information or in consummating the promised deal with AIG concerning the purchase and/or refinance of the collateral stores. Surprisingly, shortly thereafter, Beard received notification from Jolly Roger that there would be no further communication directly between the parties and that all such communication should be directed via the parties' respective counsel.

34.     In January or February of 2005, Midland, upon information and belief, the loan servicing entity for Lehman Brothers, forwarded to ProMarketing an I.R.S. Form 1099-C dated June 21, 2004, in the amount of $4,280,090.37. The 1099-C stated that the "debt description" was for a "Commercial Real Estate Loan." No further information was provided with the 1099-C. Since its receipt, Beard has attempted to obtain information from Jolly Roger, Capital Seven and Lehman Brothers as to the meaning of the 1099-C and the source of the alleged payment of $4,280,090.37, but such further request for information has continued to be denied. Upon information and belief, the 1099-C represents a portion of the payment made by AIG to Lehman Brothers. Further, Beard believes that discovery in the case will show the _entirety_ of the ProMarketing loans may have been satisfied by AIG pursuant to the environmental policy.

35.     Throughout 2005, Beard and ProMarketing continued to work with Jolly Roger

and Capital Seven making all available payments and making numerous attempts to resolve the debt, if any actually still existed. By and large, the requests for additional information and the proposals for settlement were ignored. Also, no documentation regarding the assignment was ever provided, nor has it yet been provided, indicating the process by which Jolly Roger obtained the loan, what role AIG played in the assignment, or what sums had been paid by AIG pursuant to the policy which should be credited to the loan or the loan balance, if any.

36.    In or about January and February of 2006, Peter Fahey of Jolly Roger began making threatening phone calls to employees of ProMarketing, telling them that Jolly Roger would soon be taking over all of the stores and further informing the employees that they should enter into employment agreements with Jolly Roger. Beard contacted Fahey and requested that he not interfere with ProMarketing's relationship with its employees and placed him on notice that Jolly Roger was causing harm to ProMarketing. On or about February 24, 2006, Robert Gilpin (counsel for ProMarketing) wrote to Greg Yates (counsel for Jolly Roger) and demanded that Jolly Roger no longer contact ProMarketing employees directly concerning future employment.

37.    In March, April, May, and June of 2006, ProMarketing, by and through Beard and counsel, has continued to make offers to resolve the alleged debt, without success. The only response to any of the offers came in a March 31, 2006 letter from Fahey of Jolly Roger to counsel for ProMarketing wherein Fahey stated that the loan payoff was the incredible sum of $30,628,580.99 and demanded a payoff by April 7, 2005. Though there have been many calls and correspondence by and between counsel for the parties since that date, there has been no further explanation as to: (1) the inflated payoff amount, (2) the questions regarding the

assignment, or (3) any of the AIG issues. Instead, Jolly Roger began legal advertisements that it intended to foreclose on at least one (1) of the convenience stores, which Beard noticed in the local newspaper.

### COUNT ONE

### FRAUDULENT MISREPRESENTATION

38.     The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

39.     Defendant Kern, acting in the line and scope of his employment with Lehman Brothers and in his individual capacity, represented to Beard that the ProMarketing loan could be resolved pursuant to the negotiations between Lehman Brothers and AIG concerning the environmental insurance policy held by Lehman Brothers with AIG. Kern further represented that ProMarketing would be involved with the negotiation, would participate in any settlement related to the loan and that ProMarketing would be in a position to purchase the non-contaminated convenience stores and refinance the debt on the stores for a greatly discounted amount of the original total loan, as described herein above. This action is brought pursuant to *Ala. Code §§ 6-5-100, 6-5-101.*

40.     At the time the representations were made, Lehman Brothers and Kern knew that they were false and did not intend to perform on this promise. Upon information and belief, neither Lehman Brothers nor Kern ever intended to allow ProMarketing to participate in the negotiations with AIG. Moreover, upon information and belief, upon receipt of payment from AIG for the settlement of the environmental claim, those amounts were neither disclosed to ProMarketing nor were they accurately applied to the ProMarketing debt.

41.    The representations made were false and were reasonably relied upon by Beard to his individual detriment, who is now the sole member of ProMarketing. Moreover, based upon his reliance on the false representations by Lehman Brothers and Kern, Beard agreed to substantially reduce his salary from ProMarketing and further agreed to no longer direct ProMarketing to make payments toward its lease to Beard Family Properties, LLP. Beard further made other capital injections into ProMarketing, based upon his reliance on Lehman Brothers' and Kern's representations.

42    As a result of Lehman Brothers' and Kern's fraudulent misrepresentations, Beard has been damaged.

43    Beard claims punitive damages against Lehman Brothers and Kern in an amount to be determined by a jury in light of the gross, reckless and malicious misrepresentations made by Lehman Brothers and Kern.

44.    Beard claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's misrepresentations.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

**COUNT TWO**

**SUPPRESSION**

45.    The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

46.     As set forth in the body of this Complaint, and in the previous Count, Kern, acting within the line and scope of his employment with Lehman Brothers and in his individual capacity, suppressed several material facts from Beard, to which Beard, as the sole member of ProMarketing, relied upon to his detriment.

47.     Among other things, Lehman Brothers and Kern suppressed the following facts: Lehman Brothers did not intend to allow ProMarketing to participate in any negotiations with AIG for the purpose of resolving the ProMarketing loan debt, nor would ProMarketing be allowed to refinance the non-contaminated stores as previously represented by Kern. Additionally, Kern suppressed the fact that sums received by AIG pursuant to the loan policies would not be applied to the ProMarketing loan debt. Kern further suppressed the fact that any losses incurred by Beard as a result of Beard's agreement to reduce his salary from ProMarketing or to receive payments pursuant to the lease agreement between ProMarketing and Beard Family Properties, LP, would only increase ProMarketing's ability to make the payments to Lehman Brothers and would not in the end provide any benefit to ProMarketing or Beard.

48.     Due to the confidential relationship between Lehman Brothers, by and through Kern, and ProMarketing and Beard, Lehman Brothers and Kern were under an obligation to communicate these facts to Beard. Such failure to communicate clearly constitutes fraud pursuant to *Ala. Code § 6-5-102.*

49.     As a result of Kern's suppression, Beard has been damaged.

50.     The Plaintiff claims punitive damages against Lehman Brothers and Kern in an amount to be determined by a jury in light of the gross, reckless and malicious suppression of material facts from Beard.

51.     The Plaintiff claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's suppression.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT THREE

## DECEIT

52.     The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

53.     Pursuant to *Ala. Code § 6-5-103*, Kern, acting within the line and scope of his employment with Lehman Brothers and in his individual capacity, deceived and mislead Beard to believe that ProMarketing would be allowed to participate in any negotiations with AIG for the purpose of resolving the ProMarketing loan debt, and ProMarketing would be allowed to refinance the non-contaminated stores as previously represented by Kern. Ala. Code § 6-5-103.

54.     At the time the representations were made, Lehman Brothers and Kern knew that they were false and did not intend to perform as promised.

55.     The representations immediately above were false, deceiving and misleading and were reasonably relied upon and believed by Beard.

56.     As a result of Lehman Brothers' and Kern's deceptive and misleading conduct, Beard has been damaged.

57.     The Plaintiff claims punitive damages against Lehman Brothers and Kern in an

amount to be determined by a jury in light of Lehman Brothers' and Kern's gross, reckless and malicious deceitful conduct.

58.    The Plaintiff claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's deceitful conduct.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT FOUR

### FRAUDULENT DECEIT

59.    The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

60.    Pursuant to *Ala. Code § 6-5-104*, Kern, acting within the line and scope of his employment with Lehman Brothers and in his individual capacity, deceived Beard by suggesting the above-referenced facts, when Kern did not believe them to be true. Specifically, Kern did not intend to allow ProMarketing to participate in the AIG transactions, to benefit from any payments made by AIG related to the ProMarketing loans, and did not intend to allow Beard or ProMarketing to refinance the non-contaminated stores, as described herein above. Kern's further representations to Beard that he should reduce his salary from ProMarketing and cause ProMarketing to no longer make lease payments pursuant to the agreement with Beard Family Properties, LP, was done in an attempt to fraudulently deceive Beard into believing that such conduct was for the benefit of ProMarketing and Beard.

61.    At the time of the promises and representations above were made, Lehman Brothers and Kern knew that they were false and did not intend to perform as promised.

62.    The representations immediately above were false, deceiving and misleading, and were reasonably relied upon and believed by Beard. Beard altered his position in reliance upon said promises and representations to his detriment, both individually and as the sole member of ProMarketing.

63.    The Plaintiff claims punitive damages against Lehman Brothers and Kern in an amount to be determined by a jury in light of Lehman Brothers' and Kern's willful, gross, reckless and malicious conduct.

64.    The Plaintiff claims additional damages for mental anguish resulting from Lehman Brothers' and Kern's willfully deceptive conduct.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers and Kern, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

## COUNT FIVE

### FRAUDULENT MISREPRESENTATION

65.    The Plaintiff adopts and incorporates those allegations set forth above as if fully set forth herein.

66.    In or about January or February of 2005, Kern or Lehman Brothers caused Midland to issue a Form 1099-C to ProMarketing in the amount of $4,280,090.37. The issuance of that 1099-C was fraudulent in that the amount contained therein was incorrect and was issued

for an improper purpose. As a result of the issuance of the fraudulent form 1099-C, Beard, as the

sole member of ProMarketing, has been damaged.

67.    The Plaintiff claims punitive damages against Lehman Brothers and Midland in an

amount to be determined by a jury in light of Lehman Brothers' and Midland's gross, reckless

and malicious misrepresentations made by Lehman Brothers and Midland.

68.    The Plaintiff claims additional damages for mental anguish resulting from

Lehman Brothers' and Midland's misrepresentations.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the

Defendants, Lehman Brothers and Midland, in an amount to be determined by a trier of fact, plus

punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as

the Court deems proper.

COUNT SIX

CONSPIRACY

69.    The Plaintiff adopts and incorporates those allegations set forth above as if fully

set forth herein.

70.    Each of the Defendants, including Lehman Brothers, Kem, Oak Asset, Midland,

Jolly Roger, LLC, Jolly Roger I, Inc., Capital Seven, Fahey, and Carlson, directly or by and

through their employees and others, have conspired together to, among other things, prevent

ProMarketing or Beard from participating in the negotiations with AIG, from benefitting from

any settlement between AIG and any of the other Defendants, and for refusing to produce any

and all documents related to the AIG policies that may be for the benefit of ProMarketing and

Beard as the sole member of ProMarketing. The Defendants further conspired to convince Beard

to reduce his salary from ProMarketing and to cause ProMarketing to no longer make payments pursuant to its lease agreement with Beard Family Properties, LP. The conspiring Defendants further have prevented Beard from obtaining any information related to the purported assignment of the Lehman Brothers' debt to either Jolly Roger or AIG. The conspiring Defendants have also caused a fraudulent form 1099-C in the amount of $4,280,090.37 to be issued to ProMarketing, which directly has caused damage to Beard as its sole member. Such action was wrongful, and in violation of the duties under the Loan Agreements, of the relationships between the various parties, and of applicable law.

71.    The actions of the Defendants were intentional, malicious, oppressive and/or wanton.

72.    As a proximate consequence of said conspiracy involving the Defendants, the Plaintiff has suffered injury as described and alleged in the preceding accounts.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff demands judgment against the Defendants, Lehman Brothers, Kern, Oak Asset, Midland, Jolly Roger, LLC, Jolly Roger I, Inc., Capital Seven, Fahey, and Carlson, in an amount to be determined by a trier of fact, plus punitive damages, interest, and costs. The Plaintiff seeks such other and more equitable relief as the Court deems proper.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES

Lee R. Benton
ASB: 8421-E63L

C. Steven Ball
ASB: 5126-A64C

OF COUNSEL:
BENTON & CENTENO, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
Phone: (205) 278-8000
Facsimile: (205) 278-8008

SERVE DEFENDANTS AS FOLLOWS:

Lehman Brothers Holdings, Inc. d/b/a
Lehman Capital
c/o Prentice Hall Corporation Sys, Inc.,
Registered Agent
150 S. Perry Street
Montgomery, AL 36104

Midland Loan Services, Inc.
c/o The Corporation Company, Registered
Agent
2000 Interstate Park Dr., Suite 204
Montgomery, Alabama 36109-5413

Capital Seven Recovery, LLC
c/o Corporation Service Company,
Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Jolly Roger, LLC
c/o Corporation Service Company,
Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Jolly Roger I, Inc.
c/o Corporation Service Company,
Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Oak Asset Management, LLC
c/o Jack T. Noe, Registered Agent
2535 Towngate Road Suite, 205
Westlake Village, CA 91361

G:\wpusers\LRB\Beard 2410\p-complaint.wpd

23

Peter R. Kern
Vice President
Lehman Brothers
745 Seventh Avenue, 7th Floor
New York, NY 10019

Peter Fahey
Jolly Roger, LLC
243 5th Avenue, Suite 800
New York, NY 10016

Larry W. Carlson
Capital Seven Recovery, LLC
332 Washington Blvd.
Stamford, CT 06902

Exhibit B

Loan No. 217000029

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement is executed by and between the Borrower described in **Schedule A** attached hereto and incorporated herein by this reference (together with its permitted successors and assigns **"Borrower"**), each other Loan Party (defined below), and Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a Division of Lehman Brothers Holdings Inc., a Delaware corporation (together with its successors and assigns **"Lender"**) for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the Closing Date identified in **Schedule A.**

### Recitals

The parties wish to enter into a loan transaction under the terms and conditions set forth in this Loan Agreement and the other Loan Documents (as defined herein).

### Agreements

1.      **Definitions.**  All capitalized terms used in this Loan Agreement shall be defined as set forth in this Loan Agreement or, in the absence of a definition in this Loan Agreement, as set forth in the other Loan Documents.  Terms that are not defined in this Loan Agreement or the other Loan Documents shall be defined as set forth in the UCC (as defined below).

**"Access Laws"** shall have the meaning given to such term in **Section 5(ff)(i)** of this Loan Agreement.

**"Additional Creditors"** shall have the meaning given to such term in **Section 16** of this Loan Agreement.

**"Affiliate"** shall mean any Person directly or indirectly controlling, controlled by or under common control with another Person including, but not limited to, a Subsidiary.

**"Applicable Borrower Overhead Adjustment"** shall have the meaning given to such term on Schedule A attached hereto.

**"Applicable Interest Rate"** shall have the meaning given to such term in the Note.

"**Assignments of Rents**" shall mean any and all Assignments of Leases and Rents between Borrower and Lender pertaining to the Properties and dated as of the Closing Date and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Assumption**" shall mean a transfer of the Collateral, Enterprises, and Properties subject to the lien and security interest in favor of Lender, and the related assumption of the Loan, in accordance with the terms of **Section 5(gg)** of this Loan Agreement.

"**Bankruptcy Code**" shall mean the Bankruptcy Code of the United States of America as codified in 11 U.S.C. § 101 *et seq.* and any amendments, modifications, replacements or substitutions thereto.

"**BFP Capital**" means BFP Capital, L.L.C., an Alabama limited liability company.

"**BFP Capital Membership Interests**" means membership interests in BFP Capital.

"**Business Day**" shall mean any day other than a Saturday, Sunday, legal holiday or other day on which Lender and/or commercial banks in New York, New York, are closed for business. All references to a "day" in the Loan Documents shall refer to a calendar day unless such day is described as a "Business Day" in such documents.

"**Business Interruption Policies**" shall have the meaning given to such term in **Section 5 (o)(i)** of this Loan Agreement.

"**Casualty Consultant**" shall have the meaning given to such term in **Section 5(q)(vi)** of this Loan Agreement.

"**Class A ProHoldings Membership Interests**" means the membership interests in ProHoldings which are designated as "Current Class A Membership Interests" on Exhibit A of the operating agreement of ProHoldings in the form annexed to the members/managers certificate delivered to Lender contemporaneously herewith, and the rights appurtenant thereto, including, but not limited to the ProHoldings Liquidation Preference.

"**Closing Date**" shall mean the date identified as such in **Schedule A** attached hereto.

"Collateral" shall mean all of the following rights, title, interests and property, whether now existing or hereafter arising or now owned or hereafter acquired by each Loan Party and wheresoever located, but excluding Excluded Collateral:

(i)    All rights, title and interests of each Loan Party in, to, under or derived from all machinery, equipment, fixtures and accessions thereof and renewals, replacements thereof and substitutions therefor and other tangible property of every kind and nature whatsoever owned or acquired by such Loan Party, or in which such Loan Party has or shall have an interest, now or hereafter located upon the Properties or in each of the Enterprises, or appurtenant thereto, or used in connection with the present or future operation and occupancy of each of the Properties and/or Enterprises;

(ii)    All rights, title and interests of each Loan Party in and to the Properties and/or Enterprises as granted by this Loan Agreement and/or pursuant to each Real Property Security Instrument, and all leases, rents, issues, profits and royalties deriving from the Enterprises and Properties;

(iii)    All rights, title and interests of each Loan Party in, to, under or derived from all contract rights, chattel paper, instruments, agreements, (including, but not limited to, Principal Agreements) contracts, license rights, franchise rights, goodwill, general intangibles, computer hardware, software and intellectual property, accounts, guaranties and warranties, letters of credit, and documents (including, but not limited to, Primary Enterprise and Property Documents), in each case relating to each of the Properties and/or Enterprises or to the present or future operation or occupancy of each of the Properties and/or Enterprises, and all plans, specifications, maps, surveys, studies, books of account, records, files, insurance policies, guarantees and warranties, tax refunds and tax refund claims, all relating to each of the Properties and Enterprises or to the present or future operation or occupancy of each of the Properties and Enterprises, all architectural, engineering, construction and management contracts, all supply and service contracts for water, sanitary and storm sewer, drainage, electricity, steam, gas, telephone and other utilities relating to each of the Properties and/or Enterprises and all other agreements affecting or relating to the use, enjoyment or occupancy of each of the Properties and/or Enterprises;

(iv)    All rights, title and interests of each Loan Party in, to, under or derived from all licenses, authorizations, certificates, variances, consents, approvals and other permits now or hereafter pertaining to each of the Properties and/or Enterprises and all rights, title and interests of each Loan Party in, to, under or derived from all tradenames or business names relating to each of the Properties and/or Enterprises or the present or future operation or occupancy of each of the Properties and/or Enterprises;

(v)    All rights, title and interests of each Loan Party, in, to, under or derived from all amounts deposited with the Lender, including all insurance proceeds and awards and including all notes, certificates of deposit, instruments, securities and other investments relating thereto and all interest, dividends and other income thereon, proceeds thereof and rights relating thereto;

(vi)    All rights, title and interests of each Loan Party in, to, under or derived from all proceeds of any sale, transfer, taking by condemnation (or any proceeding or purchase in lieu thereof) (including, but not limited to, Net Proceeds), financing, refinancing or a conversion into cash or liquidated claims, whether voluntary or involuntary, of each of the Properties and/or Enterprises, including all insurance proceeds and awards (including, but not limited to, Net Proceeds) and title insurance proceeds under any title insurance policy now or hereafter held by such Loan Party, and all rights, dividends and other claims of any kind whatsoever (including damage, secured, unsecured, priority and bankruptcy claims) now or hereafter relating to each of the Properties and/or Enterprises or any other collateral all of which each Loan Party hereby irrevocably directs be paid to the Lender to the extent provided hereunder or in any other Loan Documents, to be held, applied and disbursed as provided in the Loan Documents;

(vii)    All rights, title and interests of each Loan Party as seller in, to or under any agreement, contract, understanding or arrangement pursuant to which such Loan Party has obtained the agreement of any person to purchase any of the Properties, Enterprises, or Collateral or any interest therein and all income, profits, benefits, avails, advantages and claims against guarantors under any thereof;

(viii)    All inventory held or maintained at each of the Properties and/or Enterprises, or otherwise used in the ownership or operation of each

of the Properties and/or Enterprises, together with all additions and accessions thereto, replacements therefor, products thereof and documents therefor; and

(ix)     All income and proceeds, cash or non-cash, specifically including, without limitation, insurance proceeds, of any and all of the above items (i) through (viii).

It is expressly recognized that the Class A ProHoldings Membership Interests and the BFP Capital Membership Interests are not assets of any Loan Party and that they therefore do not constitute either "Collateral" or "Excluded Collateral".

"**Commitment Letter**" shall mean the letter agreement identified as such in **Schedule A** attached hereto.

"**Concurrent Financings**" shall mean the Loan and the other loans made by Lender to Borrower contemporaneously therewith, which are in the aggregate "Concurrent Financings Principal Amount" identified in **Schedule A.**

"**Condemnation**" shall mean any actual or constructive taking or other temporary or permanent requisition of any real or personal property or any rights, title or interests in or pertaining to such property by the governmental powers of condemnation or eminent domain. Any transfer in lieu or in anticipation of such taking or other temporary or permanent requisition shall be deemed to constitute a Condemnation.

"**Contractual Obligation**" of any Person shall mean any indenture, note, security agreement, deed of trust, mortgage, lease, guaranty, instrument, contract, agreement or other form of obligation or undertaking to which such Person is a party or by which such Person or any of its property is bound, and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Counterparty Estoppel Agreements**" shall mean each letter agreement, estoppel agreement, estoppel letter, triparty agreement, or substantially similar document executed and delivered by a Principal Agreement Counterparty to Lender relating to the Enterprises, and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Default Rate**" shall have the meaning given to such term in the Note.

"**Disposition**" shall have the meaning given to such term in **Section 16** of this Loan Agreement.

**"Distribution"** shall mean, with respect to any Entity, any dividend, payment or other distribution of assets, properties, cash, rights, obligations or securities by such Entity on account of any Equity Securities of such Entity or any payment made to purchase, redeem, or otherwise acquire for value any Equity Securities of such Entity, or any compensation paid to owners of Equity Securities of such Entity in excess of (i) what is usual and customary in such Entity's business and reasonable in relation to services performed, as determined by Lender in its sole discretion, or if less (ii) the actual compensation set forth for such owners in any written budget delivered to Lender for the applicable period.

**"EBITDAR"** shall have the meaning given to such term in the definition of "Fixed Charge Coverage Ratio".

**"Enterprises"** shall mean all of the businesses and/or franchises described as such in **Schedule A** attached hereto.

**"Entity"** shall mean a corporation, a limited partnership, a general partnership, a limited liability company, an association, a trust, or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

**"Environmental Indemnity"** shall mean the Environmental Warranty and Indemnification Agreement made by the Loan Parties and/or other Persons to Lender pertaining to the Properties and dated as of the Closing Date.

**"Equity Default Percentage"** shall mean the percentage designated as such in **Schedule A** attached hereto.

**"Equity Securities"** of any Person shall mean (a) all common stock, preferred stock, participations, shares, partnership interests, membership interests or other equity interests in and of such Person (regardless of how designated and whether voting or non-voting), (b) all warrants, options and other rights to acquire any of the foregoing and (c) any securities convertible into any of the foregoing.

**"ERISA"** shall mean the Employee Retirement Income Security Act of 1974 as amended from time to time.

**"Estoppel Agreements"** shall mean all of the Counterparty Estoppel Agreements, Landlord Estoppel Agreements and Manager Estoppel Agreements and any amendments, extensions, modifications, replacements and substitutions thereto.

**"Event of Default"** shall have the meaning given to such term in **Section 6** of this Loan Agreement.

"**Excluded Collateral**" shall mean any general intangibles (which would, but for the exclusion of Excluded Collateral, constitute Collateral) which are now or hereafter held by a Loan Party as licensee, franchisee or otherwise, to the extent that (i) such general intangibles are not assignable or capable of being encumbered as a matter of law or under the terms of the license, franchise agreement, or other agreement applicable thereto (but solely to the extent that any such restriction shall be enforceable under applicable law), without the consent of the applicable party thereto, and (ii) such consent has not been obtained; provided however, the term Excluded Collateral shall not include the proceeds of such general intangibles to the extent that the assignment or encumbering of such proceeds are not so restricted and, in the event such applicable party gives their consent with respect to any such otherwise excluded general intangibles being encumbered by the grant of a security interest hereunder, such general intangibles together with any and all proceeds thereof which were Excluded Collateral shall be immediately deemed part and parcel of the Collateral and subject to the security interest granted hereunder.

"**Financial Statements**" shall mean all profit and loss statements, income and cash flow statements, lists of assets, balance sheets, and other financial information of any kind.

"**Fixed Charge Coverage Ratio**" shall mean for any period the ratio (computed consistently with like items of income and expense with respect to the Loan FCCR and the Obligor FCCR except with respect to the Applicable Borrower Overhead Adjustment below) of (i) the sum, for such period, of net income from operations before income taxes plus, without duplication, to the extent previously deducted in computing net income, all noncash amounts in respect of depreciation and amortization plus interest expense, minus interest income, plus nonrecurring expenses, less non-recurring income, plus rent and lease payments (excluding percentage rent) ("EBITDAR"), and, with respect to the Loan FCCR after adding back any corporate overhead and general and administrative expenses previously deducted in arriving at the sum of net income at the Enterprise level, and subtracting the Applicable Borrower Overhead Adjustment; to (ii) the sum, for such period, of the current portion of all scheduled payments of principal, plus interest expense, plus rent and lease payments ("Fixed Charges"). All components of the Fixed Charge Coverage Ratio shall be determined in accordance with GAAP.

"**Fixed Charges**" shall have the meaning given to such term in the definition of "Fixed Charge Coverage Ratio".

"**Flood Policies**" shall have the meaning given to such term in **Section 5 (o)(i)** of this Loan Agreement.

**"GAAP"** shall mean generally accepted accounting principles and practices as in effect in the United States of America from time to time and applied in a consistent manner.

**"Governing Law State"** shall mean the state or commonwealth designated as such in **Schedule A** attached hereto.

**"Governmental Authorities"** shall mean all foreign, federal, state, county, city, municipal and other governmental or quasi-governmental authorities and all instrumentalities, divisions, agencies, bodies or departments of such governmental or quasi-governmental authorities.

**"Guaranties"** shall mean all of the Guaranties from Guarantors, if any, to Lender guarantying the payment and performance of the Liabilities or any part thereof and any amendments, extensions, modifications, replacements and substitutions thereto.

**"Guarantors"** shall mean the Persons, if any, designated as such in **Schedule A** attached hereto and any other Person who shall agree, at any time, to be a guarantor or surety for Borrower.

**"Impositions"** shall mean all Taxes, ground and other rents, excises, levies, fees and other charges (public or private) of any kind which may be assessed, levied, imposed, or constitute a Lien upon: (i) any Loan Party, (ii) the Loan or any of the Loan Documents, (iii) any of the Collateral, Enterprises or Properties; (iv) any payroll, income or gross receipts of any Loan Party, or (v) the ownership, lease or use of any Loan Party's real or personal Property.

**"Indemnified Obligations"** shall have the meaning given to such term in **Section 8** of this Loan Agreement.

**"Indemnified Parties"** shall have the meaning given to such term in **Section 8** of this Loan Agreement.

**"Insurance Premiums"** shall have the meaning given to such term in **Section 5(o)(ii)** of this Loan Agreement.

**"Judgment Default Amount"** shall mean the amount designated as such on **Schedule A** attached hereto.

**"Key Person"** shall mean the Chief Executive Officer of each Loan Party and, in addition, each individual designated as such on **Schedule A** attached hereto.

"**Landlord Estoppel Agreements**" shall mean all of the Landlord Estoppel and Consents in favor of Lender (or if no such document is obtained with respect to a Lease, any estoppel letter, triparty agreement or substantially similar document executed and delivered to or for the benefit of Lender by the lessor under such Lease) pertaining to the Properties and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Landlords**" shall mean the lessors of the Properties which are leased to Borrower or another Loan Party, and their successors and assigns under the Leases.

"**Leases**" shall mean all of the leases described in **Exhibit F** attached hereto, and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Legal Requirements**" shall mean all present and future laws, rules, regulations, judgments, orders, permits, licenses, authorizations, requirements and agreements of any kind from or with any Governmental Authority (including, but not limited to any court) pertaining to any Loan Party, the Properties, the Enterprises, or the Collateral in any manner.

"**Liabilities**" shall mean the Loan together with any and all present or future, primary or secondary, direct or indirect, joint and/or several, absolute or contingent, senior or subordinated, liquidated or unliquidated, indebtedness, liabilities and obligations of the Loan Parties to Lender of any kind arising under or in respect of this Loan Agreement or any other Loan Document or otherwise pertaining to the Loan in any manner.

"**Liability Policies**" shall have the meaning given to such term in **Section 5(o)(i)** of this Loan Agreement.

"**Lien**" shall mean any security interest, mortgage, pledge, lien, lease, claim, charge or other encumbrance upon any personal or real property including, but not limited to, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement.

"**Loan**" shall have the meaning given to such term in **Schedule A** attached hereto.

"**Loan Agreement**" shall mean this Loan and Security Agreement and any amendments, extensions, modifications, replacements and substitutions hereto .

"**Loan Amount**" shall have the meaning given to such term in **Schedule A** attached hereto.

"**Loan Documents**" shall mean this Loan Agreement, the Note, each Real Property Security Instrument, each of the Guaranties (if any), each Environmental Indemnity, each of the Subordination Agreements (if any), and each of the Estoppel Agreements (if any) and all other indentures, notes, pledges, security agreements, deeds of trust, mortgages, leases, guaranties, instruments, contracts, or other agreements of any kind pertaining to the Loan in any manner and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Loan FCCR**" shall mean for any period the Fixed Charge Coverage Ratio, (computed consistently with the Obligor FCCR using like items of income and expense) determined with reference to the Loan Parties' EBITDAR and Fixed Charges attributable or allocable solely to the Properties and Enterprises for such period.

"**Loan Maturity Date**" shall have the meaning given to such term in **Schedule A** attached hereto.

"**Loan Parties**" shall mean the Borrower (and if more than one Person is a Borrower, each such Person), and each other Person designated as a Loan Party in **Schedule A** attached hereto.

"**Machinery Policies**" shall have the meaning given to such term in **Section 5 (o)(i)** of this Loan Agreement.

"**Management Agreements**" shall mean the agreements described as such in **Schedule A** attached hereto, if any, and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Manager**" shall mean each of the Persons described as such in **Schedule A** attached hereto and their successors and assigns under the Management Agreements.

"**Manager Estoppel Agreements**" shall mean all of the Manager Estoppel and Consents in favor of Lender pertaining to the Collateral, Properties and Enterprises and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Material Adverse Change Date**" shall have the meaning given to such term in **Section 5(s)(i)** of this Loan Agreement.

"**Minimum Loan FCCR**" shall have the meaning given to such term in **Schedule A** attached hereto.

"**Minimum Obligor FCCR**" shall have the meaning given to such term in **Schedule A** attached hereto.

"**Net Proceeds**" shall have the meaning given to such term in **Section 5(q)(ii)** of this Loan Agreement.

"**Net Proceeds Availability Threshold**" shall have the meaning given to such term in **Section 5 (q)(ii)** of this Loan Agreement.

"**Net Proceeds Deficiency**" shall have the meaning given to such term in **Section 5(q)(vii)** of this Loan Agreement.

"**Note**" shall mean the Promissory Note from Borrower to Lender in the amount of the Loan and dated as of the Closing Date, and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Obligor FCCR**" shall mean for any period the Fixed Charge Coverage Ratio computed with reference to all EBITDAR and Fixed Charges of the Obligor FCCR Parties for such period.

"**Obligor FCCR Parties**" shall mean the Persons designated as such on **Schedule A** attached hereto.

"**Organizational Documents**" shall mean, with respect to any Entity, the documents pursuant to which such Entity was incorporated, organized or formed, as the case may be, and/or by which its activities are governed, as the same have been amended.

"**Other Disposition Parties**" shall have the meaning given to such term in **Section 16** of this Loan Agreement.

"**Owner Reporting Date**" shall mean the date designated as such in **Schedule A** attached hereto.

"**Owners**" shall mean, with respect to each Loan Party, the owners of the Equity Securities of such Loan Party designated as such on **Exhibit D** attached hereto.

"**Permitted Liens**" shall mean (i) the Liens in favor of Lender or its Affiliates which secure the Liabilities, (ii) zoning restrictions and easements, licenses, covenants and other restrictions currently affecting the use of the Collateral and Properties that do not individually or in the aggregate have a material adverse effect on any Loan Party's ability to use the Collateral or the use of the Properties for their intended purposes in connection with the Enterprises, (iii) the Liens described on **Exhibit A** attached hereto, (iv) any Liens excepted from coverage under any final policy of title insurance accepted by Lender insuring the Real Property Security Instrument(s) and (v) Liens for taxes not yet delinquent.

"**Person**" shall mean any individual or Entity.

"**Plan**" shall mean any employee benefit plan defined in ERISA including, but not limited to, any multiemployer plan or any employee welfare benefit plan which is maintained or has been maintained pursuant to a collective bargaining agreement to which two or more unrelated employers contribute and in respect of which a Loan Party is an "employer" as defined in ERISA.

"**Policies**" shall have the meaning given to such term in **Section 5(o)(ii)** of this Loan Agreement.

"**Primary Enterprise and Property Documents**" shall mean the Principal Agreements, Management Agreements, Leases and other instruments, agreements and documents of any kind pertaining to the Collateral, Enterprises or Properties (except for the Loan Documents), and any amendments, extensions, modifications, replacements and substitutions thereto.

"**Principal Agreement Counterparty**" shall mean, with respect to each Principal Agreement, each party thereto other than the Loan Parties.

"**Principal Agreements**" shall mean all of the agreements described in **Exhibit H** attached hereto and any other material agreement, license or permit necessary for the operation of the Enterprises and Properties.

"**ProHoldings**" means ProHoldings, L.L.C., an Alabama limited liability company.

"**ProHoldings Liquidation Preference**" shall mean the right of the holders of the Class A ProHoldings Membership Interests to receive a preferred distribution and priority return, solely from the assets of ProHoldings (including but not limited to the BFP Capital Membership Interests), as set forth in the operating agreement of ProHoldings in the form submitted to Lender contemporaneously herewith, provided that nothing set forth in this Loan Agreement shall be construed so as to permit either (i) a use of the proceeds of the Loan other than as set forth in Exhibit I, or (ii) the payment solely by the Borrower of any Distribution in contravention of the terms of this Loan Agreement.

"**Property**" or "**Properties**" shall mean, collectively, the parcels of real property identified in **Exhibit E** annexed hereto and more particularly described in each Real Property Security Instrument and all improvements thereon.

"**Properties Policies**" shall have the meaning given to such term in **Section 5(o)(i)** of this Loan Agreement.

**"Qualified Insurers"** shall have the meaning given to such term in **Section 5(o)(ii)** of this Loan Agreement.

**"Real Property Security Instrument"** shall mean each document described as such in **Schedule A** attached hereto, together with any and all Assignments of Rents, and any fixture filings in favor of Lender relating to the Properties.

**"Reimbursement Expenses"** shall have the meaning given to such term in **Section 12** of this Loan Agreement.

**"Reporting Certificate"** shall mean a certificate in the form of **Exhibit G** attached hereto, with the blanks therein duly completed, signed by the president(s), chief executive officer(s) or chief financial officer(s) of the Loan Parties.

**"Restoration"** shall have the meaning given to such term in **Section 5 (q)(i)** of this Loan Agreement.

**"Secured Creditor Policy"** shall have the meaning given to such term in each Real Property Security Instrument.

**"Subordination Agreements"** shall mean each agreement or instrument executed or accepted by a creditor or creditors of one or more Loan Parties (other than Lender) which subordinates the payment of obligations owed by such Loan Parties to such creditor to the payment of obligations owed by such Loan Parties to Lender and any amendments, extensions, modifications, replacements and substitutions thereto.

**"Subordinated Debt"** shall mean indebtedness of one or more Loan Parties, the payment of which has been subordinated to the obligations owed by such Loan Parties to Lender.

**"Subsidiary"** shall mean any Person of which fifty percent (50%) or more of its outstanding Equity Securities are directly or indirectly owned by another Person at any time.

**"Successor"** shall have the meaning given to such term in **Section 5(gg)** of this Loan Agreement.

**"Taxes"** shall mean all present and future taxes, levies, imposts, duties, charges, fees, deductions, withholdings, and assessments imposed, levied, collected, withheld or assessed by any Governmental Authority.

"**Transfer Event**" shall mean (i) an Assumption, or (ii) a Transfer of a Controlling Interest.

"**Transfer of a Controlling Interest**" shall have the meaning given to such term in **Section 5(r)** of this Loan Agreement.

"**Trustee**" shall have the meaning given to such term in **Section 5(gg)** of this Loan Agreement.

"**UCC**" shall mean the Uniform Commercial Code as adopted by the State where the Enterprise is located, and any amendments, modifications, replacements or substitutions thereto.

"**Workers' Compensation Policies**" shall have the meaning given to such term in **Section 5 (o)(i)** of this Loan Agreement.

"**Yield Maintenance Amount**" shall have the meaning given to such term in the Note.

2.    **Loan.**  Subject to the terms and conditions of this Loan Agreement and the other Loan Documents, Lender agrees to advance the Loan to Borrower in one or more advances. Borrower may not reborrow the principal amount of the Loan after any payment thereof. Monthly principal and interest payments shall be payable in accordance with the terms and conditions set forth in the Note. Borrower shall pay to Lender the loan commitment fee and loan origination fee described in the Commitment Letter prior to or upon the execution of this Loan Agreement. If not paid sooner, all Liabilities shall be due and payable on the Loan Maturity Date. Lender shall be entitled to require all payments to be remitted via an electronic fund transfer system that is acceptable to Lender in its discretion.

3.    **Grant of Security Interest.**

(a)    To secure the payment and performance of the Liabilities, each of the Loan Parties hereby assigns for security purposes and grants to Lender a security interest in and to the Collateral.

(b)    To the maximum extent permitted by applicable law, each of the Loan Parties hereby assigns, conveys, sells and transfers to Lender all of its rights, pursuant to Section 365 of the Bankruptcy Code or any similar law, to assume and reject any lease or other executory contract constituting a portion of the Collateral. Without limiting the foregoing, the Loan Parties shall not, pursuant to Section 365 of the Bankruptcy Code or any similar law, whether by action or inaction, assume or reject any lease or executory contract

constituting a portion of the Collateral without obtaining the prior written consent of Lender.

4.    **Conditions Precedent.**  The obligation of Lender to provide Borrower with the Loan is subject to the satisfaction of all of the following conditions:

(a)    No Event of Default shall have occurred and be continuing as of the Closing Date;

(b)    All of the representations and warranties of the Loan Parties described in this Loan Agreement and the other Loan Documents shall be accurate and complete in all respects as of the Closing Date;

(c)    All of the Financial Statements and other information provided by or on behalf of the Loan Parties and Guarantors to Lender shall be accurate and complete in all respects;

(d)    Lender shall have received, in form and substance satisfactory to Lender, all of the Loan Documents;

(e)    Borrower shall have paid, or made satisfactory provision for the payment of, all fees, costs, charges and other expenses due and payable to Lender under this Loan Agreement, the other Loan Documents and the Commitment Letter; and

(f)    The Loan Parties shall have satisfied all other conditions set forth in the Commitment Letter with respect to the closing of the Loan.

5.    **Representations, Warranties and Covenants.**   The Loan Parties hereby represent and  warrant to and covenant with Lender that:

(a)    **Organization and Good Standing.**  Each Loan Party is duly organized and in good standing in its state of incorporation, formation or organization and is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary. Each Loan Party has delivered or caused to be delivered to Lender accurate and complete copies of its Organizational Documents and any amendments, extensions, modifications, replacements or substitutions thereto.

(b)    **Power and Authority.** Each Loan Party has the right and power and is duly authorized and empowered to conduct its existing and anticipated

business, to own, lease and operate its assets, and to enter into, execute, deliver, and perform its obligations under this Loan Agreement and the other Loan Documents. Each Loan Party's execution and delivery of and performance of its obligations under this Loan Agreement and the other Loan Documents do not and shall not conflict with or constitute a default under the provisions of its Organizational Documents, any Legal Requirements or Principal Agreements (including, without limitation, in respect of the Primary Enterprise and Property Documents) which may now or hereafter be binding on such Loan Party and shall not result in the imposition of any Lien (other than Liens in favor of Lender) upon such Loan Party's assets. None of the Loan Parties and none of the Collateral, Properties or Enterprises are subject to any commitment, obligation or agreement, including, without limitation, any right of first refusal, option to purchase or lease granted to any third party, which could or would prevent or hinder Lender in making the Loan or prevent or hinder the Loan Parties from fulfilling their obligations under this Loan Agreement or the other Loan Documents.

(c)     **Enforceability.**    This Loan Agreement and the other Loan Documents constitute and shall constitute the legal, valid and binding obligations of each Loan Party which is a party thereto, enforceable against such Loan Party in accordance with their respective terms.

(d)     **Names.**  Each Loan Party's previous and current legal names and tradenames are listed on **Exhibit B** attached hereto and incorporated herein by this reference.  None of the Loan Parties shall change its legal name or use any additional tradenames without obtaining the prior written consent of Lender.

(e)     **State of Organization, Chief Executive Office, Places of Business and Locations of Records and Collateral** .  Each Loan Party's state of incorporation, formation or organization, chief executive office and all of its places of business (other than the Properties) and locations of their books and records are listed on **Exhibit C** attached hereto and incorporated herein by this reference.   None of the Loan Parties shall change its state of incorporation, formation or organization or chief executive office nor change or add any places of business or locations of its books and records without providing at least thirty (30) days' prior written notice to Lender.  The Collateral is and shall be kept only at the Properties or the locations listed on **Exhibit C** attached hereto and incorporated herein by this reference.

(f)     **Mergers, Consolidations, etc..**  None of the Loan Parties shall merge or consolidate with, or sell, assign, lease, or otherwise dispose of (whether in

one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any Person. None of the Loan Parties shall acquire all or substantially all of the assets of any Person for consideration (whether in one or a series of transactions) in excess of $4,000,000.00 without prior written notice being delivered to Lender, which prior written shall be delivered upon the earlier to occur of (i) execution of a purchase agreement, (ii) execution of a letter agreement or other memo of sale in connection with said acquisition, (iii) commencement of serious discussions regarding said acquisition amongst the parties involved and (iv) thirty (30) days prior to the contemplated closing of such acquisition.

(g)    **Business Operations.** Each Loan Party has taken and shall continue to take all necessary actions to: (i) maintain its legal existence and right to conduct business in all applicable jurisdictions; (ii) preserve the full value of the Collateral, Properties and Enterprises and its other material business operations and assets including, but not limited to, complying in all material respects with all Legal Requirements and Contractual Obligations, keeping all of its equipment in good working order and condition (ordinary wear and tear excepted), and not abandoning or committing or permitting waste with respect to the Collateral and Properties or other material assets and (iii) provide Lender with a valid and perfected Lien in the Collateral, subject only to Permitted Liens, and all right, title and interest of the Loan Parties in and to the Properties. Without limiting the foregoing, each Loan Party, as appropriate, is and shall remain in good standing as the franchisee or operator, as applicable, for the Enterprise(s) and lessee of each of the leased Properties, if any, and has not permitted and shall not permit any of the Collateral to become a fixture to any Property or accession to any personal property unless such Property or personal property is owned by such Loan Party and subject to a valid and first priority perfected Lien in favor of Lender. The Borrower shall not engage in any business other than the ownership and operation of the Collateral, Properties and Enterprises in accordance with the Loan Documents and the Primary Enterprise and Property Documents, and other businesses of the same business type and brand (if applicable) or franchise concept (if applicable) as the Enterprises. Borrower is at all times required to operate 60% or greater of the Enterprises as units "branded" under a petroleum supplier brand name reasonably acceptable to Lender. In determining the acceptability of the brand, Lender may rely upon any internally prepared or independently prepared tiering or ranking system of brands or such other information as Lender, its successors or assigns or respective agents thereof shall deem appropriate or necessary in their sole discretion.

(h)    **Title and Liens**. Each Loan Party owns and has good and marketable title and shall own and have good and marketable title in and to all of its assets (except for assets that are leased by such Loan Party and for which such Loan Party possesses a valid leasehold interest). The Collateral and all of the Loan Parties' right title and interest in and to the Properties shall be subject to a valid and perfected Lien in favor of Lender at all times, subject only to Permitted Liens. Notwithstanding the foregoing, provided that no violation of Section 5(s) herein is continuing or shall result therefrom, the Loan Parties may hereinafter lease, or acquire subject to a purchase money Lien, additional equipment which does not replace any existing Collateral. The Collateral, the Excluded Collateral, and all of the Loan Parties' right title and interest in and to the Properties are and shall be free and clear of all Liens except Permitted Liens. The Loan Parties shall not grant or enter into any negative pledge affecting the Collateral, the Excluded Collateral, the Enterprises or Properties, except in favor of Lender. Subject to **Section 5(gg)** herein, none of the Loan Parties shall assign, convey, sell, lease or otherwise transfer or dispose of the Collateral, the Excluded Collateral, the Enterprises or Properties or any part thereof without obtaining the prior written consent of Lender except for sales of inventory in the ordinary course of business, and the replacement of obsolete, defective, or worn-out equipment with other equipment that is owned by such Loan Party free and clear of any Liens except the Permitted Liens and subject to a valid and perfected Lien in favor of Lender.

(i)    **Intellectual Property**. Each Loan Party possesses and shall possess sufficient patents, copyrights, trademarks, and licenses for such intellectual property as is necessary to carry on its business operations (including, but not limited to, the Enterprises) and own, lease and use its assets (including, but not limited to, the Collateral and Properties).

(j)    **Primary Enterprise and Property Documents and Other Contractual Obligations**. The Loan Parties have provided or caused Lender to be provided with accurate and complete copies of the Primary Enterprise and Property Documents and other material Contractual Obligations pertaining to the Enterprises, Collateral and Properties. Such Primary Enterprise and Property Documents and other material Contractual Obligations constitute and shall constitute the legal, valid and binding obligations of the parties thereto in accordance with their respective terms. The Loan Parties shall not permit such Primary Enterprise and Property Documents or other material Contractual Obligations to be amended, extended (other than extensions of Principal Agreements and Leases), modified, replaced or substituted without obtaining the prior written consent

of Lender. The Loan Parties have recorded or caused to be recorded copies of each of the Leases or memoranda of leases describing all of the material terms and conditions of the Leases, if any, with the appropriate Governmental Authorities to provide adequate notice of such terms and conditions to third parties.  The Loan Parties have performed and shall perform all of their material obligations under the Primary Enterprise and Property Documents and other Contractual Obligations in a timely manner.  Without limiting the foregoing, the Loan Parties shall provide Lender with prompt written notice of the occurrence of any default under any Primary Enterprise and Property Documents and other Contractual Obligations.     The Loan Parties acknowledge that Lender is not affiliated with, and has no business relationship with, any Principal Agreement Counterparty other than any landlord/tenant and/or creditor/debtor relationships unrelated to the transaction set forth herein.

(k)     **Legal Requirements.**  Each Loan Party and each of the Enterprises and Properties is and shall be in material compliance with all applicable Legal Requirements.  Without limiting the foregoing, each Loan Party possesses and shall possess all material licenses, authorizations, approvals and permits from the appropriate Governmental Authorities.

(l)     **Litigation and Other Proceedings.**  Except as disclosed on Exhibit J annexed to this Loan Agreement, there are not and shall not be any pending or threatened actions, suits, administrative, arbitration or other proceedings of any kind against any Loan Party which might have a material adverse effect on the business operations, financial condition, or assets of such Loan Party including, but not limited to, the Properties, the Enterprises or Collateral. The Loan Parties shall take all reasonable steps to vigorously and actively defend the litigation disclosed on Exhibit J hereto and shall keep Lender reasonably informed as to the status and final disposition of same. Without limiting the foregoing, each Loan Party shall promptly provide Lender with written notice of any pending or threatened action, suit, administrative or other proceeding described in this subsection.

(m)     **Employment and ERISA Matters.**  Each Loan Party is and shall be in material compliance with all Legal Requirements pertaining to employment and ERISA matters. There are not and shall not be any pending or threatened actions, suits, administrative or other proceedings, or grievances of any kind against any Loan Party pertaining to employment or ERISA matters which might have a material adverse effect on the business operations, financial condition, or assets of such Loan Party. Without limiting the foregoing, each Loan Party shall promptly provide Lender with

written notice of any violation of a Legal Requirement pertaining to employment or ERISA matters or any pending or threatened action, suit, administrative or other proceeding, or grievance described in this subsection.

(n)    **Environmental Laws.** The Loan Parties, their business operations (including, but not limited to, the Enterprises) and their assets (including, but not limited to the Collateral and Properties) are and shall be in compliance with all laws concerning environmental protection and hazardous substances.

(o)    **Insurance.**

(i)    The Loan Parties have obtained and shall maintain, or cause to be maintained, insurance for the Loan Parties, the Properties, the Enterprises and Collateral providing at least the following coverages: (A) insurance with respect to the Properties insuring against any peril now or hereafter included within the classification "All Risks of Physical Loss" in amounts at all times sufficient to prevent Lender from becoming a co-insurer within the terms of the applicable policies and under applicable law. In any event such insurance shall be maintained in an amount which, after the application of any deductible, shall be equal to the full insurable value of the Properties and Collateral. The term "full insurable value" shall mean the actual replacement cost of the Properties and Collateral (without taking into account any depreciation, and exclusive of excavations, footings and foundations, landscaping and paving) determined annually by an insurer, a recognized independent insurance broker or an independent appraiser selected by Lender and paid by the Loan Parties. In no event shall such coverage be in an amount less than the coverage required pursuant to the terms of any lease agreement or any of the Primary Enterprise and Property Documents. Hereinafter, the foregoing insurance policies may be referred to as the "Properties Policies"; (B) comprehensive general liability insurance, including bodily injury, death and property damage liability, insurance against any and all claims, including all legal liability to the extent insurable and imposed upon Lender and all court costs and attorneys' fees and expenses arising out of or connected with the possession, use, leasing, operation, maintenance or condition of the Properties, Enterprises and Collateral in such amounts as are generally available at commercially reasonable premiums and are generally required by institutional lenders for businesses and assets comparable to the Properties, Enterprises and Collateral but in any event for a combined single limit of at least $1,000,000.00 per person, and $3,000,000.00 per

occurrence. Hereinafter, the foregoing insurance policies may be referred to as the "Liability Policies"; (C) statutory workers' compensation insurance with respect to any work in connection with the Properties and Enterprises or on or about the Collateral and Properties. Hereinafter, the foregoing insurance policies may be described as the "Workers' Compensation Policies"; (D) business interruption and/or loss of "rental income" insurance in an amount sufficient to avoid any co-insurance penalty and to provide proceeds with respect to the Properties, Enterprises and Collateral which shall cover the greater of (x) EBITDAR minus rent and lease expense for the preceding period of twelve (12) consecutive months, or (y) budgeted income for the ensuing twelve (12) months in accordance with a budget prepared in good faith by Borrower. Hereinafter, the foregoing insurance policies may be referred to as the "Business Interruption Policies"; (E) broad form boiler and machinery insurance (without exclusion for explosion) covering all boilers or other pressure vessels, machinery, and equipment constituting a portion of or located in, on or about the Properties and Collateral and insurance against loss of occupancy or use arising from any breakdown in such amounts as are generally required by institutional lenders for assets comparable to the Properties and Collateral. Hereinafter, the foregoing insurance policies may be referred to as the "Machinery Policies"; (F) if any of the Properties are in an area identified by the Federal Emergency Management Agency as having special flood hazards, flood insurance in an amount at least equal to the lesser of the outstanding amount of the Liabilities or the maximum limit of coverage available for the Collateral and Properties under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended from time to time. Hereinafter, the foregoing insurance policies may be referred to as the "Flood Policies"; (G) at all times during which structural construction, repairs or alterations are being made with respect to any of the Properties (1) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the Liability Policies and (2) the Properties Policies written in a so-called builder's risk completed value form on a non-reporting basis, against all risks insured against pursuant to the Properties Policies, including permission to occupy the Properties, and with an agreed amount endorsement waiving co-insurance provisions; (H) if required at any time to conform to the requirements or standards of any securities rating agency or bond insurer in connection with a securitization or

other disposition of the Loan, earthquake insurance in such coverage amount as is customarily required by such rating agency or bond insurer for similarly situated properties; and (I) such other insurance with respect to the Properties, Enterprises and Collateral against loss or damage of the kinds from time to time customarily insured against and in such amounts as are required by institutional lenders for businesses and assets comparable to the Properties, Enterprises and Collateral.

(ii)     All of the insurance policies described in subsection (i) above (the "Policies") shall be obtained under valid and enforceable policies and shall be issued by domestic primary insurers having a claims paying ability rating of A or better assigned by both Standard & Poors Ratings Service and Moody's Investors Service (or such other credit rating agencies as may be designated by Lender) or a general policy rating of A- or better and a financial class of VIII or better by A.M. Best Company, Inc. Hereinafter, insurers satisfying the foregoing requirements may be referred to as "Qualified Insurers". All insurers providing insurance required by this Loan Agreement and the other Loan Documents shall be authorized to issue insurance in each state where the Collateral and Properties are located and the states containing each Loan Party's chief executive office and principal place of business, the Enterprises, Collateral and Properties. The Liability Policies shall name Lender as an additional named insured and all Policies other than the Liability Policies and Workers Compensation Policies shall provide that all proceeds be payable to Lender as set forth in this Loan Agreement and the other Loan Documents. The Policies, as applicable, shall also contain: (A) a standard "non-contributory mortgagee" endorsement or its equivalent relating to recovery by Lender notwithstanding the negligent or willful acts or omission of Lender; (B) to the extent available at commercially reasonable rates, a waiver of subrogation endorsement as to Lender, and (C) an endorsement providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of similar properties in the general vicinity of the Properties, but in no event in excess of the lesser of $10,000.00 or five percent (5%) of annual net operating income attributable to such Properties, without duplication, based upon the Loan Parties' last annual financial statements. All Policies shall contain a provision that such Policies shall not be canceled or terminated, nor shall they expire, without at least thirty (30) days' prior written notice to Lender in each instance and include effective waivers by the insurer of all

claims for Insurance Premiums (as defined below) against any loss payees, additional insureds and named insureds (other than the Loan Parties). Certificates of Insurance with respect to all renewal and replacement Policies shall be delivered to Lender not less than twenty (20) days prior to the expiration date of any of the Policies required to be maintained hereunder, which certificates shall bear notations evidencing payment of applicable premiums (the "Insurance Premiums"). Originals or certificates of such replacement Policies shall be delivered to Lender promptly after each Loan Party's receipt thereof but in any case within thirty (30) days after the effective date thereof. If any Loan Party fails to maintain and deliver to Lender the original Policies or certificates of insurance required by this Loan Agreement and the other Loan Documents, upon ten (10) days' prior notice to such Loan Party, Lender may obtain such insurance at the Loan Parties' sole cost and expense.

(iii)    The Loan Parties shall comply with all insurance requirements and shall not bring or keep or permit to be brought or kept any article upon any of the Properties or cause or permit any condition to exist with respect to the Properties, Enterprises and Collateral which would be prohibited by an insurance requirement, or would invalidate the insurance coverage required hereunder to be maintained by the Loan Parties on or with respect to the Enterprises, Collateral or Properties pursuant to this Loan Agreement and the other Loan Documents.

(p)    **Condemnation.** Each Loan Party shall provide or cause Lender to be provided with written notice of any pending or threatened Condemnation of its business operations (including, but not limited to, the Enterprises) or assets (including, but not limited to, the Properties and Collateral) and with copies of any related communications, pleadings and other documents. The Loan Parties shall provide or cause Lender to be provided with all of the Condemnation proceeds pertaining to Properties, Enterprises and Collateral. Subject to Lender's rights described below, the Loan Parties shall diligently defend and pursue a reasonable resolution of any Condemnation of their business operations (including, but not limited to, the Enterprises) or assets (including, but not limited to, the Properties and Collateral). If any of the Loan Parties receives any Condemnation proceeds with respect to any part of the Enterprises, Properties, or Collateral, such Loan Party shall promptly remit or cause such Condemnation proceeds to be remitted to Lender and, until such Condemnation proceeds are remitted to Lender, such Loan Party shall hold such Condemnation proceeds in trust for the benefit of Lender and shall not commingle such Condemnation proceeds with any other monies or

assets. Each of the Loan Parties hereby irrevocably makes, constitutes and appoints Lender and its designees as such Loan Party's true and lawful attorney (and agent-in-fact) for the purpose of making, pursuing, settling and adjusting claims for Condemnation proceeds and commencing, appearing in, prosecuting, defending and settling any Condemnation actions, suits, administrative, arbitration or other proceedings of any kind pertaining to the Condemnation of the Enterprises, Collateral and Properties, and endorsing such Loan Party's name on any insurance check, draft, instrument or other item of payment for the Condemnation of the Enterprises, Collateral or Properties. Such powers of attorney are coupled with an interest and shall be irrevocable.

(q)    **Restoration after Casualty or Condemnation.** In the event of a casualty or Condemnation, the following provisions shall apply in connection with the Restoration (as defined below) of any affected Properties and Collateral:

(i)    If the Properties, Enterprises or Collateral shall be damaged or destroyed, in whole or in part, by fire or other casualty or if any Property, Enterprise, Collateral or any portion thereof is taken by the power of eminent domain, the Loan Parties shall give prompt notice of such damage or taking to Lender and shall promptly commence and diligently prosecute the completion of the repair and restoration of such Property, Enterprise or Collateral as nearly as possible to the condition such Property, Enterprise or Collateral was in immediately prior to such fire or other casualty or taking, with such alterations as may be approved by Lender (the "Restoration").

(ii)    The term "Net Proceeds" for purposes of this subsection (q) shall mean the net amount of all insurance proceeds under the Policies as a result of such damage or destruction, after deduction of Lender's reasonable costs and expenses (including, but not limited to reasonable counsel fees), if any, in collecting the same, or the net amount of all awards and payments received by Lender with respect to a Condemnation referenced in **Section 5(p)** of this Loan Agreement, after deduction of Lender's reasonable costs and expenses (including, but not limited to reasonable counsel fees), if any, in collecting the same, whichever the case may be. The Net Proceeds shall be disbursed directly to Borrower if: (A) the Net Proceeds do not exceed $50,000.00 (the "Net Proceeds Availability Threshold"); (B) the costs of completing the Restoration as reasonably estimated by Borrower shall be less than or equal to the

Net Proceeds; (C) no Event of Default shall have occurred and be continuing; (D) the affected Properties, Enterprises, and Collateral and the use thereof after the Restoration shall be in compliance with, and permitted under, all applicable zoning laws, ordinances, rules and regulations (including, without limitation, all applicable Environmental Laws); (E) in the event that the Net Proceeds are insurance proceeds, less than five percent (5%) of the total floor area of the improvements located on the affected Properties have been damaged or destroyed, or rendered unusable as a result of such fire or other casualty; or in the event that the Net Proceeds are condemnation awards, less than five percent (5%) of the land constituting a portion of the affected Properties are taken, any land that is taken is located along the perimeter or periphery of such Properties, no improvements are located on such taken land, and such taking does not materially impair access to the Properties; and (F) none of the Primary Enterprise and Property Documents shall have terminated.

(iii)     If the Net Proceeds are greater than the Net Proceeds Availability Threshold, such Net Proceeds shall, subject to the provisions of any Leases, any subordination and non-disturbance agreements binding upon Lender, or applicable law, be forthwith paid to Lender to be held by Lender in a segregated account to be made available to Borrower for the Restoration in accordance with the provisions of this subsection (q).

(iv)     The Net Proceeds held by Lender pursuant to this subsection (q) shall be made available to Borrower for payment or reimbursement of Borrower's expenses in connection with the Restoration, subject to the following conditions: (A) no Event of Default shall have occurred and be continuing; (B) Lender shall, within a reasonable period of time prior to request for initial disbursement, be furnished with an estimate of the cost of the Restoration accompanied by an independent architect's certification as to such costs and appropriate plans and specifications for the Restoration, such plans and specifications and cost estimates to be subject to Lender's approval, not to be unreasonably withheld or delayed; (C) the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender (which shall have been deposited with Lender prior to Lender's initial disbursement of Net Proceeds for Restoration), are sufficient to cover the cost of the Restoration as such costs are certified by the independent architect; (D) the Net Proceeds are less than the then outstanding principal amount of the Liabilities; (E) in

the event that the Net Proceeds are insurance proceeds, less than twenty five percent (25%) of the total floor area of the improvements located on the affected Properties have been damaged or destroyed, or rendered unusable as a result of such fire or other casualty; or in the event that the Net Proceeds are condemnation awards, less than ten percent (10%) of the land constituting a portion of the affected Properties are taken, any land that is taken is located along the perimeter or periphery of such Properties, no improvements are located on such taken land, and such taking does not materially impair access to the Properties; (F) Lender shall be satisfied that any operating deficits, including all payments under this Loan Agreement, the Note and the other Loan Documents, which shall be incurred with respect to the affected Enterprises, Properties and Collateral as a result of the occurrence of such fire or other casualty or taking, whichever the case may be, shall be covered out of the Net Proceeds or other funds of Borrower; (G) Lender shall be satisfied that, upon the completion of the Restoration, the net cash flow of the affected Enterprises, Properties and Collateral shall be restored to a level sufficient to (x) cover all carrying costs and operating expenses of such Enterprises, Properties and Collateral, including, without limitation, all payments under this Loan Agreement, the Note and the other Loan Documents and all required reserves and commissions and (y) result in a Fixed Charge Coverage Ratio (computed with respect to the affected Property and Enterprise alone) at least as great as that immediately preceding the casualty or taking; (H) the Restoration can reasonably be completed on or before the earliest to occur of six (6) months prior to the Loan Maturity Date; the earliest date required for such completion under the terms of any Primary Enterprise and Property Documents pertaining to the Properties, Collateral and Enterprises affected by such fire or other casualty or to such taking, or such time as may be required under applicable zoning law, ordinance, rule or regulation in order to repair and restore the affected Collateral and Properties to as nearly as possible the condition they were in immediately prior to such fire or other casualty or to such taking, as applicable; (I) such Collateral and Properties and the use thereof after the Restoration shall be in compliance with, and permitted under, all applicable zoning laws, ordinances, rules and regulations (including, without limitation, all applicable Environmental Laws); and (J) None of the Primary Enterprise and Property Documents shall have terminated.

(v)     The Net Proceeds held by Lender until disbursed in accordance with the provisions of this subsection (q) shall constitute additional security for the Liabilities.  The Net Proceeds, other than the Net Proceeds paid under the Business Interruption Policies, shall be disbursed by Lender to, or as directed by, Borrower, in an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration (less retainage equal to the greater of ten percent (10%) of such costs incurred or the actual retainage withheld by Borrower from mechanics, materialmen and the like) from time to time during the course of the Restoration, not more frequently than once per month, upon receipt of evidence satisfactory to Lender that:  (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full; and (B) there exist no notices of pendency, stop orders, mechanic's or materialmen's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the affected Properties and Collateral arising out of the Restoration which have not either been fully bonded and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company insuring the Liens belonging to Lender. The Net Proceeds paid under the Business Interruption Policies shall be disbursed by Lender to pay for amounts due under the Loan Documents, to pay other expenses incurred by Borrower in connection with the ownership and operation of the Properties and Collateral, and the remainder thereof, to or as directed by, Borrower to pay for the cost of the Restoration in accordance with this subsection (q).  Final payment shall be made after submission to Lender of all licenses, permits, certificates of occupancy and other required approvals of governmental authorization having jurisdiction, the Casualty Consultant's (as defined below) certification that the Restoration has been fully completed, and final unconditional lien waivers from all mechanics and materialmen who have provided labor or materials for the Restoration.

(vi)    Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  Such plans, specifications, permits, licenses and approvals, and the identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and an independent consulting engineer

selected by Lender (the "Casualty Consultant").  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(vii)  If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed, shall constitute additional security for the Liabilities.  Borrower shall not be entitled to any interest on sums held by Lender.

(viii)  So long as an Event of Default shall not have occurred and be continuing, Borrower shall be entitled to settle any insurance claim with respect to the Net Proceeds which in the aggregate are less than the Net Proceeds Availability Threshold.  If the Net Proceeds are received by Borrower, such Net Proceeds shall, until the completion of the related work, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of the Restoration in accordance with the terms hereof.  Lender shall have the right to participate in and reasonably approve any settlement for insurance claims with respect to the Net Proceeds which in the aggregate are greater than the Net Proceeds Availability Threshold.  If an Event of Default shall have occurred and be continuing, Borrower shall not be entitled to settle any insurance claim and hereby irrevocably empowers Lender, in the name of Borrower as its true and lawful attorney-in-fact, to file, prosecute and settle such claim and to collect and to make receipt for any such payment and any Net Proceeds received by Borrower shall not be commingled and shall be immediately delivered to Lender.

(ix)  The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been

completed in accordance with the provisions of this subsection (q) and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full and all required permits, licenses, certificates of occupancy and other required approvals of governmental authorities having jurisdiction have been issued, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and be continuing.

(x)     All Net Proceeds not required to be made available for the Restoration or to be returned to Borrower as excess Net Proceeds pursuant to this subsection (q) shall be retained and applied by Lender toward the payment of the Liabilities, without prepayment penalty, whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same shall be paid, either in whole or in part, to Borrower. If Lender shall receive and retain Net Proceeds, the Liabilities and the Liens belonging to Lender shall be reduced only by the amount received and retained by Lender and actually applied by Lender in reduction of the Liabilities.

(r)     **Change in Ownership or Management of Loan Parties.** The names of each Loan Party's directors, managers and officers and the direct and indirect Owners of each Loan Party's Equity Securities are described in **Exhibit D** attached hereto and incorporated herein by this reference. Subject to **Section 5(gg)** herein, the Loan Parties (i) will not permit any sale, transfer or hypothecation in excess of twenty percent (20%) in the aggregate of the outstanding Equity Securities of any of the following Persons: (x) Borrower, (y) Pro Holdings, L.L.C. (provided that (1) the Class A ProHoldings Membership Interests shall not be subject to this restriction for so long as no voting rights are appurtenant thereto (other than as set forth in the operating agreement of ProHoldings annexed to the members/managers certificate delivered to Lender contemporaneously herewith) and (2) the members of Pro Holdings (as set forth on Exhibit D), subject to clauses (ii) and (iii) hereinafter set forth in this sentence, may exercise the buy-sell rights set forth in such operating agreement and thereby transfer membership interests of Pro Holdings amongst each other), or (z) any member of Pro Holdings, as set forth on Exhibit D, (ii) will not permit any Key Person to cease active participation in the management of the Loan Parties, and (iii) will not permit any Key Person to maintain a lesser actual cash investment in the equity ownership interest of any Loan Party than that maintained by such Key Person on the date hereof.  Any transfer or series of transfers of Equity

Securities of any Loan Party or any other event which results in a violation of the preceding sentence shall be deemed a "Transfer of a Controlling Interest". In the event of the death, incapacity, retirement or withdrawal from management of any Key Person, the Loan Parties agree to replace such Key Person with an individual acceptable to Lender within sixty (60) days thereafter, which replacement shall be the owner of all Equity Securities, if any, of the Loan Parties previously owned by such Key Person. Any and all transfers of Equity Securities of the Loan Parties which do not require Lender's consent hereunder may only be made after 10 days prior written notice to Lender. Provided, however, the transfer of a membership interest in Borrower or a member of Borrower (directly or indirectly) by Ben F. Beard for the purposes of estate planning solely between himself and his immediate family members or to trusts created for their benefit shall not be deemed a "Transfer of a Controlling Interest," provided, however, that any subsequent owner (directly or indirectly) of ten percent (10%) (excluding the now current owners of Equity Securities, to the extent they do not acquire additional Equity Securities) or more of the membership interest in Borrower or a member of Borrower shall execute and deliver a Conditional Guaranty in the form delivered by Ben F. Beard, Sam J. Carroll, III, Robert Warren Jackson and James W. Jackson, Jr. on the date hereof. For the purposes of this paragraph (r) immediate family shall mean spouse, offspring, parents and siblings. It is expressly recognized that transfers of the BFP Capital Membership Interests are not subject to the restrictions set forth in this paragraph.

(s)    **Financial Covenants.**

(i)    The Loan Parties shall maintain or cause to be maintained (1) an Obligor FCCR of not less than the Minimum Obligor FCCR at all times, tested quarterly as of the end of each fiscal quarter of the Obligor FCCR Parties based upon the period of twelve consecutive months then ended (or, if less, the period beginning at the commencement of the Loan Parties' operation of the Enterprises), and (2) a Loan FCCR of not less than the Minimum Loan FCCR at all times, tested quarterly as of the end of each calendar quarter based upon the period of twelve consecutive months then ended (or, if less, the period beginning at the commencement of the Loan Parties' operation of the Enterprises). The Loan Parties represent that the Reporting Certificate(s) delivered by the Loan Parties to the Lender contemporaneously herewith are true, correct and complete in all material respects, and that there has been no material adverse change in the financial condition or prospects of the Loan Parties or the

Enterprises since the "Material Adverse Change Date" designated on **Schedule A**.

(ii)     The Loan Parties shall comply with any and all additional financial covenants which are set forth on **Schedule A**.

(t)     **Payment of Indebtedness, Taxes and Other Impositions**. Each of the Loan Parties shall file all of its required tax returns and pay and perform all of its indebtedness (including, but not limited to, all Taxes and other Impositions) when due; provided, however, that after providing Lender with prior written notice, each Loan Party may contest, by appropriate legal or other proceedings conducted in good faith and with due diligence, the amount, validity or appropriateness of any indebtedness (other than indebtedness owing to Lender or any of its Affiliates), Taxes or other Impositions so long as: (i) such actions do not constitute a breach of any Legal Requirements or Contractual Obligations; (ii) such Loan Party's business operations (including, but not limited to, the Enterprises) and assets (including, but not limited to, the Collateral and Properties) do not become subject to a Lien and are not diminished or forfeited as a result of such actions; and (iii) if required by Lender, such Loan Party shall have furnished to Lender a bond or other security reasonably satisfactory to Lender. Each Loan Party shall pay when due all sums which become due under the Primary Enterprise and Property Documents. Each Loan Party shall, promptly following Lender's request, deliver to Lender or Lender's designee documentary evidence of payment of all such indebtedness, Taxes, Impositions and other sums.

(u)     **Payment of Distributions**. The Borrower shall not make or pay any Distribution except to the extent that:

(i)     no default or Event of Default is existing;
(ii)    the Loan FCCR for the period of twelve consecutive months ending as of the most recent Reporting Date (defined below) is greater than 1.2:1.0 (defined below); and
(iii)   no Distribution may be made except from Distributable Income (defined below).

As used herein:

"Distributable Income" means for any period the remainder obtained by subtracting from EBITDAR for such period the following sums: (i) the product of (x) Fixed Charges for such period multiplied by (y) 1.05, and (ii)

sums required to be added to reserve accounts in order to comply with Section 5(hh) herein.

"Reporting Date" means that closing date for any quarterly or annual Financial Statements required to be delivered by Borrower to Lender pursuant to this Loan Agreement.

(v)    **Solvency.** Each Loan Party is and shall be solvent and able to pay its debts as they become due and possesses and shall possess sufficient capital to operate its business and own its assets. None of the Loan Parties shall be rendered insolvent by the execution, delivery and performance of its obligations under this Loan Agreement and the other Loan Documents nor by the completion of the transactions contemplated thereby.

(w)    **Payments of Subordinated Debt.** Notwithstanding anything to the contrary set forth herein, the Loan Parties shall not make any payment of Subordinated Debt at any time while the Loan is outstanding.

(x)    **Margin Securities.** Each Loan Party does not and shall not own any margin securities and none of the Loan proceeds shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation G or Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

(y)    **Affiliate Transactions.** Except with respect to the ownership of the BFP Capital Membership Interests and the Class A ProHoldings Membership Interests, each Loan Party is not conducting and shall not conduct any activities or transactions with an Affiliate of such Loan Party unless such activity or transaction is entered into in the ordinary course of such Loan Party's business and the terms and conditions of such activity or transaction are not less favorable to such Loan Party than if such Loan Party had entered into the activity or transaction on a reasonable basis and with a non-Affiliate.

(z)    **Financial Statements and Other Information and Materials.** The Loan Parties shall provide Lender with the following Financial Statements and information and materials during the term of the Loan:

(a) With respect to the Loan Parties, the Obligor FCCR Parties, and each Entity (other than BFP Capital) which is an Affiliate of one or more Loan Parties and which is principally engaged in a business or

businesses of the same business classification or type as that in which the Loan Parties are engaged, on a consolidated and consolidating basis (or, if appropriate, on a combined and combining basis):

(i) quarterly, within thirty days after the end of each fiscal quarter (1) a current Reporting Certificate, (2) a balance sheet and income statement for such quarter compiled by an independent certified public accountant acceptable to Lender and certified by the applicable party's chief financial officer(s), (3) an income statement for the period of twelve consecutive months then ending, and (4) if any accounts receivable or accounts payable are aged twenty days or greater, an aging of accounts receivable and accounts payable;

(ii) annually, within 120 days after the end of each fiscal year (1) a current Reporting Certificate, (2) audited financial statements, including a balance sheet, income statements, statement of cash flows and footnotes, audited by independent certified public accountants acceptable to Lender, and (3) a signed copy of the most recently filed federal income tax returns of each such entity;

(b) With respect to each Enterprise:

(i) quarterly, within thirty days after the end of each fiscal quarter (1) a current Reporting Certificate, (2) an income statement for such quarter compiled by an independent certified public accountant acceptable to Lender and certified by the Loan Parties' chief financial officer(s), (3) an income statement for the period of twelve consecutive months then ending, and (4) if any accounts payable are aged twenty days or greater, an aging of accounts receivable and accounts payable, and

(ii) annually, within 120 days after the end of each fiscal year (1) a current Reporting Certificate, (2) internally prepared financial statements for such Enterprise, including an income statement, and statement of cash flows, and, if prepared, any audits or accountant's review statements with respect to such Enterprise; and

(c) With respect to each natural Person who owns, directly or indirectly, 20% or greater of the Equity Securities of any Loan Party, and each other natural Person who is a Guarantor, annually, by the Owner Reporting Date (i) a current personal financial statement, and (ii) a signed copy of such person's most recently filed federal income tax return.

The Loan Parties shall provide to Lender any and all additional financial information and materials as Lender may request concerning the Loan Parties, the Collateral, the Properties or the Enterprises, all of which shall be in form and substance satisfactory to Lender in all respects. All of the Financial Statements and other information and materials delivered or caused to be delivered by the Loan Parties to Lender shall be prepared in accordance with GAAP and has been and shall be accurate and complete in all respects.

(aa)    **Inspections.** Lender and its designees shall have the right to inspect each Loan Party's business operations (including, but not limited to, the Enterprises), assets (including, but not limited to, the Properties and Collateral), and books, records and other data upon reasonable advance notice during normal business hours and shall have the additional right to make copies of any books, records and other data and conduct phase one environmental site assessments at the Loan Parties' cost and expense. Upon the occurrence of an Event of Default, such inspections may be conducted at any time without advance notice. In addition, Lender and its designees shall have the right to verify the accuracy and completeness of the Financial Statements and other information and materials provided to Lender under this Loan Agreement and the other Loan Documents with any Person and to speak with the Loan Parties' owners, directors, managers, officers, employees or agents, or any other Person (including, but not limited to, any other party to the Primary Enterprise and Property Documents) regarding each Loan Party's business operations, financial condition, or assets. The Loan Parties shall provide Lender with their full cooperation with respect to all of the actions described in this subsection.

(bb)    **Books and Records.** Each of the Loan Parties has kept and shall keep accurate and complete books, records and other data in accordance with GAAP and good business practices.

(cc)    **Notice of Material Adverse Change or Event of Default.** Each of the Loan Parties shall provide Lender with prompt written notice of the occurrence of any material adverse change to such Loan Party, their business operations (including, but not limited to, the Enterprises), their assets

(including, but not limited to, the Properties and Collateral) or any other actual or likely Event of Default (including, but not limited to, conditions that if not cured or that but for the lapse of time or giving notice or both, shall constitute an Event of Default) under this Loan Agreement or the other Loan Documents.

(dd)    **Use of Loan Proceeds.**  Borrower shall use the proceeds of the Concurrent Financings solely for business (and not for any consumer or agricultural) purposes.  The proceeds of the Concurrent Financings shall be used solely for the purposes set forth on **Exhibit I** annexed hereto.

(ee)    **Management of the Enterprises and Properties.** The Loan Parties further covenant and agree with Lender as follows:

(i)     The Loan Parties shall: (A) pay all sums required to be paid by the Loan Parties under the Primary Enterprise and Property Documents, promptly perform and/or observe all of the covenants and agreements required to be performed and observed by them under the Primary Enterprise and Property Documents, and cause the Enterprises and Properties to be operated in compliance therewith and do all things necessary to preserve and to keep unimpaired their material rights thereunder; (B) promptly notify Lender of any default under any Primary Enterprise and Property Documents of which they are aware and provide Lender with copies of any notices delivered in connection therewith; (C) promptly deliver to Lender a copy of each notice of default and other material notice received by them under any Primary Enterprise and Property Documents; (D) promptly enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by the other parties to the Primary Enterprise and Property Documents; (E) grant Lender the right, but Lender shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any Primary Enterprise and Property Documents on the part of the Loan Parties to be performed or observed to be promptly performed or observed on behalf of the Loan Parties, to the end that the rights of the Loan Parties in, to and under any applicable Primary Enterprise and Property Documents shall be kept unimpaired and free from default; (F) exercise each individual option, to the extent any exist or are granted, to extend or renew the term of any Primary Enterprise and Property Documents upon demand by Lender made at any time within one year of the last day upon which any such option may be

exercised, and the Loan Parties hereby expressly authorize and appoint Lender their attorney-in-fact to exercise any such option in the name of and upon behalf of the Loan Parties, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest; and (G) continuously operate each Enterprise during ordinary business hours.

(ii)     The Loan Parties shall not, without Lender's prior written consent: (A) surrender, terminate or cancel any of the Primary Enterprise and Property Documents; (B) reduce or consent to the reduction of the term of any of the Primary Enterprise and Property Documents; (C) increase or consent to the increase of the amount of any charges under any of the Primary Enterprise and Property Documents (provided that any unilateral right in favor of a Principal Agreement Counterparty, contained in any applicable Principal Agreement, to modify fees charged therein, and the Loan Parties' obligation to pay such fees, shall not require Lender's consent); or (D) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Primary Enterprise and Property Documents in any material respect.

(ff)     **Persons with Disabilities; Accessibility.**

(i)     The Loan Parties represent that the Collateral and Properties presently do, and covenant that the Collateral and Properties at all times shall, strictly comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, all state and local laws and ordinances related to accessibility for persons with disabilities and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "Access Laws").

(ii)     Notwithstanding any provisions set forth herein or in any other document regarding Lender's approval of alterations of the Properties, the Loan Parties shall not alter the Properties in any manner which would increase the Loan Parties' responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender. The foregoing shall apply to tenant improvements constructed by the Loan Parties or by any of their tenants. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other person acceptable to Lender.

(iii)    The Loan Parties agree to give prompt written notice to Lender of the receipt by any of the Loan Parties of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(gg)    **Transfer Events.** Notwithstanding anything to the contrary set forth herein Lender shall, if requested by Borrower, consent to one Transfer Event during the term of the Loan and any extension of the Loan, provided that each of the following conditions are met:

(i)    The new borrower, in the case of an Assumption, or the new holder of Equity Securities, in the case of a Transfer of a Controlling Interest (such new borrower or new holder, the "Successor") and any new guarantor, if any, shall provide to Lender, at the expense of the Successor or the Loan Parties, evidence satisfactory to Lender, in its sole discretion, that the Successor and new guarantor, if any, and the Loan upon Assumption, shall meet Lender's underwriting standards then in effect.  Such obligation shall include providing to Lender financial statements, appraisals, credit reports, environmental reports and such other documentation as Lender shall reasonably request;

(ii)    In the case of an Assumption, the Successor must purchase all of the Collateral and Enterprises and all of the Loan Parties' interest in the Properties, and the Successor must obtain the written consent of the applicable Principal Agreement Counterparties to the Transfer Event (if required under the Principal Agreements), succeed to the Loan Parties' interest in each such Principal Agreement and remain in good standing under it, and be authorized to operate each Enterprise.  In the case of a Transfer of a Controlling Interest, the Successor shall obtain the written consent of the applicable Principal Agreement Counterparties to the Transfer Event (if required under the Principal Agreement);

(iii)    No Event of Default shall be continuing;

(iv)    The Successor or Loan Parties shall pay to Lender an administrative fee equal to one percent (1%) of the then outstanding principal balance of the Loan;

(v)    If the Loan has been sold to a trust the Transfer Event shall not cause a change in the asset characteristics of the trust, or violate the trust's underwriting requirements,  and Lender shall have received, at the

Loan Parties' expense, written confirmation from all securities rating agencies designated by Lender that the Transfer Event shall not result in a downgrade, withdrawal or qualification by such securities rating agencies of the rating of any securities issued by the trust. The determination of such issues shall be at the sole discretion of Lender and the trustee ("Trustee");

(vi)     In the event of an Assumption, the Successor shall assume all the obligations of the Loan Parties under the Loan Documents pursuant to an agreement approved by Lender, the Successor shall execute such other documents as Lender may request in order to document the Assumption or amend the Loan Documents to reflect the same, and the Successor shall provide to Lender such Organizational Documents, resolutions, opinions of counsel, title policies or title endorsements, lien searches and other documents as Lender may require in connection with the Assumption, all at the Loan Parties' or Successor's cost and expense. If a Guaranty is in effect, at Lender's election, upon the occurrence of any Transfer Event, a new guarantor satisfactory to Lender in all respects shall assume all the obligations of Guarantor under the Guaranty pursuant to an agreement approved by Lender;

(vii)    The Loan Parties shall obtain the prior written consent of Lender and the Trustee, if applicable, to the Transfer Event, which consent may be denied in Lender's or Trustee's sole discretion based upon Lender's or Trustee's evaluation of the creditworthiness of the Successor and/or guarantor or if in Lender's or Trustee's reasonable judgment the Transfer Event would have unfavorable tax consequences to Lender or the trust; and

(viii)   The Loan Parties and/or Successor shall have reimbursed Lender and Trustee for their costs and expenses in connection with the closing of any Transfer Event, including, but not limited to attorneys fees and costs (including, without limitation, allocated fees of in-house counsel, if any) incurred in connection with any Transfer Event.

(hh)     **Required Reserves.**  Borrower shall establish and maintain (i) a capital expenditure reserve in an amount equal to the greater of (a) the amount set forth in a budget prepared by Borrower in good faith and (b) $11,000.00 per Enterprise; and (ii) a cash working capital reserve in an amount equal to at least $1,000,000.00.

6.    **Events of Default**.  The occurrence of any one or more of the following events shall constitute an **Event of Default** under this Loan Agreement and the other Loan Documents:

(a)    **Monetary Defaults**.  The failure of any of the Loan Parties to pay on or prior to the tenth (10th) day after the same is due any of the Liabilities or any other amount owing to Lender under this Loan Agreement, the other Loan Documents, or any other indenture, note, security agreement, deed of trust, mortgage, lease, guaranty, instrument, contract, or other agreement;

(b)    **Covenant Defaults**.  The failure of the Loan Parties to comply with any of the requirements of **Sections 5(f), 5(h), 5(o), 5(r), 5(s), 5(u), 5(z), 5(gg) or 5(hh)** of this Loan Agreement;

(c)    **Breaches of Representations or Warranties**.    The breach or inaccuracy of any Loan Party's representations or warranties to Lender under this Loan Agreement, the other Loan Documents, or any other indenture, note, security agreement, deed of trust, mortgage, lease, guaranty, instrument, contract, or other agreement;

(d)    **Nonmonetary Defaults**.  The failure of any Loan Party to perform any of its obligations under this Loan Agreement or the other Loan Documents (other than as provided in Sections 6(a) through 6(c) above), and such failure is not cured within thirty (30) days following the earlier to occur of Lender's provision of notice thereof to the Loan Parties or the Loan Parties' actual knowledge of such failure, provided, however, that such notice and cure rights shall not apply to any default that cannot be cured, or which is required to be corrected within a shorter time period in accordance with Legal Requirements, or constitutes more than the third occurrence of an Event of Default during any twelve (12) month period;

(e)    **Third Party Contracts**.  Any Loan Party's default beyond applicable notice and cure periods under any of the Primary Enterprise and Property Documents, or any other material Contractual Obligation with a Person other than Lender;

(f)    **False or Misleading Statements**.  The provision by or on behalf of any Loan Party to Lender of any false or misleading Financial Statements or other material information and materials pertaining to any Loan Party's business operations (including, but not limited to, the Enterprises), financial condition, or assets (including, but not limited to, the Properties and Collateral);

(g)     **Limitation or Contest of Liabilities or Liens.** The limitation (other than limitations specifically described in this Loan Agreement and the other Loan Documents) or contest by any Loan Party of any of the Liabilities owing to Lender or Liens in favor of Lender described in this Loan Agreement and the other Loan Documents;

(h)     **Levy or Seizure.** The actual or attempted levy, seizure or attachment of any Loan Party's assets (including, but not limited to, the Collateral and Properties) which assets, either individually, or in the aggregate, have a fair market value (as determined by Lender) or book value greater than or equal to the Judgment Default Amount;

(i)     **Bankruptcy, Insolvency, Etc. ("Voluntary").** Any Loan Party or any Guarantor shall (1) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar official of itself or of all or a substantial part of its property, (2) be generally not paying its debts as such debts become due (as such concept is defined and construed under applicable bankruptcy law), (3) make a general assignment for the benefit of its creditors, (4) commence a voluntary case under the Bankruptcy Code (as now or hereafter in effect), (5) take any action or commence any case or proceeding under any law relating to bankruptcy, insolvency, reorganization, winding-up or composition or adjustment of debts, or any other law providing for the relief of debtors, (6) fail to contest in a timely or appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under the Bankruptcy Code or other law, (7) take any action under the laws of its jurisdiction of incorporation or organization similar to any of the foregoing, or (8) take any corporate action for the purpose of effecting any of the foregoing;

(j)     **Bankruptcy, Insolvency, Etc. ("Involuntary").** A proceeding or case shall be commenced, without the application or consent of any Loan Party or any Guarantor in any court of competent jurisdiction, seeking (1) the liquidation, reorganization, dissolution, winding up, or composition or readjustment of its debts, (2) the appointment of a trustee, receiver, custodian, liquidator or the like of it or of all or any substantial part of its assets, or (3) similar relief in respect of it, under any law relating to bankruptcy, insolvency, reorganization, winding-up or composition or adjustment of debts or any other law providing for the relief of debtors, and such proceeding or case shall continue and not be stayed or dismissed, for a period of 30 days; or an order for relief shall be entered in an involuntary case under the Bankruptcy Code, against any Loan Party or any Guarantor; or action under the laws of the jurisdiction of incorporation or organization of any Loan Party or any

Guarantor similar to any of the foregoing shall be taken with respect to any Loan Party or any Guarantor and shall continue unstayed and in effect for any period of 30 days;

(k)    **Entry of Judgment or Order.**  The entry of any judgment in an amount greater than or equal to the Judgment Default Amount or other material order or decree against any Loan Party which remains unsatisfied or undischarged and in effect for five (5) Business Days after such entry without a stay of enforcement or execution;

(l)    **Criminal Proceedings.**  The indictment or institution of any criminal proceeding against any Loan Party or any Owner, director, manager, or officer of any Loan Party for any felony;

(m)    **Material Adverse Change.**  The occurrence of any material adverse change in any Loan Party's or Guarantor's business operations (including, but not limited to, the Enterprises), financial condition, or assets (including, but not limited to, the Collateral and Properties);

(n)    **Death, Dissolution, Etc.**  The cessation of business, death, dissolution, incapacity, liquidation, retirement or withdrawal of: (i) any Loan Party; or (ii) Owners representing a percentage of the Equity Securities of any Loan Party greater than or equal to the Equity Default Percentage; or (iii) any Key Person, unless the Loan Parties provide a replacement for such Key Person who is acceptable to Lender within sixty (60) days thereafter; or

(o)    **Cross-Default.**  The occurrence of any event of default under the documents which evidence and/or secure any other obligation owed by any of the Loan Parties to Lender, including, without limitation, the Concurrent Financings.

7.    **Remedies.**  Upon the occurrence of any Event of Default, Lender shall possess all of the following remedies without presentment, demand, notice, protest, or legal process of any kind:

(a)    **Acceleration of Liabilities.**  Lender may accelerate and declare all of the Liabilities (including, but not limited to, the Yield Maintenance Amount and any other fees and charges described in this Loan Agreement, the Note and any other Loan Documents) immediately due and payable (provided that in the event of any Event of Default arising under Sections 6(i) or 6(j) the Liabilities shall immediately and automatically become immediately due and payable);

(b)     **Cessation of Additional Loans or Other Financial Accommodations.**  Lender may cease providing the Loan Parties with any additional loans or other financial accommodations required by the Loan Documents, if any, or any other instrument, agreement or document of any kind;

(c)     **Repossession or Assemblage of Collateral.**  Lender may seek to repossess the Collateral or cause the Loan Parties to assemble and make available to Lender the Collateral with or without resorting to legal process. In the event that Lender seeks to replevy the Collateral, such replevin may be conducted on an *ex parte* basis and without the posting of any bond;

(d)     **Entry Upon, Possession and Protection of Collateral, Enterprises, and Properties.**  Lender may seek to enter upon and take possession of the Collateral, Enterprises, and Properties with or without resorting to legal process. Lender shall have the right, but not the obligation, to take any actions it deems appropriate to preserve or protect the Collateral, Enterprises, and Properties, and all costs and expenses incurred by Lender in doing so shall be Liabilities secured hereby;

(e)     **Notification and Collection of Accounts, Rents and Other Monies.**  Lender may notify all Persons (including any lessees of the Collateral and Properties) to pay all accounts, rents, and other amounts owing to the Loan Parties directly to Lender and to take any necessary actions to collect such accounts, rents, and other monies;

(f)     **Other UCC Rights.**  Lender may conduct a private or public sale of the Collateral, retain the Collateral in satisfaction of the Liabilities secured by such assets, or exercise any other rights against the Collateral that are permitted by the UCC.  To the extent that notice of any private or public sale of the Collateral is required by the UCC, each Loan Party agrees that ten (10) days shall constitute reasonable notice thereof;

(g)     **Appointment of Receiver.**  Lender may seek the appointment of a receiver for the Enterprises, Collateral or Properties.  Such appointment may be obtained without notice (all notice being waived) and on an *ex parte* basis, without regard to any Loan Party's financial condition or the value of the Collateral or Properties, and without the posting of any bond;

(h)     **Foreclosure of Collateral and Properties.**  Lender may seek to foreclose on the Collateral and Properties by any trustee sale, judicial foreclosure, or other means permitted by applicable law;

(i)     **Amendment, Modification, Replacement, Substitution and Termination of Primary Enterprise and Property Documents and Other Agreements.**  Lender may seek to amend, modify, replace, substitute and/or terminate the Primary Enterprise and Property Documents and any other instruments, agreements and documents of any kind constituting a portion of the Collateral.  Each of the Loan Parties hereby appoints Lender as its attorney-in-fact to execute any documents and take any actions with respect to the remedies described in this subsection.  Such powers of attorney are coupled with an interest and irrevocable; and

(j)     **Other Remedies.**  Lender may seek to exercise any other remedy provided for in this Loan Agreement, the other Loan Documents, any other indenture, note, security agreement, deed of trust, mortgage, lease, guaranty, instrument, contract, or other agreement or permitted by applicable law or in equity.

All of the foregoing remedies shall be cumulative and non-exclusive in nature and may be exercised by Lender in any order and concurrently. The proceeds from any disposition or foreclosure of the Collateral, Enterprises and Properties and any other monies recovered by Lender may be applied by Lender against the Liabilities in the following order: First, to any outstanding attorneys' and other fees, charges, and expenses (including, but not limited to, the Yield Maintenance Amount, any other fees and charges described in this Loan Agreement, the Note and any other Loan Documents and any expenses pertaining to repossession, repair, preparation and advertisement for disposition or foreclosure, appointment of a receiver for, and disposition or foreclosure of the Collateral, Enterprises and Properties); Second, to any outstanding accrued interest; and Third, to any outstanding principal.

8.     **Indemnification.** Except with respect to the litigation described in Exhibit J annexed to this Loan Agreement, the Loan Parties shall defend (with counsel satisfactory to Lender, in its discretion), protect, indemnify and hold harmless Lender, its participants, successors and assigns, and their Affiliates, and the respective owners, directors, managers, officers, employees, and agents of any of the foregoing persons who may hold or acquire a full or partial interest in the Loan at any time (including, but not limited to, investors or prospective investors in the securities secured hereby as well as custodians, trustees and other fiduciaries for such investors), any servicers of the Loan and any Other Disposition Parties (collectively, **"Indemnified Parties"**) from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind (including, but not limited to, the attorneys' fees and related expenses incurred by each Indemnified Party before, during or following any trial, appeal, administrative,

arbitration, or other legal proceeding of any kind whether or not such Indemnified Party shall be a designated party to such proceeding) which may be imposed on, incurred by, or asserted against any Indemnified Party as the result of or in connection with this Loan Agreement, the other Loan Documents, the Loan Parties, their business operations (including, but not limited to, the Enterprises), their assets (including, but not limited to, the Collateral and Properties), or the Loan in any manner (collectively "**Indemnified Obligations**"). Without limiting the foregoing, the Loan Parties shall defend (with counsel satisfactory to Lender in its discretion), protect, indemnify and hold harmless the Indemnified Parties from and against all Indemnified Obligations which may be imposed on, incurred by, or asserted against any Indemnified Party as the result of or in connection with the actual or alleged breach of any environmental law by the Loan Parties, their business operations (including, but not limited to, the Enterprises), or their assets (including, but not limited to, the Collateral and Properties) in any manner. Provided, however, the Loan Parties shall not be required to defend, protect, indemnify or hold harmless any Indemnified Party from an Indemnified Obligation caused solely by such Indemnified Party's gross negligence or willful misconduct. All Indemnified Obligations shall be deemed to be Liabilities hereunder. Provided further, however, the obligations of the Loan Parties under this section shall survive payment of the Loan and any termination, satisfaction, assignment, discharge of this Loan Agreement or the other Loan Documents, entry of a judgment, possession or sale of the Collateral and Properties, the exercise of any other rights and remedies and any discharge in bankruptcy.

9.      **Reinstatement of Liabilities.**  Notwithstanding the satisfaction in full of the Liabilities or otherwise, if any payment or other amount applied by Lender against the Liabilities proves to be defeasible or revocable for any reason, the Liabilities satisfied by such payment or other amount shall be reinstated, payable by the Loan Parties responsible for the payment thereof and secured by the Collateral and any other collateral for the Liabilities.

10.     **Further Assurances.**  The Loan Parties shall, at Lender's request, execute any additional documents and take any additional actions reasonably requested by Lender to carry out the intent and purposes of this Loan Agreement and the other Loan Documents (including, but not limited to, the execution of any documents completing any omissions or correcting any mistakes in this Loan Agreement and the other Loan Documents). Without limiting the foregoing, each Loan Party shall execute and obtain the execution of any subordination, attornment and/or estoppel agreements requested by Lender with respect to the Loan, this Loan Agreement and the other Loan Documents, the Enterprises, the Collateral, and the Properties. Each Loan Party hereby authorizes Lender, at the Loan Parties' expense, to file one or more UCC financing statements to perfect the security interest granted herein without the Loan Parties' signature thereon. If this Loan Agreement references two or more Properties or Enterprises, the Note, this Loan Agreement, the Real Property Security Instrument and the other Loan Documents shall, at any time until the same shall be fully paid and satisfied, at the sole election of Lender, be split or divided into two or more notes and, solely in connection with a split of the Note, two or more loan agreements, and mortgages or deeds of trust, each of which shall cover all or a portion of the Collateral and one or more of the Properties at Lender's discretion, provided that each transfer of the Note shall be accompanied by the transfer

of relevant rights under the security instruments and agreements. To that end, the Loan Parties, upon written request of Lender and at Lender's expense (provided that if an attorney is engaged by the Loan Parties, Lender shall only pay such attorney's reasonable fees for review of documents prepared by Lender), shall execute, acknowledge and deliver to Lender and/or its designee or designees substitute notes, loan agreements, mortgages, deeds of trust and related documents in such principal amounts, aggregating not more than the then unpaid principal amount of the Note and containing terms, provisions and clauses substantially identical to those contained in this Loan Agreement, the Note, the Real Property Security Instrument and such other documents and instruments as may be reasonably required by Lender including, without limitation, substitute Guaranties (if any) and other Loan Documents.

11.    **Power of Attorney.**  In addition to any other power of attorney granted to Lender in this Loan Agreement and the other Loan Documents, each of the Loan Parties hereby appoints Lender and its designees as such Loan Party's attorney in fact and agent to execute any document and take any action that should have been ( but was not) executed or taken by the Loan Parties in accordance with the terms and conditions set forth in this Loan Agreement and the other Loan Documents including, but not limited to, the execution of any UCC filing or other document and the taking of any action necessary to provide Lender with or preserve its valid and perfected first priority Lien in the Collateral and Properties. Such powers of attorney are coupled with an interest and irrevocable.

12.    **Reimbursement of Expenses.**  The Loan Parties shall reimburse Lender for all fees, costs and expenses incurred by Lender in connection with the preparation, execution and delivery of (excluding the fees of Lender's counsel to close the Loan (but including out of pocket disbursements), and excluding the cost of the Phase I environmental reports obtained prior to closing), and the exercise of Lender's rights and duties under this Loan Agreement and the other Loan Documents, the closing of the Loan, the preservation and protection of the Collateral, Enterprises and Properties, and the enforcement or attempted enforcement of the Loan Parties' obligations under the Loan Documents, including, without limitation, attorney's fees. In addition, the Loan Parties shall reimburse Lender for all trustee, receiver and property manager fees and commissions and all costs, expenses and charges incurred by those parties in connection with this Loan Agreement, the other Loan Documents, the Enterprises, the Collateral and Properties. All such costs, expenses and charges (collectively, the "Reimbursement Expenses") shall be payable by the Loan Parties to Lender within five (5) Business Days after demand from Lender and, if not paid when due, shall accrue interest at the Default Rate. The Reimbursement Expenses shall be Liabilities under this Loan Agreement and shall be secured by the lien of this Loan Agreement.

13.    **Modification and Waiver.**  This Loan Agreement and the other Loan Documents may not be amended, extended, modified, replaced, substituted, or waived in any respect except by a written agreement signed by the Loan Parties and Lender. Subject to **Section 5(gg)** herein, neither Borrower nor any other Loan Party may assign, convey, sell, transfer, subordinate, or encumber any

of its rights, title and interests in and under this Loan Agreement and the other Loan Documents without obtaining the prior written consent of Lender.

14.     **Notice.** Except as otherwise provided herein, all notices and other communications to the Loan Parties or Lender under this Loan Agreement and the other Loan Documents shall be in writing and sent by confirmed facsimile transmission, mailed or delivered to each party at its facsimile number or address set forth on **Schedule A** (or such other facsimile number or address for any party as may be indicated in any written notice provided by such party to the other parties in accordance herewith in the future) provided that Lender may designate in writing, from time to time, additional parties to whom copies of notices sent to Lender must be sent. All such notices and other communications shall be deemed given: (a) when sent via Federal Express or another reputable national overnight delivery service, on the Business Day following deposit with such service; (b) when mailed, first class postage prepaid, on the third Business Day following deposit with the United States Postal Service; (c) when delivered by hand, upon delivery, and (d) when sent by confirmed facsimile transmission, upon receipt of an electronic confirmation of transmission.

15.     **Successors and Assigns.** This Loan Agreement and the other Loan Documents shall inure to the benefit of and be binding upon the Loan Parties, Lender, and their permitted successors, assigns, and, if applicable, their estates.

16.     **Loan Sales and Participation; Disclosure of Information.** The Loan Parties agree that Lender may elect, at any time in its sole discretion, to assign, convey, sell, transfer, securitize or grant a participation in (a "Disposition") all or any portion of Lender's rights and obligations under this Loan Agreement and the other Loan Documents, and that any such Disposition may be to one or more financial institutions, private investors, public securities marketplace, trust and/or other entities, in Lender's sole discretion ("Additional Creditors"). The Loan Parties further agree that whether or not the Loan or any interest therein is sold or transferred, Lender may disseminate to any actual or potential Additional Creditors and to any servicer of the Loan, Governmental Authority, securities rating agency, bond insurer, and any other Person in connection with a Disposition ("Other Disposition Parties"), all financial and other information and materials which have been or shall be provided to or known by Lender with respect to this Loan Agreement, the other Loan Documents, the Loan, the Loan Parties, their business operations (including, but not limited to, the Enterprises), or their assets (including, but not limited to, the Collateral and Properties). The Loan Parties shall promptly execute and deliver to Lender any estoppel certificates or other documents requested by Lender in connection with a Disposition of the Loan within fifteen (15) days from the date of such request. The indemnity and hold harmless obligations of the Loan Parties under this Loan Agreement and the other Loan Documents also shall also inure to the benefit of the Additional Creditors and the Other Disposition Parties and their respective owners, directors, managers, officers, employees, and agents.

17.     **Headings of Subdivisions; Grammatical Changes.** The headings of subdivisions in this Loan Agreement and the other Loan Documents are only for convenience of reference and

shall not govern the interpretation of any of the provisions of this Loan Agreement or the other Loan Documents. All grammatical changes shall be made to this Loan Agreement and the other Loan Documents to maximize the rights and benefits belonging to Lender, including, without limitation, so that the singular shall include the plural and the masculine the feminine and vice versa.

18.    **Time is of the Essence.** Time is of the essence with respect to this Loan Agreement and the other Loan Documents. For purposes of payments, notices and other requirements under this Loan Agreement and the other Loan Documents, if the relevant date is not a Business Day, payment and/or performance shall be extended to the next succeeding Business Day, and in the case of payments the same shall be made together with interest to the date paid.

19.    **Survival; Severability; Integration.** All of the Loan Parties' representations, warranties, covenants, and hold harmless and indemnification obligations described in this Loan Agreement and the other Loan Documents shall survive the payment and performance of the Liabilities and the termination of this Loan Agreement and the other Loan Documents. In the event that any term or condition of this Loan Agreement or the other Loan Documents shall be deemed to be invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining terms and conditions set forth in this Loan Agreement and the other Loan Documents. This Loan Agreement and the other Loan Documents contain the entire agreement between the parties relating to the subject matter hereof.

20.    **Joint and Several Obligations.** In the event that the Borrower and/or any other Loan Party consists of more than one Person or if more than one Loan Party is liable for any indebtedness, liabilities and obligations to Lender described in this Loan Agreement or the other Loan Documents or grants Lender a Lien against their assets (x) their liability shall be joint and several in nature and affect their jointly and/or severally-owned assets and (y) except as prohibited by applicable state law, each Loan Party waives (a) any right to require Lender to: (i) proceed against any other Loan Party, (ii) proceed against or exhaust any security received from any other Loan Party, or (iii) pursue any other remedy whatsoever; (b) any defense arising by reason of the application by any other Loan Party of the proceeds of any borrowing; (c) any defense resulting from the absence, impairment or loss of any right of reimbursement, subrogation, contribution or other right or remedy of any Loan Party against any other Loan Party, or any security, whether resulting from an election by Lender to foreclose upon security by non-judicial sale, or otherwise; (d) any setoff or counterclaim of any other Loan Party or any defense which results from any disability or other defense of any other Loan Party or the cessation or stay of enforcement from any cause whatsoever of the liability of any other Loan Party (including, without limitation, the lack of validity or enforceability of any Loan Document); (e) any right to exoneration of sureties which would otherwise be applicable; (f) any right of subrogation or reimbursement and, if there are any guarantors of the Liabilities, any right of contribution, and right to enforce any remedy which Lender now has or may hereafter have against any other Loan Party and any benefit of, and any right to participate in, any security now or hereafter received by Lender; (g) all presentments, diligence, demands for performance, notices of non-performance, notices delivered under this Loan Agreement or any other Loan Document,

protests, notice of dishonor, and notices of acceptance of the Note and of the existence, creation or incurring of new or additional Liabilities and notices of any public or private foreclosure sale; (h) the benefit of any statute of limitations to the extent permitted by law; (i) any appraisement, valuation, stay, extension, moratorium, redemption or similar law or similar rights for marshaling; (j) any right to be informed by Lender of the financial condition of any other Loan Party or any change therein or any other circumstances bearing upon the risk of nonpayment or nonperformance of the Liabilities; and (k) the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Loan Agreement or any other Loan Document, and agrees that the Liabilities of each Loan Party shall not be affected by any circumstances, whether or not referred to in this Loan Agreement or any other Loan Document, which might otherwise constitute a legal or equitable discharge of any Loan Party. Each Loan Party has the ability and assumes the responsibility for keeping informed of the financial condition of any other Loan Party and of other circumstances affecting such nonpayment and nonperformance risks. Without limiting the generality of any of the foregoing, each Loan Party hereby waives any right to be reimbursed by any other Loan Party for any payment of the Liabilities made directly or indirectly by either Loan Party or from any property of any Loan Party, whether arising by way of any statutory, contractual or other right of subrogation, contribution, indemnification or otherwise.

21.    **Choice of Governing Law; Construction; Forum Selection**. This Loan Agreement, except with respect to the exercises of remedies under the UCC with respect to Collateral consisting of tangible personal property, which shall be in accordance with the law of the state where such Collateral is located and, except to the extent provided therein, the other Loan Documents, shall be governed and controlled by the internal laws of the State of New York as to interpretation, enforcement, validity, construction, effect, and in all other respects. To induce Lender to accept this Loan Agreement and the other Loan Documents, each Loan Party irrevocably agrees that, at Lender's sole and absolute election, all legal and other proceedings of any kind arising out of or related to this Loan Agreement, the other Loan Documents, the Loan, each Loan Party, their business operations (including, but not limited to, the Enterprises), or their assets (including, but not limited to, the Collateral and Properties) shall be litigated in courts having situs in the City of New York, in the State of New York. Each Loan Party hereby consents and submits to the jurisdiction of any local, state or federal courts located within said city and state. Each Loan Party hereby waives any right it may have to transfer or change the venue of any legal or other proceeding brought against such person by Lender in accordance with this subsection.

22.    **Integration; Counterparts**. This Loan Agreement and the other Loan Documents shall constitute the complete and integrated understanding between the Loan Parties and Lender pertaining to the subject matter thereof. All prior and contemporaneous agreements and understandings, written or oral, express or implied, are of no further force and effect to the extent inconsistent therewith. In the event of any conflict between the terms of this Loan Agreement and the other Loan Documents, this Loan Agreement shall prevail, unless such other Loan Document shall constitute an amendment of this Loan Agreement or shall otherwise expressly provide to the contrary. This Loan Agreement and the other Loan Documents may be executed in any number of

counterparts and any set of such counterparts shall be deemed to constitute a complete original of such document for all purposes.

23.     **WAIVER OF JURY TRIAL; OTHER WAIVERS.**

(a)     THE LOAN PARTIES HEREBY WAIVE DEMAND, PRESENTMENT, PROTEST AND NOTICE OF NONPAYMENT, AND FURTHER WAIVE THE BENEFIT OF ALL HOMESTEAD, DOWER, CURTESY, MARSHALING AND REDEMPTION RIGHTS AND ALL VALUATION, APPRAISAL, MORATORIUM AND EXEMPTION LAWS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

(b)     LENDER'S FAILURE, AT ANY TIME OR TIMES HEREAFTER, TO REQUIRE STRICT PERFORMANCE BY BORROWER OR ANY OTHER LOAN PARTIES OF ANY TERM OR CONDITION OF THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL NOT WAIVE, DIMINISH OR OTHERWISE AFFECT ANY SUBSEQUENT RIGHT OF LENDER TO DEMAND STRICT COMPLIANCE AND PERFORMANCE OF SUCH TERM OR CONDITION. ANY SUSPENSION OR WAIVER BY LENDER OF AN EVENT OF DEFAULT UNDER THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL NOT SUSPEND, WAIVE OR OTHERWISE AFFECT ANY OTHER PREVIOUS, CONTEMPORANEOUS OR SUBSEQUENT EVENT OF DEFAULT UNDER THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS WHETHER OF THE SAME OR OF A DIFFERENT KIND OR CHARACTER. NO DELAY ON THE PART OF LENDER IN THE EXERCISE OF ANY RIGHT OR REMEDY UNDER THIS LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL PRECLUDE LENDER'S EXERCISE OF SUCH OR ANY OTHER RIGHT OR REMEDY. NONE OF THE LIABILITIES AND NO EVENT OF DEFAULT UNDER THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE DEEMED TO HAVE BEEN SUSPENDED OR WAIVED BY LENDER UNLESS SUCH SUSPENSION OR WAIVER IS IN WRITING, SIGNED BY A DULY AUTHORIZED OFFICER OF LENDER, AND DIRECTED TO THE LOAN PARTIES.

(c)     TO THE EXTENT PERMITTED BY APPLICABLE LAW, PROCESS IN ANY SUIT, ACTION OR PROCEEDING MAY BE SERVED BY CERTIFIED MAIL, POSTAGE PREPAID, TO EACH OF THE LOAN PARTIES AT THE ADDRESS SET FORTH ON SCHEDULE A OR TO SUCH OTHER ADDRESS OF WHICH EACH OF THE LOAN PARTIES SHALL HAVE GIVEN LENDER WRITTEN NOTICE.

(d)     EACH OF THE LOAN PARTIES HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS LOAN AGREEMENT, THE OTHER LOAN DOCUMENTS, THE LOAN, THE ENTERPRISES, THE COLLATERAL, THE PROPERTIES, ANY ALLEGED TORTIOUS CONDUCT BY ANY LOAN PARTY OR LENDER, OR ANY RELATIONSHIP BETWEEN THOSE PERSONS. IN NO EVENT SHALL LENDER BE LIABLE FOR ANY LOAN PARTY'S LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

(e)     THE LOAN PARTIES HEREBY WAIVE THE RIGHT TO ASSERT A COUNTERCLAIM, OTHER THAN A MANDATORY OR COMPULSORY COUNTERCLAIM, IN ANY ACTION OR PROCEEDING BROUGHT AGAINST THEM BY LENDER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LOAN AGREEMENT, THE NOTE, THE REAL PROPERTY SECURITY INSTRUMENT, ANY OTHER LOAN DOCUMENT, OR THE LIABILITIES.

**[NO FURTHER TEXT ON THIS PAGE]**

**IN WITNESS WHEREOF,** the Loan Parties and Lender have caused this Loan Agreement to be executed as of the Closing Date.

PROMARKETING, L.L.C.

By: _____
    Ben F. Beard, manager

By: _____
    Sam J. Carroll, III, manager

Lender:  LEHMAN BROTHERS HOLDINGS INC.
d/b/a LEHMAN CAPITAL, A DIVISION OF LEHMAN
BROTHERS HOLDINGS INC.


By:_____
    Name:
    Title:

[TPW_WP01 2148963 1] 18576-00123 03.21.00 03 58PM
LOAN #1

**IN WITNESS WHEREOF,** the Loan Parties and Lender have caused this Loan Agreement to be executed as of the Closing Date.

PROMARKETING, L.L.C.


By:_____
    Ben F. Beard, manager



By:_____
    Sam J. Carroll, III, manager

Lender:  LEHMAN BROTHERS HOLDINGS INC.
d/b/a LEHMAN CAPITAL, A DIVISION OF LEHMAN
BROTHERS HOLDINGS INC.

By:_____
    Name:    JONATHAN H. EPSTEIN
    Title:    AUTHORIZED SIGNATORY

## ACKNOWLEDGMENT

STATE OF ALABAMA    )
           ss:
COUNTY OF HOUSTON    )

On the _____ day of March in the year 2000 before me, the undersigned, personally appeared Ben F. Beard, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of Dothan, County of Houston, State of Alabama.

Signature and Office of Individual
taking acknowledgment

My commission expires 1-18-04.

STATE OF ALABAMA    )
           ss:
COUNTY OF HOUSTON    )

On the _____ day of March in the year 2000 before me, the undersigned, personally appeared Sam J. Carroll, III, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of Dothan, County of Houston, State of Alabama.

Signature and Office of Individual
taking acknowledgment

[TPW:WF01 2148963 1] 18576-00123 03 21 00 03 58PM
LOAN #1

## SCHEDULE A TO LOAN AND SECURITY AGREEMENT

### Dated March 24, 2000 ("Closing Date")

| | |
|---|---|
| **Borrower:** | ProMarketing, L.L.C., a limited liability company organized under the laws of the State of Alabama |
| **Loan Parties:** | Borrower |
| **Obligor FCCR Parties:** | The Loan Parties, ProHoldings, LLC and the subsidiaries of ProHoldings, LLC on a consolidated basis (exclusive of BFP Capital, LLC) |
| **Minimum Obligor FCCR:** | 1.2:1.0 |
| **Minimum Loan FCCR** | 1.2:1.0 |
| **Applicable Borrower Overhead Adjustment** | With respect to each business unit owned or operated by the Loan Parties, including, without limitation, each Enterprise, the lesser of (a) the amount computed by dividing the total annual general and administrative expenses of the Loan Parties as approved by Lender by the total number of such business units or (b) (i) $12,000.00 if annual net sales at such business unit or Enterprise are less than $1,000,000.00, (ii) $15,000.00 if annual net sales at such business unit or Enterprise are less than $2,000,000.00 and equal to or greater than $1,000,000.00 or (iii) $18,000.00 if annual net sales at such business unit or Enterprise equal or exceed $2,000,000.00. |
| **Key Person(s):** | Ben F. Beard, Sam J. Carroll, III, Dennis Kelly, Faye Harmon, Karen Outlaw |
| **Enterprises:** | Each Enterprise is a gas station - convenience store located at one of the Properties. |
| **Material Adverse Change Date:** | October 31, 1999 |

| | |
|---|---|
| **Additional Financial Covenants:** | (a) Borrower shall not incur Indebtedness (other than subordinated stockholder/affiliate/insider Indebtedness) to the extent that, after giving effect to such Indebtedness, the Obligor FCCR would be less than 1.45:1.0.<br>(b) Borrower shall not incur stockholder/affiliate/insider Indebtedness, to the extent that, after giving effect to such Indebtedness, the Obligor FCCR would be less than 1.1:1.0. |
| **Management Agreement(s):** | None |
| **Manager(s):** | None |
| **Guarantors:** | None |

| Addresses for Notice: | **Lender:**<br>Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a Division of Lehman Brothers Holdings Inc.<br>3 World Financial Center<br>New York, New York 10285<br>Attention:    Ms. Allyson V. Bailey<br>Telephone:    (212) 526-5849<br>Facsimile:    (212) 526-0035<br><br>with a copy to:<br><br>Univest Financial Services<br>7000 Central Parkway, Suite 970<br>Atlanta, Georgia 30328<br>Attention:    Ms. Betsy Vartanian<br>Telephone:    (770) 395-7277 x 2243<br>Facsimile:    (770) 394-6068<br><br>and<br><br>Orix Real Estate Capital Markets, LLC<br>1717 Main Street, 12th Floor<br>Dallas, Texas 75201<br>Attention:    Mr. Daniel K. Olsen<br>Telephone:    (214) 237-2190<br>Facsimile:    (214) 237-2219<br><br>**Loan Parties:**<br>ProMarketing, L.L.C.<br>2011 Highway 231 South<br>Troy, Alabama 36081<br><br>with a copy to:<br><br>Mr. Sam J. Carroll, III<br>1 Main Street<br>Petrey, Alabama 36362<br>Office Phone:    (334) 774-5164<br>Alt. Phone:    (334) 335-6582<br>Cell Phone:    (334) 714-9499 |

| Loan: | The term loan in the original principal amount of $4,519,000.00 ("**Loan Amount**") provided by Lender to Borrower pursuant to the terms and conditions of this Loan Agreement and the other Loan Documents. |
|---|---|
| **Concurrent Financings Principal Amount:** | $25,000,000.00 |
| **Real Property Security Instruments:** | Mortgage, Assignment of Leases and Rents, Security Agreement, Financing Statement and Fixture Filing in the principal sum of $4,519,000.00 bearing even date herewith made by Borrower to Lender covering premises located in Bay County, Florida |
| **Commitment Letter:** | Letter agreement dated February 28, 2000 by and between Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a Division of Lehman Brothers Holdings Inc. and Ben F. Beard and ProMarketing, L.L.C. |
| **Loan Maturity Date:** | June 1, 2019 |
| **Governing Law State** | The State of New York. |
| **Equity Default Percentage** | 20% |
| **Judgment Default Amount** | $100,000.00 |
| **Owner Reporting Date** | May 1 of each year |

# EXHIBIT A TO LOAN AND SECURITY AGREEMENT

## Permitted Liens

None

**EXHIBIT B TO LOAN AND SECURITY AGREEMENT**

Loan Parties' Legal Names and Tradenames

| Current Legal Name | Previous Legal Name (if any) | Trade Name |
|---|---|---|
| ProMarketing, L.L.C. | None | Beeline |

## EXHIBIT C TO LOAN AND SECURITY AGREEMENT

**Loan Parties' State of Organization, Chief Executive Office and Places of Business and Locations of its Books and Records**

1.      Each of the Properties is a place of business.

2.      Each Loan Party's State of Organization is as set forth below.

3.      Each Loan Party's Chief Executive Office is located at the respective address set forth below.

4.      All books and records pertaining to each Enterprise, and all Collateral are located at the respective Properties and/or at each Loan Party's Chief Executive Office.

| Name of Loan Party | State of Organization | Address of Chief Executive Office | Location of Books Records and/or Collateral (if not at Properties) |
|---|---|---|---|
| ProMarketing, L.L.C. | Alabama | 2011 Highway 231 South Troy, Alabama 36081 | 2011 Highway 231 South Troy, Alabama |

## EXHIBIT D TO LOAN AND SECURITY AGREEMENT

### Loan Parties' Owners, Directors, Managers and Officers

| Loan Party | Owners of Equity Securities | Name(s) and Title(s) of Directors, Managers, Officers |
|---|---|---|
| ProMarketing, L.L.C. | (i) Pro Holdings, L.L.C., an Alabama limited liability company is the owner of 100% of the membership interests of Borrower. (ii) BFB, L.L.C. is the owner of (x) 100% of the Class A ProHoldings Membership Interests (as defined in this Loan Agreement), and (y) 51% of the Class B membership interests of ProHoldings. Ben F. Beard (as approximately 80% owner) and Beard Family Properties, L.P. (as approximately 20% owner), of which Beard Properties, Inc. (100% owned by Ben F. Beard) is the general partner, are together the owners of 100% of the Equity Securities of BFB, L.L.C. (iii) C-Store Partners is the owner of 49% of the Class B membership interests of Pro Holdings. Sam J. Carroll, III, Robert Warren Jackson and James W. Jackson, Jr. are the holders of the partnership interests of C-Store Partners. | Ben F. Beard, Manager Sam J. Carroll, III, Manager |

# EXHIBIT E TO LOAN AND SECURITY AGREEMENT

## SCHEDULE OF PROPERTIES

| Location | Address | City | State | County | Ownership |
|---|---|---|---|---|---|
| Beeline 507 | 6217 Cherry St. | Panama City | FL | Bay | Fee |
| Beeline 508 | 1415 Tennessee Ave. | Lynn Haven | FL | Bay | Fee |
| Beeline 609 | 2338 Stanford Rd. | Panama City | FL | Bay | Fee |
| Beeline 640 | 131 West 23rd St. | Panama City | FL | Bay | Fee |
| Beeline 641 | 435 Tyndall Pkwy | Panama City | FL | Bay | Fee |
| Beeline 642 | 2520 Hwy 77 | Lynn Haven | FL | Bay | Fee |

**EXHIBIT F TO LOAN AND SECURITY AGREEMENT**

**SCHEDULE OF LEASES**

None

**EXHIBIT G TO LOAN AND SECURITY AGREEMENT**

**FORM OF**
**REPORTING CERTIFICATE**
**OF**
**PROMARKETING, L.L.C.**

For Period _____ , 20___ through _____ ___, 20___ ("Reporting Period")

The undersigned, being the Chief Financial Officer(s) of the above referenced Loan Parties, do hereby certify in connection with a certain Loan and Security Agreement dated _____ between the Loan Parties and Lehman Brothers Holding, Inc., (the "Loan Agreement") that the information stated herein for the period referenced above is true and correct and complete, and attached hereto are all financial statements required to be delivered to Lender with respect to this reporting period pursuant to the Loan Agreement.

<u>Obligor FCCR</u>

| | | |
|---|---|---|
| A. | Net income from operations before income taxes | \$_____ |
| B. | Depreciation | \$_____ |
| C. | Amortization | \$_____ |
| D. | Interest expense net of interest income | \$_____ |
| E. | Non-recurring Expenses | \$_____ |
| F. | (less non-recurring income) | (\$_____) |
| G. | Rent and Lease Payments | \$_____ |
| H. | TOTAL OF A THROUGH G | \$_____ |
| I. | Current portion of Scheduled payments of principal | \$_____ |
| J. | Interest expense | \$_____ |
| K. | Rent and Lease Payments | \$_____ |
| L. | TOTAL OF I THROUGH K | \$_____ |
| M. | The ratio which H bears to L (if L = 1) | 1.____:1.0 |

<u>Loan FCCR:</u>

| | | |
|---|---|---|
| A. | Net income from operations before income taxes | \$_____ |
| B. | Depreciation | \$_____ |
| C. | Amortization | \$_____ |
| D. | Interest expense net of interest income | \$_____ |
| E. | Non-recurring Expenses | \$_____ |
| F. | (less non-recurring income) | (\$_____) |
| G. | Rent and Lease Payments | \$_____ |
| H. | Corporate overhead and general administrative | |

|      | expenses at Enterprise level | $_____ |
|------|------------------------------|-------------|
| I.   | TOTAL OF A THROUGH H (less the Applicable Borrower Overhead Adjustment) | $_____ |
| J.   | Current portion of Scheduled payments of principal | $_____ |
| K.   | Interest expense | $_____ |
| L.   | Rent and Lease Payments | $_____ |
| M.   | TOTAL OF J THROUGH L | $_____ |
| N.   | The ratio which I bears to M (if M = 1) | 1.____:1.0 |

Distributions During this Reporting Period          $_____

   The undersigned hereby further certify that the financial statements which accompany this certificate are true, correct and complete in all material respects and that no Event of Default (as defined in the Loan Agreement) has occurred and is continuing.

Date:_____          _____
               [Name of Chief Financial Officer]

## EXHIBIT H TO LOAN AND SECURITY AGREEMENT

### SCHEDULE OF PRINCIPAL AGREEMENTS

1.    Distribution Service Agreement dated as of March ___, 2000 by and between ProMarketing, L.L.C. and W.L. Petrey Wholesale Company, Inc.

2.    Gasoline Supply Agreement dated as of March 24, 2000 by and between Ben F. Beard Oil, Inc. and ProMarketing, L.L.C.

**EXHIBIT I TO LOAN AND SECURITY AGREEMENT**
**AGGREGATE**
**USE OF LOAN PROCEEDS**
**WITH RESPECT TO THE CONCURRENT FINANCINGS**

| Approximate Amount | Purpose |
|---|---|
| $15,575,000.00 | Distribution from ProMarketing, L.L.C. to ProHoldings, L.L.C. in turn distributed to BFP Capital LLC, such amount to be subject to the ProHoldings Liquidation Preference. |
| $8,432,000.00 | Payoff of Existing Debt |
| $993,000.00 | Closing Costs |

## EXHIBIT J TO LOAN AND SECURITY AGREEMENT
### LITIGATION

Claim by Mr. Marc Freed, an individual and resident of the State of New York, for certain sums due, and related implied threat of potential legal action concerning the same, evidenced by (i) that certain letter dated February 18, 2000, addressed to Mr. Warren Jackson over signature of Marc S. Koplik, Esq., legal counsel for Mr. Freed, and (ii) that certain implied threat of legal action communicated by Mr. Koplik to Mr. Christopher Epes, an employee of Lehman Brothers, by telephone call on February 24, 2000.

Exhibit C

**Loan Number: 217000029**

## PROMISSORY NOTE

$4,519,000.00                                                                                    March 24, 2000

For value received, PROMARKETING, L.L.C., an Alabama limited liability company (together with its permitted successors and assigns "Borrower"), with an address of 2011 Highway 231 South, Troy, Alabama 36081 hereby promises to pay to the order of LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS INC., whose address is 3 World Financial Center, New York, New York 10285-0900 (together with its successors and/or assigns "Lender"), the principal sum of FOUR MILLION FIVE HUNDRED NINETEEN THOUSAND AND 00/100 DOLLARS ($4,519,000.00), or so much thereof which has been advanced, together with interest thereon at the rate and in the manner described below in this Promissory Note (the "Note") as well as all other amounts now or hereafter owing by Borrower to Lender that are described in the Loan Agreement (as defined below) and the other Loan Documents (as defined below).

The unpaid principal balance of this Note shall bear interest from the date hereof until paid at the lesser of nine and eighty-nine one hundredths of one percent (9.89%) per annum or the highest rate permitted by applicable law (the "Applicable Interest Rate"). Interest shall be computed on the basis of a 360 day year and paid for the actual number of days elapsed.

The unpaid principal balance of this Note together with the interest thereon computed at the Applicable Interest Rate shall be paid in installments as follows: on the first day of May, 2000, and on the first day of each calendar month thereafter (each, a "Payment Date") up to and including the first day of March, 2020, Borrower shall pay to Lender equal monthly payments, each in the sum of $43,711.89 (each, a "Monthly Payment"), each of which Monthly Payments shall be applied in the manner hereinafter set forth in this Note. On April 1, 2020 (the "Loan Maturity Date"), the then unpaid principal balance and accrued interest thereon and all other sums unpaid under this Note shall be due and payable.

Notwithstanding the foregoing, Borrower shall pay in advance on the date of this Note, and Lender shall apply when due, if this Note is not dated the first day of a month, interest due on the Reference Date (defined below). "Reference Date" means the date of this Note, if it is the first day of a month, or otherwise the first day of the next succeeding month.

Borrower shall pay to Lender a late payment charge of five percent (5%) of the amount of any payment that is not paid when due under the Loan Agreement, this Note or the other Loan Documents. Such late payment charges represent a reasonable estimate of the additional costs and expenses that will be incurred by Lender as a result of any late payments from Borrower and shall not be construed to constitute a penalty of any kind. In addition, during the continuance of an Event of Default, Borrower shall pay interest on the unpaid principal sum of this Note at the lower of the Applicable Interest Rate plus four percent (4%) per annum or the highest rate permitted by applicable law (the "Default Rate").

This Note may not be voluntarily prepaid in whole or in part. If this Note is accelerated or involuntarily prepaid due to the occurrence of an Event of Default or otherwise, Borrower shall pay to Lender the outstanding balance of this Note and all other Liabilities (including, but not limited to, the Yield Maintenance Amount (defined below)) described in the Loan Agreement, this Note and the other Loan Documents. Borrower acknowledges that Lender has provided Borrower with the Loan in reliance upon Borrower's covenant not to prepay the Loan and agrees that the imposition of the Yield Maintenance Amount is reasonable and shall not be construed to constitute a penalty of any kind. As used herein, the term "Yield Maintenance Amount" means the greater of:

    i.    1% of the portion of the principal Liabilities being prepaid; or

    ii.    the product of (1) a fraction whose numerator is an amount equal to the portion of the principal Liabilities being prepaid and whose denominator is the entire outstanding principal Liabilities on the date of such prepayment, multiplied by (2) an amount equal to the remainder obtained by subtracting (x) an amount equal to the outstanding principal Liabilities as of the date of such prepayment from (y) the present value as of the date of such prepayment of the remaining scheduled payments of principal and interest described in this Note determined by discounting such payments at a discount rate (the "Discount Rate") equivalent to the rate which, when compounded monthly, equals the yield calculated by linear interpolation of the yields of noncallable and non redeemable U.S. Treasury notes or bonds with terms (one longer and one shorter) most nearly approximating the period from the date of such prepayment to the Loan Maturity Date.

    As used in this Note, the term "Loan Year" means each period of 365 (or 366 in the case of a leap year) days commencing on the Reference Date.

    So long as no Event of Default has occurred and is continuing, Borrower may obtain the release of the liens securing this Note and belonging to Lender against one or more of the Properties (the "Release Collateral") upon the satisfaction of the following conditions precedent (the "Defeasance Conditions"):

    i.    Borrower shall have provided Lender with not less than thirty (30) days and not more than sixty (60) days prior written notice specifying the date (the "Release Date"), which shall be a Payment Date, on which the Defeasance Deposit (as defined below) is to be made, which notice shall also specify (a) whether (x) the entire Loan is subject to the Defeasance (as defined below)(a "Total Defeasance"), or (y) only a portion of the Loan is subject to the Defeasance (a "Partial Defeasance"), and (b) in the event of a Partial Defeasance, which Properties are the Release Collateral (the "Defeased Properties");

    ii.    Borrower shall have paid to Lender all accrued but unpaid Liabilities owing as of the Release Date;

    iii.    Borrower shall have paid to Lender the Defeasance Deposit;

iv.    Borrower shall have delivered to Lender the following:

(1)        In the event of a Partial Defeasance, all documents deemed necessary by Lender to amend and restate this Note and issue substitute notes to reflect a note evidencing the portion of the principal balance of this Note that has not been defeased (the "Undefeased Note") and a substitute note (the "Defeased Note") having a principal balance equal to the lesser of (x) 125% of the Allocated Loan Amount (as defined below) applicable to the Defeased Properties, or (y) the then aggregate unpaid principal balance of this Note (the "Defeased Note Principal Balance"). The Undefeased Note shall have terms identical to the terms of this Note, except for the principal balance which shall be equal to the undefeased principal portion of this Note, and provided that the Monthly Payment set forth herein shall be apportioned ratably amongst the Defeased Note and the Undefeased Note. Each Defeased Note shall (a) be in a principal amount equal to the Defeased Note Principal Balance, (b) be payable to the order of Lender, (c) be dated as of the date hereof, (d) mature on the Loan Maturity Date, (e) be secured by the Defeasance Deposit and the U.S. Obligations (defined below) purchased therewith in connection with the Defeasance, and (f) otherwise contain substantially the same terms as this Note, and provided that the Monthly Payment set forth herein shall be apportioned ratably amongst the Defeased Note and the Undefeased Note. Each Defeased Note shall evidence a portion of the existing indebtedness hereunder and not any new or additional indebtedness of Borrower. A Defeased Note cannot be the subject of any further Defeasance. As used herein, the term "Allocated Loan Amount" shall mean an amount equal to the product of (1) the unpaid principal balance of the Loan immediately prior to the Partial Defeasance multiplied by (2) the quotient of (x) EBITDA (defined below) of the Defeased Properties at the time of the Partial Defeasance (or most closely approximating the time of Partial Defeasance as approved by Lender) divided by (y) the aggregate EBITDA of all the Collateral and Properties (including the Defeased Properties) at the time of the Partial Defeasance (or most closely approximating the time of Partial Defeasance as approved by Lender). As used herein, "EBITDA" shall mean earnings before interest, taxes, depreciation and amortization. Lender's computation of the Allocated Loan Amount shall be conclusive in all respects.

(2)        A security agreement (the "Pledge Agreement"), in form and substance satisfactory to Lender, creating a first priority Lien on the Defeasance Deposit and the U.S. Obligations (as defined below) purchased on behalf of Borrower with the Defeasance Deposit in accordance with the terms and conditions set forth in this Note as security for this Note in the case of a Total Defeasance, or the Defeased Note, in the case of a Partial Defeasance, which Pledge Agreement shall provide, among other things, that any excess payments of principal and interest received by Lender under the U.S. Obligations over the amount needed to pay the principal, interest and

other amounts owing by Borrower under this Note and the other Loan Documents in the case of a Total Defeasance, or the Defeased Note and the Pledge Agreement in the case of a Partial Defeasance, shall be refunded to Borrower;

(3)     Termination statements, releases of deeds of trust and mortgages, and any other documents necessary to terminate or release the Liens against the Release Collateral belonging to Lender and described in the Loan Agreement and the other Loan Documents;

(4)     An officer's certificate of Borrower certifying that the Defeasance Conditions have been satisfied;

(5)     An opinion of counsel for Borrower in form satisfactory to Lender stating, among other things, that Lender has a perfected first priority Lien on the Defeasance Deposit and the U.S. Obligations purchased by Lender on behalf of Borrower, and that, if the holder of this Note is a trust, its tax qualification and status will not be adversely affected as a result of the defeasance;

(6)     Evidence in writing from the rating agencies and bond insurers designated by Lender to Borrower at such time to the effect that such release shall not result in a requalification, reduction or withdrawal of any rating or bond insurance in effect immediately prior to such Defeasance for any securities involving the Loan, Loan Documents, Collateral or Properties;

(7)     A certificate of an independent certified public accountant in form and substance satisfactory to Lender stating that the Defeasance Deposit is sufficient to generate the Scheduled Defeasance Payments (as defined below); and

(8)     Such other certificates, instruments and other documents as Lender may reasonably require.

v.     In the case of a Partial Defeasance, the following additional conditions and restrictions shall apply:

(1)     Each of the Defeased Properties shall constitute a single discrete Enterprise and Property identified on the annexed Schedule of Properties. In the event that no Schedule of Properties is annexed hereto, or only one Property is designated on the Schedule of Properties annexed hereto, Partial Defeasance shall be prohibited.

(2)     Borrower shall deliver to Lender evidence satisfactory to Lender that there are no Liens (other than those in favor of Lender or as otherwise expressly permitted under the Loan Documents) encumbering the Collateral

and Properties which remain as collateral for the Undefeased Note, including, without limitation, a "bring down" or "datedown" of the title insurance policies insuring Lender's Liens; and

(3)         The Loan FCCR following the Partial Defeasance, as determined by Lender in its sole discretion shall not be less than the greater of (a) the Minimum Loan FCCR, or (b) the Loan FCCR immediately prior to the Partial Defeasance.

Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations which provide for payments (the "Scheduled Defeasance Payments") that are payable on or prior to (but as close as possible to) the various payment dates described in this Note and the other Loan Documents in the case of a Total Defeasance or the Defeased Note and the Pledge Agreement in the case of a Partial Defeasance, and are in sufficient amounts to satisfy the various payments described in this Note and the other Loan Documents in the case of a Total Defeasance or the Defeased Note and the Pledge Agreement in the case of a Partial Defeasance. Borrower, pursuant to the Pledge Agreement or other appropriate documents, shall authorize and direct that the payments received from the U.S. Obligations be made directly to Lender and applied to satisfy the obligations of the Borrower under this Note and the other Loan Documents in the case of a Total Defeasance or the Defeased Note and the Pledge Agreement in the case of a Partial Defeasance. Upon Borrower's compliance with all Defeasance Conditions, the Release Collateral shall be released from the Liens belonging to Lender and described in this Note and the other Loan Documents and the pledged Defeasance Deposit and the U.S. Obligations purchased therewith shall be the sole source of collateral securing this Note and the other Loan Documents in the case of a Total Defeasance or the Defeased Note and the Pledge Agreement in the case of a Partial Defeasance (a "Defeasance"). In connection with such release, Lender, or its designee, shall establish or designate a successor entity (the "Successor Borrower") and Borrower shall transfer and assign all obligations, rights and duties under this Note and the Pledge Agreement in the case of a Total Defeasance or the Defeased Note and the Pledge Agreement in the case of a Partial Defeasance together with the pledged Defeasance Deposit and/or U.S. Obligations to such Successor Borrower. Such Successor Borrower shall assume the obligations of Borrower under this Note and the Pledge Agreement in the case of a Total Defeasance, or the Defeased Note and the Pledge Agreement in the event of a Partial Defeasance, and Borrower shall be relieved of its obligations under the documents so assumed by the Successor Borrower. Borrower shall pay the sum of $1,000.00 to any such Successor Borrower on the assumption date as consideration for such Successor Borrower's assumption of the Borrower's obligations under this Note and the Pledge Agreement in the case of a Total Defeasance, or the Defeased Note and the Pledge Agreement in the event of a Partial Defeasance. No other assumption fee shall be payable by Borrower upon a transfer of this Note and the Pledge Agreement in the case of a Total Defeasance, or the Defeased Note and the Pledge Agreement in the event of a Partial Defeasance, but Borrower shall pay on demand all costs and expenses incurred by Lender, including, but not limited to, Lender's attorneys' fees and expenses, in connection with a Defeasance. For the purposes hereof, the term "Defeasance Deposit" shall mean an amount equal to the sum of: (i) the amount which shall be sufficient to purchase U.S. Obligations necessary to meet the Scheduled Defeasance Payments; (ii) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of this Note and the Pledge Agreement in the case of a Total Defeasance, or the Defeased Note and the Pledge

Agreement in the event of a Partial Defeasance or the execution and delivery of any substitute notes in the case of a Partial Defeasance, or otherwise required to accomplish the agreements in this subsection; and (iii) all fees, costs, expenses, incurred or to be incurred by Lender in the purchase of such U.S. Obligations and the assumption payments referred to in this subsection. The term "U.S. Obligations", as used herein, shall mean direct non-callable and non-redeemable securities evidencing an obligation to timely pay principal and interest in a full and timely manner that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged.

It is Borrower's and Lender's intent that the interest, fees, charges and other amounts described in this Note and the other Loan Documents shall be lawful in all respects. If such interest, fees, charges or other amounts are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrower, then they shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid to Lender, such excess amount shall, in Lender's sole discretion, be applied by Lender against any principal and other non-interest amounts owing by Borrower or refunded to Borrower. To the greatest extent permitted by applicable law, all interest paid or agreed to be paid by Borrower to Lender shall be amortized, prorated, allocated and spread throughout the complete term of the Loan so that such actions do not violate any usury statute.

All amounts received by Lender shall be applied against the amounts owing by Borrower with respect to this Note and the other Loan Documents in the following order: first, to any outstanding attorneys' and other fees, charges, and expenses (including, but not limited to, the Yield Maintenance Amount and any expenses pertaining to the repossession, repair, preparation and advertisement for disposition or foreclosure, appointment of a receiver for, and disposition or foreclosure of any collateral); second, to any outstanding interest, in arrears; and third, to any outstanding principal.

All payments shall be made to Lender at the address specified above (or at such other office as may be designated in writing by Lender) in lawful money of the United States of America not later than 12:00 noon (EST or EDT) on the date due. Whenever the date due for any payment shall fall on a day other than a Business Day, such payment shall be made on the next Business Day and the amount payable to Lender shall be adjusted for such extension of time. Lender shall be entitled to require all payments to be remitted via an electronic fund transfer system that is acceptable to Lender in its discretion.

Notwithstanding the satisfaction in full of this Note and the other Loan Documents, if any payment or other amount applied by Lender against the indebtedness, liabilities and obligations described in this Note and the other Loan Documents proves to be defeasible or revocable for any reason, the indebtedness, liabilities and obligations satisfied by such payment or other amount shall be reinstated, payable by Borrower and any other person or entity responsible for the payment thereof, and be secured by any collateral securing the payment and performance of the indebtedness, liabilities and obligations described in this Note and the other Loan Documents.

Time is of the essence with respect to this Note and the other Loan Documents. If any amount is not paid to Lender or any other Event of Default occurs under this Note and the other Loan

Documents, Lender may accelerate and declare all of the amounts owing under this Note and the other Loan Documents immediately due and payable without presentment, demand, notice, protest, or legal process of any kind (provided that in the event of any Event of Default arising from the commencement of a bankruptcy, liquidation, insolvency, or similar proceeding, the Liabilities shall automatically become immediately due and payable without presentment, demand, notice, protest, or legal process of any kind). Upon the occurrence of any Event of Default, Lender shall be entitled to exercise any remedies set forth in the Loan Agreement, this Note, and the other Loan Documents or otherwise permitted under applicable law.

This Note is the Note referred to in the Loan and Security Agreement between Borrower and Lender dated of even date herewith and any amendments, extensions, modifications, replacements and substitutions thereto ("Loan Agreement"). All capitalized terms used herein shall be defined as set forth in this Note or, in the absence of a definition in this Note, as set forth in the Loan Agreement and the other Loan Documents. Terms that are not defined in this Note, the Loan Agreement or the other Loan Documents shall be defined as set forth in the UCC.

Borrower shall reimburse Lender for all Reimbursement Expenses (as defined in the Loan Agreement) in accordance with the terms of the Loan Agreement.

All notices and other communications required or permitted with respect to this Note shall be in writing and given in accordance with the requirements set forth in the Loan Agreement.

In the event that the Borrower consists of more than one Person, all of Borrower's indebtedness, liabilities and obligations to Lender described in this Note and the other Loan Documents shall be joint and several in nature and affect the Borrower's jointly and/or severally-owned assets.

This Note is secured by the collateral described in the Real Property Security Instrument and the collateral described in the Loan Agreement (the "Collateral").

This Note and the other Loan Documents are freely assignable by Lender without the consent of Borrower.

Borrower and all others who may become liable for the payment of all or any part of the Liabilities severally waive presentment and demand for payment, notice of intent to accelerate and notice of acceleration, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note or the other Loan Documents. No release of any security for the Liabilities or extension of time for payment of this Note or any installment of this Note, and no alteration, amendment or waiver of any provision of this Note or the other Loan Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the Liabilities. under this Note or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note or the other Loan Documents. If Borrower is a partnership. corporation or limited liability company. the agreements

contained in this Note shall remain in full force and effect, notwithstanding any changes in the individuals or entities comprising the Borrower. The term "Borrower," as used in this Note, shall include any alternate or successor entity, but any predecessor entity, and its partners or members, as the case may be, shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in Borrower which may be set forth in the other Loan Documents.)

All of the terms, covenants and conditions contained in the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth in this Note.

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

This Note, the Loan Agreement, except with respect to the exercise of remedies under the UCC with respect to Collateral consisting of tangible personal property, which shall be in accordance with the law of the state where such Collateral is located and, except to the extent provided therein, the other Loan Documents, shall be governed and controlled by the internal laws of the State of New York as to interpretation, enforcement, validity, construction, effect, and in all other respects. To induce Lender to accept this Note and the other Loan Documents, Borrower irrevocably agrees that, at Lender's sole and absolute election, all legal and other proceedings of any kind arising out of or related to this Note, the other Loan Documents, the Loan, Borrower, its business operations (including, but not limited to, the Enterprises), or its assets (including, but not limited to, the Collateral and Properties) shall be litigated in courts having situs in the City of New York, in the State of New York. Borrower hereby consents and submits to the jurisdiction of any local, state or federal courts located within said city and state. Borrower hereby waives any right it may have to transfer or change the venue of any legal or other proceeding brought against Borrower by Lender in accordance with this paragraph.

**BORROWER HEREBY WAIVES DEMAND, PRESENTMENT, PROTEST AND NOTICE OF NONPAYMENT, AND FURTHER WAIVES THE BENEFIT OF ALL HOMESTEAD, DOWER, CURTESY, AND REDEMPTION RIGHTS AND ALL VALUATION, APPRAISAL, MORATORIUM, MARSHALING, AND EXEMPTION LAWS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.**

**BORROWER HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS NOTE, THE OTHER LOAN DOCUMENTS, THE LOAN, THE FRANCHISED BUSINESS, THE COLLATERAL, THE PROPERTY, ANY ALLEGED TORTIOUS CONDUCT BY BORROWER, ANY OTHER LOAN PARTY, OR LENDER, OR ANY RELATIONSHIP BETWEEN THOSE PERSONS.**

**FLORIDA DOCUMENTARY STAMP TAX IN THE AMOUNT OF $ 15,816.50
HAS BEEN PAID IN CONNECTION WITH THIS NOTE AND THE PROPER
DOCUMENTARY STAMPS HAVE BEEN AFFIXED TO THE MORTGAGE SECURING
REPAYMENT OF THIS NOTE.**

IN WITNESS WHEREOF, Borrower has duly executed this Note under seal as of the day and year first above written.

PROMARKETING, L.L.C.

By: _____
Name:    Ben F. Beard, manager

By: _____
Name:    Sam J. Carroll, III, manager

ACKNOWLEDGMENT

STATE OF ALABAMA          )
                                        ss:
COUNTY OF HOUSTON        )

On the 22 day of March in the year 2000 before me, the undersigned, personally appeared Ben F. Beard, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of Dothan, County of Houston, State of Alabama.

_Sharalee Barbata_
Signature and Office of Individual
taking acknowledgment  4/15/03
                                        My Commission Expires

STATE OF ALABAMA          )
                                        ss:
COUNTY OF HOUSTON        )

On the 22 day of March in the year 2000 before me, the undersigned, personally appeared Sam J. Carroll, III, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of Dothan, County of Houston, State of Alabama.

_Sharalee Barbata_
Signature and Office of Individual
taking acknowledgment  4/15/03

[TPW_WP01 2148943 1] 18576-00123 03 21 00 01 55PM
LOAN 1

## SCHEDULE OF PROPERTIES

| Location | Address | City | State | County | Ownership |
|---|---|---|---|---|---|
| Beeline 507 | 6217 Cherry St. | Panama City | FL | Bay | Fee |
| Beeline 508 | 1415 Tennessee Ave. | Lynn Haven | FL | Bay | Fee |
| Beeline 609 | 2338 Stanford Rd. | Panama City | FL | Bay | Fee |
| Beeline 640 | 131 West 23rd St. | Panama City | FL | Bay | Fee |
| Beeline 641 | 435 Tyndall Pkwy | Panama City | FL | Bay | Fee |
| Beeline 642 | 2520 Hwy 77 | Lynn Haven | FL | Bay | Fee |

# Exhibit D

## GUARANTY
### (Conditional Recourse)

**THIS GUARANTY,** dated as of March 24, 2000 (the "Guaranty"), is executed by the undersigned Guarantor(s) identified in the Information Schedule (hereinafter defined)(whether one, or if more than one, then individually and/or collectively "Guarantor"), in favor of LEHMAN BROTHERS HOLDINGS INC. d/b/a LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation (together with its successors and assigns, "Lender").

### RECITALS

A.     The borrower ("Borrower") identified in the Information Schedule to Guaranty annexed hereto (the "Information Schedule"), with respect to which Guarantor is affiliated in the manner indicated on the Information Schedule, has concurrently herewith executed certain Loan Documents (as defined in the Loan and Security Agreement between Borrower and Lender dated as of the date hereof (the "Loan Agreement") in connection with a loan to Borrower in the Loan Amount identified on the annexed Information Schedule to Guaranty and in Schedule A of Basic Terms (as defined in the Loan Agreement), which loan is subject to the conditions set forth in the Loan Documents (as defined in the Loan Agreement).

B.     Lender's agreement to extend the Loan (as defined in the Loan Agreement), to Borrower under the Loan Documents is subject, among other conditions, to receipt by Lender of this Guaranty, duly executed by Guarantor. Guarantor acknowledges that in consideration of the Loan made by Lender to Borrower and as an inducement for Lender to make the Loan to Borrower, and other good and valuable consideration. the receipt and sufficiency of which are hereby acknowledged by Guarantor, Guarantor has or will benefit from the making of the Loan and therefore has entered into this Guaranty.

### AGREEMENT

**NOW, THEREFORE.** in consideration of the above recitals and for other good and valuable consideration. the receipt and adequacy of which are hereby acknowledged. Guarantor hereby agrees with Lender as follows:

1.     **Definitions and Interpretation**. When used in this Guaranty. the following terms shall have the following respective meanings:

**"Obligations"** shall mean the Loan and all amounts owed by Borrower under the Loan Documents.

Unless otherwise defined herein, all other capitalized terms used herein and defined in the Loan Agreement shall have the respective meanings given to those terms in the Loan Agreement. Guarantor acknowledges receipt of copies of the Loan Agreement and the other Loan Documents.

2.A.    **Guaranty**.  Subject to the limitations set forth in Paragraph 2B hereof, Guarantor, jointly and severally, hereby unconditionally, absolutely and irrevocably guarantees and promises to pay to Lender, or order, at Lender's office located at the address set forth in Paragraph 10 hereof, on demand, in lawful money of the United States, any and all Obligations, and to perform on demand any and all Obligations.  The liability of Guarantor hereunder is independent of the Obligations, and a separate action or actions may be brought and prosecuted against Guarantor irrespective of whether action is brought against Borrower or any other guarantor of the Obligations or whether Borrower or any other guarantor of the Obligations is joined in any such action or actions.  This Guaranty constitutes an agreement of suretyship, and Guarantor's liability hereunder is direct, primary and independent of the liability of Borrower, any other guarantor or any other person or entity.  This Guaranty is a guaranty of payment and performance and not of collection.

2.B.    **Limitation on Claims**.  Notwithstanding anything to the contrary herein, (a) Lender shall not make any claims under this Guaranty in respect of the Obligations unless and until Lender notifies Guarantor that, in Lender's reasonable good faith judgment, one or more of the acts, omissions, items or events ("Trigger Events") set forth on the Schedule of Trigger Events, attached hereto and made a part hereof, has occurred and (b) in the case of Trigger Events described in paragraphs (a), (b), (c), (d), (e) or (g) on the Schedule of Trigger Events (the "Limited Trigger Events"), if Lender's claim under this Guaranty is based solely upon one or more Limited Trigger Events, Guarantor's obligations hereunder with respect to each Limited Trigger Event shall be limited as set forth with respect to such Limited Trigger Event in the Schedule of Trigger Events, provided that if more than one Limited Trigger Event occurs, Guarantor's obligations shall be in the aggregate of the amounts set forth on the Schedule of Trigger Events with respect to each such Limited Trigger Event which so occurs.

3.    **Representations and Warranties**.  Guarantor represents and warrants to Lender that (a) this Guaranty has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally; (b) the execution, delivery and performance of this Guaranty do not (i) violate any requirement of law, (ii) contravene any material contractual obligation, or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of Guarantor except Permitted Liens; (c) no consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other person is required in connection with the execution, delivery and performance of this Guaranty, except such consents, approvals, orders, authorizations, registrations, declarations and filings that are so required and which have been obtained and are in full force and effect; (d) Guarantor has paid all taxes and other charges imposed by any governmental authority due and payable by Guarantor other than those which are being challenged in good faith by appropriate proceedings and for which adequate reserves have been established; (e) Guarantor is not

in violation of any requirement of law or contractual obligation other than those the consequences of which could not have a material adverse effect on Guarantor's ability to pay and perform under this Guaranty; (f) no litigation, investigation or proceeding of any governmental authority is pending or, to the knowledge of Guarantor, threatened against Guarantor which, if adversely determined, could have a material adverse effect on Guarantor's ability to pay and perform under this Guaranty; (g) any Financial Statements of Guarantor delivered to Lender present fairly the financial condition of Guarantor as of the date thereof and since the date thereof there has been no material adverse change in the financial condition, business affairs or prospects of the Guarantor, except as previously disclosed in writing to Lender; (h) the transactions contemplated by this Guaranty are being consummated by Guarantor in furtherance of Guarantor's ordinary business purposes, with no contemplation of insolvency and with no intent to hinder, delay or defraud any of its present or future creditors; (i) neither before nor as a result of the transactions contemplated by this Guaranty will Guarantor be insolvent or have an unreasonably small capital for the conduct of its business and the payment of its anticipated obligations; (j) Guarantor's assets and cash flow enable it to meet its present obligations in the ordinary course of business as they become due, and Guarantor does not believe that it will incur debts beyond its ability to pay; and (k) the information contained in the loan application completed by Borrower and delivered to Lender in order to obtain the Loan (the "Loan Application") is true and correct in all material respects and does not omit any information necessary to make the information not misleading, and since the date of the Loan Application there has been no material adverse change in the financial condition, business affairs or prospects of the Borrower.

4.   **Covenants**.  Guarantor hereby agrees (a) to deliver to Lender (i) notice of any Event of Default or any event or circumstance not yet constituting an Event of Default but which, with the giving of notice or lapse of time or both , would become an Event of Default (a "Default") or of any other event or condition which could have a material adverse effect on Guarantor's ability to honor this Guaranty, and (ii) such other information regarding the business, operations or financial or other condition of Guarantor as required by the Loan Documents or as Lender may reasonably request; (b) to the extent failure to do so could have a material adverse effect on Guarantor's ability to honor this Guaranty, to pay all taxes and other charges imposed by any governmental authority upon Guarantor or its property as and when they become due; (c) to the extent failure to do so could have a material adverse effect on Guarantor's ability to honor this Guaranty, to comply with all requirements of law and contractual obligations; and (d) to deliver to Lender on each and every April 30, during the term of the Loan (i) financial statements prepared on a form acceptable to Lender for the most recent year and (ii) a true, correct and complete copy of Guarantor's federal income tax return for the most recent year; and (e) that any common stock, preferred stock, participations, shares, partnership interests, membership interests or other equity interests (whether voting or non-voting), including warrants, options and other rights to acquire any of the foregoing and securities convertible into any of the foregoing, that it owns, if any, in Borrower shall not be assigned, conveyed or otherwise transferred in violation of Section 5(r) of the Loan Agreement.

5.   **Authorized Actions**.  Guarantor authorizes Lender, in its discretion, without notice to Guarantor, irrespective of any change in the financial condition of Borrower, Guarantor or any other guarantor of the Obligations since the date hereof, and without affecting or impairing in any

way the liability of Guarantor hereunder, from time to time to (a) create new Obligations, and, either before or after receipt of notice of revocation, renew, compromise, extend, accelerate or otherwise change the time for payment or performance of, or otherwise change, amend or waive the terms of the Obligations or any part thereof, including, without limitation, increase or decrease of the rate of interest thereon; (b) take and hold security for the payment or performance of the Obligations and exchange, enforce, compromise, surrender, waive or release any such security; (c) apply such security and direct the order or manner of sale thereof; (d) purchase such security at a public or private sale; (e) otherwise exercise any right or remedy it may have against Borrower, Guarantor, any other guarantor of the Obligations or any security, including, without limitation, the right to foreclose upon any such security by judicial or nonjudicial sale; (f) settle, compromise with, release or substitute any one or more makers, endorsers or guarantors of the obligations; (g) assign the Obligations, this Guaranty, or the other Loan Documents in whole or in part; and (h) grant Borrower indulgences generally. Guarantor hereby agrees that none of the foregoing acts constitutes a material alteration of Guarantor's liability hereunder and specifically waives any such defense to liability otherwise arising by reason of any such act.

6.    **Waivers.** Guarantor waives (a) any right to require Lender to (i) proceed against Borrower or any other guarantor of the Obligations, (ii) proceed against or exhaust any security received from Borrower or any other guarantor of the Obligations, or (iii) pursue any other remedy whatsoever; (b) any defense arising by reason of the application by Borrower of the proceeds of any borrowing; (c) any defense resulting from the absence, impairment or loss of any right of reimbursement, subrogation, contribution or other right or remedy of Guarantor against Borrower, any other guarantor of the obligations or any security, whether resulting from an election by Lender to foreclose upon security by nonjudicial sale, or otherwise; (d) any setoff or counterclaim of Borrower or any defense which results from any disability or other defense of Borrower or the cessation or stay of enforcement from any cause whatsoever of the liability of Borrower (including, without limitation, the lack of validity or enforceability of any Loan Document); (e) any right to exoneration of sureties which would otherwise be applicable; (f) any right of subrogation or reimbursement and, if there are any other guarantors of the obligations, any right of contribution, and right to enforce any remedy which Lender now has or may hereafter have against Borrower, and any benefit of, and any right to participate in, any security now or hereafter received by Lender; (g) all presentments, diligence, demands for performance, notices of non-performance, notices delivered under the Loan Agreement or any Loan Document, protests, notice of dishonor, and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional obligations and notices of any public or private foreclosure sale; (h) the benefit of any statute of limitations to the extent permitted by law; (i) any appraisement, valuation, stay, extension, moratorium, redemption or similar law or similar rights for marshalling; (j) any right to be informed by Lender of the financial condition of Borrower or any other guarantor of the Obligations or any change therein or any other circumstances bearing upon the risk of nonpayment or nonperformance of the Obligations; and (k) the benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty, and agrees that the obligations of the Guarantor shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of guarantors. Guarantor has the

ability and assumes the responsibility for keeping informed of the financial condition of Borrower and any other guarantors of the Obligations and of other circumstances affecting such nonpayment and nonperformance risks. Without limiting the generality of any of the foregoing, Guarantor hereby waives any right to be reimbursed by Borrower or any other guarantor of the Obligations for any payment of the Obligations made directly or indirectly by Guarantor or from any property of Guarantor, whether arising by way of any statutory, contractual or other right of subrogation, contribution, indemnification or otherwise.

The obligations of the Guarantor hereunder shall not be released, diminished, impaired, reduced, dependent upon or affected by any one or more of the following: (i) the genuineness, validity, regularity or enforceability of, or the existence of any default with respect to, the Obligations, any security therefor, or any related instrument, documents, obligation, transaction or matter; (ii) the nature, extent, condition, value or continued existence of any security given in connection with the Obligations; (iii) any action or failure to take action by any holder of the Obligations under or with respect to this Guaranty or the obligations, any security therefor, or any related documents, transaction or matter; (iv) any other dealings between any holder of the obligations and Lender; (v) any exculpatory language or provisions limiting or restricting Lender's rights or remedies against Borrower under the Loan Documents; or (vi) any claim by or on behalf of Borrower of any credit or right of setoff with respect to the Note or any of the Obligations. This Guaranty is irrevocable and the Obligations of the Guarantor hereunder shall terminate and cease only at the time Lender receives payment in full of all of the Obligations or the Guarantor pays the Obligations to the full and maximum extent of its liability hereunder.

The Guarantor agrees that this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time, payment of the Obligations or any part thereof is rescinded or must otherwise be restored by Lender upon or as a result of the bankruptcy or reorganization of Borrower or otherwise. If after receipt of any payment of, or the proceeds of any collateral for, all or any part of the Obligations, Lender is compelled to surrender or voluntarily surrenders such payment or proceeds to any person because such payment or application of proceeds is or may be avoided, invalidated, recaptured or set aside as a preference, fraudulent conveyance, impermissible setoff, or for any other reason, whether or not such surrender is the result of: (i) any judgment, decree or order of any court or administrative body having jurisdiction over Lender; or (ii) any settlement or compromise by Lender of any claim as to any of the foregoing, with any person (including Borrower), then the Obligations or affected part thereof shall be reinstated and continue and this Guaranty shall be reinstated and continue in full force as to such Obligations or part thereof as if such payment or proceeds had not been received, notwithstanding any previous cancellation of any instrument delivered to evidence the satisfaction thereof. The provisions hereof shall survive the termination of this Guaranty and any satisfaction and discharge by the Borrower by virtue of any payment, court order, or any federal or state law.

7.  **Subordination**. Guarantor hereby subordinates any and all indebtedness of Borrower to Guarantor (the "Subordinated Obligations") to the prior indefeasible payment and performance of all Obligations. Guarantor agrees that Lender shall be entitled to receive payment of all Obligations

before Guarantor receives payment of any indebtedness of Borrower to Guarantor. Any payments on such indebtedness of Borrower to Guarantor, if Lender so requests, shall be collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Lender is authorized and empowered irrevocably (but without any obligation to so do), in its discretion, as attorney-in-fact (with such power being coupled with an interest and being irrevocable) for Guarantor or otherwise (a) in the name of Guarantor, to collect and enforce, and to submit claims in respect of, indebtedness of Borrower to Guarantor and to apply any amounts received thereon to the Obligations, and (b) to require Guarantor (i) to collect and enforce, and to submit claims in respect of, indebtedness of Borrower to Guarantor, and (ii) to pay any amounts received on such indebtedness to Lender for application to the Obligations. Guarantor hereby assigns to Lender all of Guarantor's rights to any payments to which Guarantor would be entitled under this Guaranty. Notwithstanding anything to the contrary set forth herein, Guarantor may receive and retain payments in respect of the Subordinated Obligations to the extent permitted by the Loan Agreement.

8.    **General Pledge; Setoff**.

(a)    **Pledge**. In addition to all liens upon and rights of setoff against the property of Guarantor given to Lender by law or separate agreement to secure the liabilities of Guarantor hereunder, to the extent permitted by law, Guarantor hereby grants to Lender a security interest in (i) all monies, deposit accounts, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender or its affiliate, whether held in a general or special account or deposit, or for safekeeping or otherwise and (ii) all payments received from any Person upon termination of a Primary Enterprise and Property Document, if any, or in settlement or as a result of any litigation with any Person that is party to a Primary Enterprise and Property Document. Lender shall have all rights and remedies of a secured party with respect to such property.

(b)    **Setoff**. In addition to any rights and remedies of Lender provided by law, Lender shall have the right, without prior notice to Guarantor, any such notice being expressly waived by Guarantor to the extent permitted by applicable law, upon the occurrence and during the continuance of a Default or an Event of Default, to set-off and apply against the Obligations, whether matured or unmatured, any amount owing from Lender or its affiliates to Guarantor, including all deposits, accounts and moneys of Guarantor then or thereafter maintained with Lender, at or at any time after, the happening of any of the above mentioned events.

(c)    **Nonwaiver**. No security interest or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender or by any failure to exercise such right of setoff or to enforce such security interest, or by any delay in so doing; and every right of setoff and security interest shall continue in full force and effect until such right of setoff or security interest is specifically waived or released by an instrument in writing executed by Lender.

9.   **General Limitations and Contribution Rights**. (a) If the Obligations are now or hereafter guaranteed by more than one Person (whether pursuant to this Guaranty or any other instrument), each such Person shall be deemed for purposes of this Section 9 to be a "Guaranty Obligor." Each Guaranty Obligor which is a party to this Guaranty hereby agrees that if any Guaranty Obligor shall become an Excess Funding Guarantor (as defined below) by reason of the payment by such Guaranty Obligor of any of the Obligations, each other Guaranty Obligor shall, on demand of such Excess Funding Guarantor (but subject to the next sentence), pay to such Excess Funding Guarantor an amount equal to such Guaranty Obligor's Pro Rata Share (as defined below and determined, for this purpose, without reference to the assets, debts and liabilities of such Excess Funding Guarantor) of the Excess Payment (as defined below) made by such Excess Funding Guarantor in respect of such Obligations. The payment obligation of a Guaranty Obligor to any Excess Funding Guarantor under this Section 9(a) shall be subordinate and subject in right of payment to the prior payment in full of the obligations of such Guaranty Obligor under the other provisions of this Guaranty and such Excess Funding Guarantor shall not exercise any right or remedy with respect to such excess until payment and satisfaction in full of all of such Obligations. For purposes of this Section 9(a), (i) "Excess Funding Guarantor" shall mean, in respect of any of the Obligations, a Guaranty Obligor that has paid an amount in excess of its Pro Rata Share of such Obligations, (ii) "Excess Payment" shall mean, in respect of any Obligations, the amount paid by an Excess Funding Guarantor in excess of its Pro Rata Share of such Obligations, and (iii) "Pro Rata Share" shall mean, for any Guaranty Obligor, the lesser of (1) the ratio (expressed as a percentage) of (x) the amount by which the aggregate fair saleable value of all assets of such Guaranty Obligor (excluding any shares of stock of any other Guaranty Obligor) exceeds the amount of all the debts and liabilities of such Guaranty Obligor (including contingent, subordinated, unmatured and unliquidated liabilities, but excluding the obligations of such Guaranty Obligor hereunder and any obligations of any other Guaranty Obligor that have been guaranteed by such Guaranty Obligor) to (y) the amount by which the aggregate fair saleable value of all assets of the Borrower and all of the Guaranty Obligors exceeds the amount of all the debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities, but excluding the obligations of the Guaranty Obligors hereunder) of the Borrower and all of the Guaranty Obligors as of the date hereof or (2) the percentage of Equity Securities of the Borrower owned or controlled (whether directly or indirectly) by such Guaranty Obligor. If any entity becomes a Guaranty Obligor hereunder subsequent to the date hereof, then for purposes of this Section 9(a) such subsequent Guaranty Obligor shall be deemed to have been a Guaranty Obligor as of the date hereof and the aggregate present fair saleable value of its assets and the amount of the debts and liabilities, of such Guaranty Obligor as of the date hereof shall be deemed to be equal to such value and amount on the date such Guaranty Obligor becomes a Guaranty Obligor hereunder.

(b)   In any action or proceeding involving any state corporate law, or any state or Federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guaranty Obligor under the terms of this Guaranty would otherwise, taking into account the provisions of Section 9(a) hereof, be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under the terms of this Guaranty, then, notwithstanding any other provision hereof to the

contrary, the amount of such liability shall, without any further action by such Guaranty Obligor, Lender or any other person or entity, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

10.    **Miscellaneous**.

(d)    **Notices**. Except as otherwise provided herein, all notices, requests, demands, consents, instructions or other communications to or upon Lender or Guarantor under this Guaranty shall be in writing and sent by facsimile transmission, mailed or delivered to each party at its facsimile number or address set forth below (or to such other facsimile number or address for any party as indicated in any notice given by that party to the other party). All such notices and communications shall be effective (i) when sent by Federal Express or other overnight service of recognized standing, on the Business Day following the deposit with such service; (ii) when mailed, first class postage prepaid and addressed as aforesaid through the United States Postal Service, upon receipt; (iii) when delivered by hand, upon delivery; and (iv) when sent by facsimile transmission, upon confirmation of receipt.

Lender:    LEHMAN BROTHERS HOLDINGS INC.,
           d/b/a LEHMAN CAPITAL, A DIVISION OF
           LEHMAN BROTHERS HOLDINGS INC.,
           a Delaware corporation
           3 World Financial Center
           New York, New York 10285-0900
           Attention:    Ms. Allyson V. Bailey
           Telephone:    (212) 526-5849
           Facsimile:    (212) 526-7423

Guarantor:    AS SET FORTH ON THE INFORMATION SCHEDULE

(e)    **Amendments and Waivers**. This Guaranty may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by Guarantor and Lender. No failure or delay on Lender's part in exercising any right hereunder shall operate as a waiver thereof or of any other right nor shall any single or partial exercise of any such right preclude any other further exercise thereof or of any other right. Unless otherwise specified in any such waiver or consent, each waiver or consent under any provision hereof shall be effective only in the specific instance and for the purpose for which given.

(f)    **Assignments**. This Guaranty shall be binding upon and inure to the benefit of Lender, all future holders of the Note and their respective successors and assigns. Guarantor may not sell, assign or delegate any of its rights or obligations hereunder, but Guarantor's obligations hereunder shall be binding upon Guarantor and Guarantor's heirs, executors, administrators, successors and assigns. This Guaranty is assignable by Lender with the Obligations which it

guarantees and when so assigned, the Guarantor shall be bound to the assignees without in any manner affecting Guarantor's liability hereunder for any part of the obligations retained by Lender. The obligations and liability of Guarantor hereunder and the validity and enforceability of this Guaranty shall not be terminated, impaired or otherwise affected by reason of the transfer of any Business or any part thereof or interest therein to any other Person.

(g)    **Cumulative Rights, etc.**  The rights, powers and remedies of Lender under this Guaranty shall be in addition to all rights, powers and remedies given to Lender by virtue of any applicable law, rule or regulation of any governmental authority, the Loan Agreement, any other Loan Document or any other agreement, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently without impairing Lender's rights hereunder.

(h)    **Payments Free of Taxes, etc.**  All payments made by Guarantor under this Guaranty shall be made by Guarantor free and clear of and without deduction for any and all present and future taxes, levies, charges, deductions and withholdings.  In addition, Guarantor shall pay upon demand any stamp or other taxes, levies or charges of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Guaranty.  Upon request by Lender, Guarantor shall furnish evidence satisfactory to Lender that all requisite authorizations and approvals by, and notices to and filings with, governmental authorities and regulatory bodies have been obtained and made and that all requisite taxes, levies and charges have been paid.

(i)    **Partial Invalidity**.  If at any time any provision of this Guaranty is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction neither the legality, validity or enforceability of the remaining provisions of this Guaranty nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(j)    **Governing Law**.  This Guaranty shall be governed and controlled by the internal laws of the Governing Law State (as such term is defined in the Loan Agreement) as to interpretation, enforcement, validity, construction, effect, and in all other respects.  To induce Lender to accept this Guaranty, Guarantor irrevocably agrees that, at Lender's sole and absolute election, all legal and other proceedings of any kind arising out of or related to this Guaranty shall be litigated in courts having situs in the Governing Law State.  Guarantor hereby consents and submits to the jurisdiction of any local, state or federal courts located within the Governing Law State.  Guarantor hereby waives any right it may have to transfer or change the venue of any legal or other proceeding brought against such person by Lender in accordance with this subsection.

(k)    **Jury Trial.  EACH OF GUARANTOR AND LENDER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT.**

(l)   **Costs**.  Guarantor shall pay all costs incurred by Lender in connection herewith, including, but not limited to, reasonable attorneys' fees, and all other costs and expenses associated with court and/or administrative proceedings through the appellate level, incurred by reason of any action, suit, proceeding, hearing, motion or application before any court or administrative body in which Lender may be or become a party by reason of this Guaranty, including but not limited to condemnation, bankruptcy and administrative proceedings, as well as any other of the foregoing where a proof of claim is by law required to be filed, or in which it becomes necessary to defend or uphold the terms hereof (the "Costs"), in the event that (a) there shall occur any default under this Guaranty; (b) Lender is made party to any litigation merely because of the existence of this Guaranty; (c) it becomes necessary, by reason of acts or omissions of Guarantor for Lender to seek the advice of counsel with respect to this Guaranty; or (d) it becomes necessary for Lender to seek the advice of or retain counsel by reason of any request of Guarantor.  Said Costs shall be paid in addition to the amounts guaranteed in accordance with the provisions hereof.

(m)   **Counterparts**.  This Guaranty may be executed in one or more counterparts.

(n)   **Liability**.  If more than one Person has executed this Guaranty, or if Guarantor consists of more than one Person, the liabilities and obligations of all such persons under this Guaranty shall be joint and several.

**[NO FURTHER TEXT ON THIS PAGE]**

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the day and year first above written.

WITNESS

_____

_____

_____

_____

_____
JAMES W. JACKSON, JR.

_____
ROBERT WARREN JACKSON

_____
SAM J. CARROLL, III

_____
BEN F. BEARD

ACKNOWLEDGMENT

State of  Alabama    )

                                           ss:

County of Houston   )

On the _22n_day of March in the year 2000 before me, the undersigned, personally appeared JAMES W. JACKSON, JR., personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of _Dothan_____, State of __Alabama_____.


_____

Signature and Office of Individual
taking acknowledgment
My Commission Expires: 1/15/03

State of  Alabama    )

                                           ss:

County of _Houston_)

On the _22_ day of March in the year 2000 before me, the undersigned, personally appeared ROBERT WARREN JACKSON, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of __Dothan_____, State of _Alabama_____.


_____

Signature and Office of Individual
taking acknowledgment
My Commission Expires: 1/15/03

State of  Alabama     )
                                    ss:
County of Houston  )

On the _22_ day of March in the year 2000 before me, the undersigned, personally appeared SAM J. CARROLL, III, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of  Dothan  , State of  Alabama  .


_____
Signature and Office of Individual
taking acknowledgment
 My  Commission  Expires: 1/15/03


State of    Alabama   )
                                    ss:
County of __Houston )

On the  _22_ day of March in the year 2000 before me, the undersigned, personally appeared BEN F. BEARD, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of  Dothan  , State of  Alabama  .


_____
Signature and Office of Individual
taking acknowledgment
My  Commission  Expires: 1/15/03


[TPW: WP01·2148498.1] 18576-00123 03·14·00 01·31PM

## INFORMATION SCHEDULE TO GUARANTY

| Name of Guarantor(s) | Guarantor's Address for Notices | Guarantors' Affiliation with Borrower |
|---|---|---|
| James W. Jackson, Jr. | 3507 Thomas Avenue<br>Montgomery, Alabama 36111 | Holder of Equity Securities in member of Borrower |
| Robert Warren Jackson | 3960 Wiley Road<br>Montgomery, Alabama 36106 | Holder of Equity Securities in member of Borrower |
| Sam J. Carroll, III | 706 Squirrel Drive<br>Ozark, Alabama 36360 | Holder of Equity Securities in member of Borrower |
| Ben F. Beard | 503 Forrest Circle<br>Troy, Alabama 36081 | Holder of Equity Securities in member of Borrower |

Name of Borrower:     PROMARKETING, L.L.C.

Loan Amount:          $4,519,000.00

## SCHEDULE OF TRIGGER EVENTS

(a)     Proceeds paid to any Loan Party, any Guarantor, or any Affiliate of any of the foregoing or to any other Person at the direction of, or with the acquiescence of, any Loan Party, any Guarantor, or any Affiliate of any of the foregoing under any insurance policies (or paid as a result of any other claim or cause of action against any person or entity) by reason of damage, loss or destruction to, or proceeds or awards resulting from a condemnation of, all or any portion of any of the Collateral and Properties (i) which, under the terms of the Loan Documents, should have been delivered to Lender are not delivered to Lender, in which case the obligations of the Guarantor shall be equal to the sum not so delivered, or (ii) which, under the terms of the Loan Documents, should have been used to reconstruct or rebuild the applicable Collateral and Properties affected by the casualty are not so used due to the intentional misconduct or gross negligence of any Loan Party, any Guarantor or any Affiliate of any of the foregoing, in which case the obligations of the Guarantor shall be equal to the sum not so used;

(b)     Rents, issues, profits and revenues of all or any portion of any Collateral and Properties received by any Loan Party, any Guarantor, or any Affiliate of any of the foregoing or by any other Person at the direction of, or with the acquiescence of, any Loan Party, any Guarantor, or any Affiliate of any of the foregoing, received or applicable to a period after the occurrence of any Event of Default or any event which with notice or the passage of time, or both, would constitute an Event of Default, are not either applied to the ordinary and necessary expenses of owning and operating the Collateral and Properties or paid to Lender, in which case the obligations of the Guarantor shall be equal to the sum not so applied or paid to Lender, as the case may be;

(c)     Material waste is committed or permitted on any Collateral and Properties by, or material damage is caused to any Collateral and Properties as a result of the intentional misconduct or gross negligence of, Guarantor, Borrower, any other Loan Party or any of their principals, general partners or members, in which case the obligations of the Guarantor shall be equal to the cost of repairs necessitated by such waste or damage, or any removal of Collateral in violation of the terms of the Loan Documents occurs, in which case the obligations of the Guarantor shall be equal to the value of such removed Collateral, or the Guarantor, the Borrower or any other Loan Party or any of their Affiliates engages in the unauthorized relocation of any of the Enterprises, in which case the obligations of the Guarantor shall be equal to the greater of the value of such Enterprise and the Loan Party's interest in the corresponding Property (x) as set forth in the valuation therefor obtained by Lender in connection with the closing of the Loan, or (y) as set forth in a valuation obtained by Lender, at Guarantor's expense, with respect thereto based upon the operation thereof prior to such unauthorized relocation;

(d)     Failure by Borrower or any other Loan Party to pay any valid taxes, assessments, mechanic's liens, materialmen's liens or other liens which could create liens on any portion of any Collateral and Properties (the "Unauthorized Lien") which would be superior to the lien or security title of the Real Property Security Instrument(s) or the other Loan Documents, in which case the obligations of the Guarantor shall be equal to the amount required to fully repay the obligation giving rise to the Unauthorized Lien and discharge the Unauthorized Lien, except, with

respect to any such taxes or assessments, to the extent that funds have been deposited with Lender pursuant to the terms of the Real Property Security Instrument(s) specifically for the applicable taxes or assessments and not applied by Lender to pay such taxes;

(e)    Borrower or the other Loan Parties shall fail to comply with, perform or honor any obligations and indemnities of Borrower or the other Loan Parties under the Loan Documents relating to hazardous or toxic substances or compliance with environmental laws and regulations or failure to comply with environmental laws or regulations, in which case the obligations of Guarantor shall be equal to the amount required to cause such compliance, performance or honor, as the case may be;

(f)    Fraud or material misrepresentation at any time, or failure to disclose at or prior to the closing of the Loan a material fact, by Borrower, any other Loan Party, or any Guarantor or any of their principals, officers, general partners or members, or any agent, employee or other person authorized to make statements, representations or disclosures on behalf of Borrower or any other Loan Party or any Guarantor, any principal, officer, partner or members, of Borrower, or any other Loan Party or any Guarantor;

(g)    Borrower or any other Loan Party shall make any Distribution in violation of the provisions of the Loan Agreement, in which case the obligations of the Guarantor shall be equal to the amount of such Distribution;

(h)    Borrower, any Loan Party or any Guarantor shall commit any intentional act which prevents, delays or hinders Lender's perfection of Lender's interest in the Collateral or Properties or shall voluntarily encumber the Collateral or Property or any material part thereof or interest therein by a lien or encumbrance that is not a Permitted Lien;

(i)    The Guarantor, the Borrower or any other Loan Party or their equity owners or affiliates (i) files, initiates or consents to the filing of a voluntary petition on behalf of or with respect to the Borrower or any other Loan Party or any of such parties files or takes any action seeking or intended to initiate the filing of an involuntary petition on behalf of or with respect to the Borrower or any other Loan Party under any chapter of the Federal Bankruptcy Code, or in any manner seeks relief under the insolvency laws of any state or jurisdiction or the appointment of a trustee, receiver, conservator or liquidator for all or any part of Borrower's or any other Loan Party's properties and assets; (ii) voluntarily seeks, causes or takes any action to effect a dissolution or liquidation of the Borrower or any other Loan Party; (iii) consents to, initiates or institutes or makes any claim or proceeding that seeks or is intended to result in consolidating or otherwise causing the Borrower, or any other Loan Party or any of their properties or assets to become subject to any other Person's case, action or proceeding under the insolvency laws of any state or jurisdiction, or the Collateral or Property, or any portion thereof or interest therein, to be included in any other Person's bankruptcy estate or otherwise subject to the claims of creditors of any other Person, the property of any bankruptcy estate or becomes subject to any proceeding under any insolvency laws of any state or other jurisdiction; or (iv) objects to a motion by Lender for relief from any stay or injunction from

[TPW_WP01_2148498_1]_18576-00123_03_14_00_01_51PM]

the foreclosure of the Real Property Security Instrument or any other remedial action permitted under the Note, the Loan Agreement or the other Loan Documents;

(j)    Failure by the Borrower to use the proceeds of the Loan for the purposes described in Exhibit I of the Loan Agreement.

(k)    The conviction of any Guarantor of a felony or crime of moral turpitude provided that in the case of a crime of moral turpitude, the same shall have been committed in connection with the operation of the Enterprises or shall otherwise have a material adverse effect on the value of the Collateral, Properties or Enterprises.

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
---------------------------------------------------------- *
BEN F. BEARD,                                               *
                                                           *
              Plaintiff,                                   *
                                                           *
vs.                                                        *
                                                           *      Civil Action No:
                                                           *         2:06-CV-653-A
LEHMAN BROTHERS HOLDINGS INC.,                              *
d/b/a LEHMAN CAPITAL, PETER R. KERN,                        *
OAK ASSET MANAGEMENT, LLC,                                  *
MIDLAND LOAN SERVICES, INC.,                                *
JOLLY ROGER, LLC, JOLLY ROGER I, INC.,                      *
CAPITAL SEVEN RECOVERY, LLC,                                *
PETER FAHEY, LARRY W. CARLSON,                              *
                                                           *
              Defendants.                                  *
---------------------------------------------------------- *
```

MEMORANDUM OF LAW OF DEFENDANTS
LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL,
PETER R. KERN, OAK ASSET MANAGEMENT, LLC,
AND MIDLAND LOAN SERVICES, INC.,
IN SUPPORT OF THEIR MOTION TO TRANSFER VENUE

Pursuant to 28 U.S.C. § 1404(a), defendants Lehman Brothers Holdings Inc. ("Lehman"),

Midland Loan Services, Inc., Oak Asset Management, LLC, and Peter R. Kern (collectively,

"Defendants") respectfully submit this memorandum of law in support of their Motion to

Transfer Venue to the United States District Court for the Southern District of New York.

Plaintiff Ben F. Beard chose to enter into dozens of loan-related agreements with Lehman, each

containing a forum selection clause specifying that any and all disputes "arising out of or related

to" those agreements would be resolved under New York law in a New York court.  Plaintiff

now attempts to circumvent the agreed-upon forum by filing claims relating to the agreements in Alabama. Pursuant to binding Eleventh Circuit law -- which holds that forum selection clauses generally should be enforced (except in "rare" or "exceptional" circumstances not present here) -- Plaintiff should be required to submit to his contractually chosen forum.

## FACTUAL BACKGROUND

This action was commenced by Plaintiff in the Circuit Court of Pike County, Alabama, on June 14, 2006. On July 21, 2006, all named defendants removed the action to this Court on the ground of diversity under 28 U.S.C. § 1332. Solely for purposes of this motion, the allegations contained in the complaint are accepted as true.

Plaintiff is the sole member of ProMarketing, LLC ("ProMarketing"), an Alabama corporation that owns and operates convenience stores. (*See* Affidavit of Michael E. Jones ("Jones Aff."), Ex. A, Compl. ¶¶ 1, 41) Defendant Lehman loaned money to ProMarketing for the financing of those stores. (*Id.* ¶ 13) Subsequently, Lehman entered into negotiations to transfer its rights under the loan documents to non-party American International Group, Inc. ("AIG"). (*Id.* ¶ 19)

At the heart of Plaintiff's case is an allegation that Lehman breached an agreement with ProMarketing that provided that ProMarketing would be "at the table" during Lehman's negotiations with AIG, so that ProMarketing would be able to negotiate with AIG a refinancing of its loan. (*Id.* ¶ 20) All of the controlling documents with respect to the loan were signed by Plaintiff, and all of them contain forum selection clauses designating New York courts as the venue for any related disputes.

There are three categories of loan-related documents. First, the loan was evidenced by five separate Loan and Security Agreements ("Loan Agreements"). Second, as security for the loans, ProMarketing gave Lehman five Promissory Notes promising to repay the loan amounts

2

and mortgages. Third, as additional security for each of the five loans, Plaintiff personally guaranteed the repayment of the loan amounts and executed Guaranty agreements in his individual capacity ("Guaranties").

The Loan Agreements and Promissory Notes (collectively with the Guaranties, the "Agreements") each contain forum selection and choice of law clauses. These clauses specify that as an inducement to Lehman's acceptance of the Loan Agreements and Promissory Notes, the documents would be governed by New York law and "all legal or other proceedings of any kind arising out of or related to" them would be brought in a court located in New York City. *See* Jones Aff., Exs. B and C. Likewise, Plaintiff irrevocably agreed that each of his Guaranties would be governed by New York law and that "all legal and other proceedings of any kind arising out of or related to this Guaranty shall be litigated in courts having situs in the Governing Law State [*i.e.*, New York]"). *See* Jones Aff., Ex. D at p. 9.

Plaintiff is attempting to avoid his promises by attempting to litigate these claims outside the agreed-upon forum. He should be held to the Agreements and this case should be transferred to the Southern District of New York.

## ARGUMENT

Defendants bring this motion pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a) (2006). Under controlling Eleventh Circuit law, transfer of venue to the Southern District of New York is required in this action because Plaintiff explicitly agreed that disputes arising out of or relating to the Agreements would be brought in New York. The other factors considered on transfer motions also weigh in favor of transfer to New York.

## I.  PLAINTIFF CANNOT MEET HIS SUBSTANTIAL BURDEN TO SHOW WHY THE COURT SHOULD NOT ENFORCE THE FORUM SELECTION CLAUSES

Plaintiff has a weighty burden on this motion.  As the Eleventh Circuit has stated, "[t]he burden is on the party opposing the enforcement of the forum selection clause [*i.e.*, Plaintiff here] to show that the contractual forum is sufficiently inconvenient to justify retention of the dispute."  *P&S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) (citation omitted).  Parties such as Plaintiff should not be accorded any deference with respect to their filing forum -- and have the burden of proof -- because "such deference to the filing forum would only encourage parties to violate their contractual obligations, the integrity of which are vital to our judicial system."  *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989).

Moreover, Plaintiff's burden to overcome the contractually-agreed upon forum is nearly insurmountable.  The Eleventh Circuit, relying upon Supreme Court precedent, has stated that "venue mandated by a choice of forum clause rarely will be outweighed by other factors."  *Ricoh*, 870 F.2d at 573.  Put another way, "a valid forum selection clause [should be] given controlling weight in all but the most exceptional cases."  *Id.* at 573 n.6 (brackets in original; quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1998) (Kennedy, J., concurring)); *see E&H Steel Contracting, Inc. v. Turner Const. Co.*, No. 1:05-cv-1135-MEF, 2006 WL 1731153, at *4 (M.D. Ala. June 23, 2006) (transferring case to Southern District of New York); *Skyline Steel Corp. v. RDI/Caesars Riverboat Casino, LLC*, 44 F. Supp. 2d 1337, 1338 (N.D. Ala. 1999) (stating that "the law of the Eleventh Circuit is that forum selection clauses are virtually impossible to overcome by an application of the general principles of forum non conveniens").

There can be no doubt that the forum selection clauses here are valid.  Plaintiff has not alleged in his complaint that duress or fraud caused him to agree to those clauses.  *See Ricoh*, 870 F.2d at 573-74; *E&H Steel*, 2006 WL 1731153, at *4.  Further, Plaintiff is bound by those

forum selection clauses with respect to claims that he asserts both individually and as the sole member of ProMarketing LLC (*see, e.g.*, Compl. ¶¶ 46, 62, 66), since he agreed to the forum selection clauses in both capacities.

Also beyond challenge is that this lawsuit falls within the scope of the forum selection clauses. The complaint, by its express terms, centers on Lehman's transfer of its rights concerning the loans. *See, e.g.,* Compl. ¶¶ 20, 23, 31. Thus, Plaintiff's claims do "arise out of or relate to" all three categories of loan-related documents -- the Loan Agreements, Promissory Notes, and Guaranties. Pursuant to Plaintiff's contractual agreements, this case should be transferred to the Southern District of New York.

## II.    OTHER FACTORS ALSO REQUIRE TRANSFER TO THE SOUTHERN DISTRICT OF NEW YORK

As noted above, the Eleventh Circuit enforces forum selection clauses in all but "rare" or "exceptional" circumstances. *See supra* at 4; *Stewart v. Dean-Michaels Corp.*, 716 F. Supp. 1400, 1403 (N.D. Ala. 1989) (finding "impressive pro-Alabama forum facts," such as the locations of witnesses and the relative financial abilities of the parties, did not negate forum selection clause); *Skyline Steel Corp.*, 44 F. Supp. 2d at 1338 (enforcing forum selection clause notwithstanding "severe inconvenience" to Alabama plaintiff). Nonetheless, even if this Court were to consider § 1404(a) factors other than the forum selection clause, those factors also would require transfer of this case.

Other factors include "the plaintiff's initial choice of forum; the convenience of the parties; the convenience of the witnesses; the relative ease of access to sources of proof; the availability of compulsory process for witnesses; the location of relevant documents; the financial ability to bear the cost of the change; and trial efficiency." *See Gould v. Nat'l Life Ins. Co.*, 990 F. Supp. 1354, 1357-58 (M.D. Ala. 1998).

The most important factor is the convenience of the witnesses. *See Lasalle Bank v. Mobile Hotel Props.*, 274 F. Supp. 2d 1293, 1301 (S.D. Ala. 2003). Here, there can be no doubt that New York would be a more convenient forum for the parties and their witnesses. Most of the defendants are located in and around New York City. Mr. Kern and Mr. Fahey are individuals who reside in the New York area. Lehman has its principal place of business in New York. Oak Asset Management, LLC has its principal place of business in New Jersey. Capital Seven Recovery, LLC and Jolly Roger I, Inc. (n/k/a Jolly Roger LLC) have members (or members of members) who are citizens of New York.

The location of the parties and their witness in the New York area also means that New York will be a relatively easy place to get access to sources of proof and the relevant documents. Another factor in favor of transfer is Plaintiff's contractual agreement that his claims are governed by New York law. *See Insuracorp, Inc. v. Am. Fid. Assurance Co.*, 914 F. Supp. 504, 506 (M.D. Ala. 1996) (stating, as a practical matter, a district court located in Oklahoma and routinely applying Oklahoma law "can more appropriately apply such law than a district court located in another state"). In sum, even if the Court were to consider factors other than the dispositive forum selection clause, New York still would be a more convenient forum and transfer of the action would serve the interest of justice.[1]

---

[1] By making this motion, Defendants do not waive any defenses that they may have, including, but not limited to, lack of personal jurisdiction and improper service.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their

motion and transfer this case to the Southern District of New York.


/s/ Terry L. Butts
Terry L. Butts (BUT009)
P. O. Drawer 272
Luverne, Alabama 36049
(334) 335-2262




/s/ Michael E. Jones
Michael E. Jones (JON039)
Jones & Coots, LLC
P. O. Box 367
Luverne, Alabama 36049
(334) 335-6534

Attorneys for Defendants
Lehman Brothers Holdings Inc.
d/b/a Lehman Capital, Peter R. Kern,
Oak Asset Management, LLC, and
Midland Loan Services, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following:

Lee R. Benton, Esq.
C. Steven Ball, Esq.
Benton & Centeno, LLP
2019 Third Avenue North
Birmingham, Alabama 35203

by placing a copy of the same properly addressed, postage prepaid in the United States Mail, first class delivery this 1st day of August, 2006.

/s/ Michael E. Jones_____
Of Counsel